**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. <u>1:21-cv-1261</u>

MILLENNIUM FUNDING, INC.,
LHF PRODUCTIONS, INC.,
HUNTER KILLER PRODUCTIONS, INC.
OUTPOST PRODUCTIONS, INC.,
EVE NEVADA, LLC, and
VOLTAGE HOLDINGS, LLC.

       Plaintiffs,

v.

SHARKTECH, INC., and
TIM MOUHIEDDINE TIMRAWI,

       Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiffs MILLENNIUM FUNDING, INC., LHF PRODUCTIONS, INC., HUNTER KILLER PRODUCTIONS, INC, OUTPOST PRODUCTIONS, INC., EVE NEVADA, LLC. and VOLTAGE HOLDINGS, LLC, ("Plaintiffs") file this Complaint against Defendants SHARKTECH, INC. and TIM MOUHIEDDINE TIMRAWI ("Defendants") and allege as follows:

## I.    NATURE OF THE ACTION

1.    This matter arises under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act").

2.    The Plaintiffs allege that Defendants are secondarily liable for: (a) direct

20-023W

copyright infringement in violation of 17 U.S.C. §§ 106 and 501; and (b) violations under the Digital Millennium Copyright Act, 17 U.S.C. § 1202.

## II.    JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et. seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition).

4.     Defendants solicit, transact, and/or do business within this jurisdiction, and have committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that their acts would cause injury in this jurisdiction.   As such, Defendants have sufficient contacts with this judicial district to permit the Court's exercise of personal jurisdiction over them.

5.     Defendants operate a data center in Denver, Colorado.   *See* https://sharktech.net/data-centers/denver/ [last accessed on May 4, 2021] ("Sharktechs Denver, CO services are located at H5s data center campus, which is found within the heart of the citys technology sector.")

6.     Plaintiffs' injuries arise out of Defendants' forum-related activities, namely Defendants' contribution to infringements of Plaintiffs' Works and DMCA violations at IP addresses controlled by Defendants in this District.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) - (c) because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; (b) the Defendants can or could be found, in this District; and/or (c) Defendants are subject to the court's personal jurisdiction with respect to the present

2

action.  Additionally, venue is proper in this District pursuant 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendants or Defendants' agents reside and can be found in this District.

### III.    PARTIES

#### A.   The Plaintiff

8.      Each of Plaintiffs LHF Productions, Inc. ("LHF"), Millennium Funding, Inc. ("Millennium"), Hunter Killer Production, Inc. ("Hunter Killer") and Outpost Productions, Inc. ("Outpost") is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media, a production company and distributor of a notable catalog of major motion pictures.

9.      LHF is the owner of the copyrights for the screen play and motion picture in *London Has Fallen*, a major motion picture released in 2016 and the sequel to the successful 2013 theatrical release *Olympus Has Fallen*.

10.     *London Has Fallen* features Gerard Butler, Morgan Freeman, Aaron Eckhart and Angela Basset, and tells the story of Secret Service Agent Mike Banning (Gerald Butler) being caught up in a plot to assassinate all the attending world leaders while he is in London for the Prime Minister's funeral.

11.     Millennium is the owner of the copyrights for the screen play and motion picture in *Angel Has Fallen*, a major motion picture released in 2019 and the sequel to *London Has Fallen*

12.     *Angel Has Fallen* features Gerard Butler, Frederick Schmidt and Danny Huston, and tells the story of Secret Service Agent Mike Banning (Gerald Butler)

3

wrongfully accused and taken into custody after an assassination attempt on U.S. President Allan Trumbull, his trusted confidant. After escaping from capture, he becomes a man on the run and must evade his own agency and outsmart the FBI in order to find the real threat to the President.  Desperate to uncover the truth, Banning turns to unlikely allies to help clear his name, keep his family from harm and save the country from imminent danger.

13.     Hunter Killer is the owner of the copyrights for the screen play and motion picture in *Hunter Killer*, a major motion picture released in 2018 and starring Gerard Butler, Gary Oldman, Common, and Linda Cardellini.  *Hunter Killer* tells the story of American submarine Captain Joe Glass on the hunt for a U.S. submarine in distress when he discovers a secret Russian coup which threatens to dismantle the world order.

14.     Outpost is the owner of the copyrights for the screen play and motion picture in the 2019 movie *The Outpost* featuring Scott Eastwood, Caleb Landry Jones, Orlando Bloom.  *The Outpost* tells the story of a small team of U.S. soldiers' battle against hundreds of Taliban fighters in Afghanistan.

15.     Each of Plaintiffs Voltage Holdings, LLC ("Voltage") and Eve Nevada, LLC ("Eve") is a limited liability company registered under the laws of the State of Nevada, has principal offices in Los Angeles, California and is an affiliate of Voltage Pictures, a production company with a notable catalog of major award-winning motion pictures.

16.     Eve is the owner of the copyrights in the 2020 action movie *Ava* featuring Jessica Chastain, Colin Farrell, John Malkovich and Common. *Ava* tells the story of a deadly assassin, traveling the globe specializing in high profile hits who is forced to fight

4

for her own survival when a job goes wrong.

17.     Voltage is the owner of the copyright for *Extremely Wicked, Shockingly Evil, and Vile*, a major motion picture released in May of 2019 that tells the story of how a courtroom frenzy ensues and sweeps 1970s America when a young single mother reluctantly tips the attention of a widespread manhunt toward her longtime boyfriend, Ted Bundy.

### B.   The Defendants

18.     Defendant Sharktech, Inc. ("Sharktech") is, upon information and belief, a corporation organized under the laws of Montana with its principal place of operation in Henderson, Nevada.

19.     Sharktech operates data centers in Los Angeles, Denver, Chicago and Amsterdam.

20.     Sharktech provides servers, colocation and DDoS protection at its data centers.

21.     Sharktech is a member of The American Registry of Internet Numbers ("ARIN"), which is a nonprofit, member-based organization that manages and distributes Internet number resources such as IP addresses and Autonomous System Numbers.

22.     ARIN manages these resources within its service region, which is comprised of Canada, the United States, and many Caribbean and North Atlantic islands.

23.     Sharktech is required to update the WHOIS records for the IP addresses it reassigns or reallocates to its subscribers per its registration agreement with ARIN.

24.     Defendant TIM MOUHIEDDINE TIMRAWI ("Timrawi") is an adult male

20-023W

residing, upon information and belief, in Henderson, Nevada.

25.     Timrawi is the president, treasurer and director of Sharktech.

26.     Non-party Erin Timrawi is the secretary of Sharktech.  Upon information and belief Erin Timrawi is the wife of Timrawi.

27.     Timrawi closely holds Sharktech.

28.     The principal office of Sharktech is Timrawi's home in Henderson, Nevada.

29.     Upon information and belief, Timrawi controls Sharktech by owning and/or controlling fifty percent or more of the voting rights.

30.     Timrawi has completely disregarded corporate formalities of Sharktech.

31.     Timrawi effectively makes all policy decisions for Sharktech, specifically including any policy regarding copyright infringement. Upon information and belief, Timrawi directed Sharktech's response to allegations of copyright infringement by Sharktech's subscribers, including the decisions not to terminate repeat copyright infringers and to ignore notices of copyright infringement.

32.     Upon information and belief, Timrawi so dominates Sharktech that it has become merely the alter ego to Timrawi.

33.     There is such a unity of interest between Timrawi and Sharktech that the individuality, or separateness, of Sharktech and Timrawi has ceased and the facts are such that an adherence to the fiction of the separate existence of Timrawi and Sharktech would, under the particular circumstances, sanction a fraud or promote injustice.

34.     Timrawi controls, participates in, exercises control over, or benefits from the infringements of Sharktech as discussed below.

20-023W

## IV. JOINDER

35.     Pursuant to Fed. R. Civ. P. 20(a)(1), each of the Plaintiffs are properly joined because, as set forth in detail above and below, the Plaintiffs assert: (a) a right to relief arising out of the same transaction, occurrence, or series or transactions, namely (i) the use of Sharktech's services by its subscribers for infringing the copyrights in Plaintiffs' Works, (ii) the contribution to said copyright infringements by Sharktech, (iii); and (b) that there are common questions of law and fact.

36.     Pursuant to Fed. R. Civ. P. 20(a)(2), each of the Defendants was properly joined because, as set forth in more detail below, the Plaintiffs assert that the contributory infringements complained of herein by each of the Defendants (a) arises out of the same transaction, occurrence, or series of transactions or occurrences, and (b) there are common questions of law and fact.

37.     Plaintiffs assert a right of relief against the Defendants jointly and severally.

## V. FACTUAL BACKGROUND

### A. The Plaintiffs Own the Copyrights to the Works

38.     The Plaintiffs are the owner of the copyrights in the motion pictures ("Works") as shown in Exhibit "1". The Works are the subjects of copyright registrations, and this action is brought pursuant to 17 U.S.C. § 411.

39.     Defendants had notice of Plaintiffs' rights through at least the credits indicated in the content of the motion pictures which bore proper copyright notices.

40.     Defendants also had notice of Plaintiffs' rights through general publication

20-023W

and advertising associated with the motion pictures, and packaging and copies, each of which bore a proper copyright notice.

41.     Defendants also had notice of Plaintiffs' rights through notices that were sent to Sharktech's abuse contact.

42.     The Works are motion pictures currently offered for sale in commerce.

**B. Sharktech's subscribers Infringe Plaintiffs' Copyrights.**

43.     Sharktech's subscribers include the service provider Tzulo, Inc. ("Tzulo") and Virtual Private Network ("VPN") providers such as Private Internet Access, Inc. ("PIA"), Express VPN International Ltd. ("ExpressVPN") and Pango, Inc. ("Pango").

44.     Customers of Sharktech's subscribers ("end users") use BitTorrent to infringe Plaintiffs' exclusive rights of reproduction and distribution.

45.     Sharktech's subscribers distribute Plaintiffs' Works for these end users in violation of Plaintiffs' exclusive right of distribution.

46.     BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

47.     The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

**1.  The Initial Seed, Torrent, Hash and Tracker**

20-023W

48.     A BitTorrent user that wants to upload the new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using, for example, the Client he or she installed onto his or her computer.

49.     The initial user or seeder of a file used a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

50.     The initial seeder often modifies the file title of the Work to include a wording such as "FGT", "RARBG" or "YTS" in the title of the torrent files and file copies in order to enhance a reputation for the quality of his or her torrent files and attract users to his or her piracy website.

51.     The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

52.     The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Works, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

53.     When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

54.     Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash identifier for each

20-023W

piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive.

56. The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

56. The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Work, on them and facilitates the exchange of data among the computers.

57. Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

### 2. Torrent Sites

58. "Torrent sites" are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol. There are numerous torrent websites including the notorious YTS and RARBG websites.

59. The YTS and RARBG websites were noted by the Office of the United States Trade Representative ("USTR") as examples of Notorious Markets defined as an online marketplace reportedly engaged in and facilitating substantial piracy. *See* USTR, 2014 Out-of-Cycle Review of Notorious Markets, Mar. 5, 2015, pg. 17, Available at https://ustr.gov/sites/default/files/2014%20Notorious%20Markets%20List%20-%20Published_0.pdf [last accessed on May 7, 2021]; *see also* USTR, *2018 Out-of-Cycle Review of Notorious Markets*, April 2019, pgs. 24, 27 Available at https://ustr.gov/sites/default/files/2018_Notorious_Markets_List.pdf [accessed on May 7,

20-023W

2021].

### 3. End users access the torrent sites from Sharktech IP addresses

60.     End users accessed torrent sites including the YTS website to upload and download Plaintiffs' copyrighted Work from IP addresses provided by Sharktech.

61.     End user Robert O'Brien accessed the torrent website YTS from IP address 174.128.226.10 and downloaded torrent files for the Works *Angel Has Fallen* and *London Has Fallen*.

62.     Robert O'Brien was an end user of Sharktech's subscriber PIA.

63.     An end user who registered for an account with the YTS website with the email address jclarkness@gmail.com accessed the torrent website YTS from IP address 174.128.227.226 and downloaded a torrent file for the Work *Hunter Killer*.

64.     An end user who registered for an account with the YTS website with the email address schmuckatelli2@gmail.com accessed the torrent website YTS from IP address 174.128.243.122 and downloaded a torrent file for the Work *London Has Fallen*.

65.     An end user who registered for an account with the YTS website with the email address mike@graystarr.com accessed the torrent website YTS from IP address 174.128.236.98 and downloaded a torrent file for the Work *London Has Fallen*.

66.     An end user who registered for an account with the YTS website with the email address amybluesoul@gmail.com accessed the torrent website YTS from IP address 199.115.97.202 and downloaded a torrent file for the Work *Extremely Wicked, Shockingly Evil and Vile*.

67.     IP   addresses   174.128.226.10,   174.128.227.226,   174.128.243.122,

20-023W

174.128.236.98 and 199.115.97.202 were assigned to Sharktech from ARIN, and reassigned by Sharktech to its subscribers to use at the Denver, CO data center.

### 4. The Peer Identification

68.     The BitTorrent Client will assign an identification referred to as a Peer ID to the computer so that it can share content (here the copyrighted Work) with other peers.

### 5. Uploading and Downloading a Work Through a BitTorrent Swarm

69.     Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Work) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

70.     The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file.  Defendants' subscribers' transmit the pieces to the peers.

71.     Once a peer receives a piece of the computer file, here a piece of the copyrighted Work, it starts transmitting that piece to the other peers.  Defendants' subscribers transmit the pieces to the peers.

72.     In this way, all of the peers and seeders are working together in what is called a "swarm."

73.     Here, the end users (customers of Defendants' subscribers) participated in a swarm and directly interacted and communicated with other members of the swarm through digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions, Plaintiffs' Works.

20-023W

74.     Defendants' subscribers distributed the end users' transmissions to other members of the swarm.

75.     In this way, and by way of example only, one initial seeder can create a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of a computer file, like the Works here, upload the torrent onto a torrent site, and deliver a different piece of the copyrighted Work to each of the peers. The recipient peers then automatically begin delivering the piece they just received to the other peers in the same swarm.

76.     Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

***6. The Plaintiffs' Computer Investigator Identified Sharktech's IP Addresses as Participants in Swarms That Were Distributing Plaintiffs' Copyrighted Works.***

77.     The Plaintiffs retained Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform the Plaintiff's copyrighted Work.

78.     MEU used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.

79.     MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses

20-023W

associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

80.     The IP addresses, Unique Hash Numbers, and hit dates contained in Exhibit "2" accurately reflect what is contained in the evidence logs.

81.     The logged information in Exhibit "2" show that Defendants' subscribers distributed pieces of the Plaintiffs' copyrighted Works identified by the Unique Hash Number.

82.     End users' computers used the identified IP addresses in Exhibit "2" to connect to the investigative server from a computer in this District in order to transmit a full copy, or a portion thereof, of a digital media file identified by the Unique Hash Number.

83.     MEU's agent analyzed each BitTorrent "piece" distributed by the IP addresses listed on Exhibit "2" and verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Works.

84.     MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

### C. The Operator of the YTS website confirmed that the end users downloaded torrent files for copying the Work from the YTS website.

85.     The YTS website operator maintained records of activity of registered user accounts.  *See* Exhibit "3" at pg. 10 (Certificate of Authenticity).

86.     As shown in Exhibit "3", the records including the email address of the

14

registered user account, the torrent files the registered account downloaded, the IP address from where the registered user accessed the YTS website, and the time.

87.     The records show end users downloaded the torrent file for reproducing the Work, the same file copy MEU's agent verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Works, from IP addresses assigned to Sharktech and in Denver, CO.

### D. Defendants' subscribers distributed copies of Plaintiffs' Works.

88.     Defendants' subscribers distributed at least pieces of each of Plaintiffs' Works over network connections to other peers in the Swarm.

89.     Defendants' subscriber PIA distributed copies of Plaintiff Millennium's Work *Angel Has Fallen* by the file name Angel Has Fallen (2019) [WEBRip] [720p] [YTS.LT] from IP address 174.128.226.10.

90.     Defendants' subscriber Pango distributed copies of Plaintiff Eve's Work *Ava* by the file names: "Ava.2020.1080p.WEB-DL.DD5.1.H264-FGT"; "Ava.2020.1080p.WEBRip.x264-RARBG"; and "Ava (2020) [1080p] [BluRay] [5.1] [YTS.MX]" from IP address 174.128.250.122.

91.     Defendants' subscriber Tzulo distributed copies of Plaintiffs' Works *Angel Has Fallen* by the file name "Angel Has Fallen (2019) [WEBRip] [720p] [YTS.LT]"; *Ava* by the file names "Ava.2020.1080p.WEB-DL.DD5.1.H264-FGT" and "Ava (2020) [1080p] [BluRay] [5.1] [YTS.MX]"; *Extremely Wicked, Shockingly Evil and Vile* by the file name "Extremely.Wicked.Shockingly.Evil.and.Vile.2019.1080p.NF.WEBRip.DDP5.1.x264-CM", *Outpost* by the file name "The Outpost (2020) [1080p] [WEBRip] [5.1] [YTS.MX]"

15

20-023W

from IP address 198.54.128.19.

**E. Sharktech's subscribers promote and encourage their end users to pirate copyright protected Works including Plaintiffs'.**

92.    Sharktech's VPN customers promote their services for the purpose of infringement.

93.    Sharktech subscriber Pango promotes its VPN service under the brand name "Hotspot Shield" as a means for obtaining torrent files.

94.    Pango even recommends notorious movie piracy sources to its end users such as Piratebay and KickAssTorrent for obtaining torrent files.



https://www.hotspotshield.com/blog/protect-torrent-downloads-hotspot-shield/        [last accessed on May 5, 2021].

95.    KickassTorrents and The Pirate Bay have also been identified by the USTR as examples of Notorious Markets.  *See* USTR *supra* 2014 at pgs. 5 and 15,

96.    Pango goes even further to warn its end users that if they don't use a VPN, they risk "…revealing your IP address in order to download the file - This opens you up

20-023W

to … monitoring from groups who try to stop torrenting services. A VPN will hide your own IP address and connect to the torrent service instead meaning there is no traceability back to your own device" in the context of discussing how to setup the Hotspot Shield to use BitTorrent for "…downloading files such as programs, movies and music from other users worldwide."   https://www.hotspotshield.com/resources/vpn-for-torrenting/   [last accessed on May 5, 2021].



97.     ExpressVPN partners with piracy websites to promote its VPN service as a tool to pirate copyright protected content without getting caught.

98.     ExpressVPN promotes it service on the piracy website YTS with the message, "WARNING! Download only with VPN…" and describes its VPN service as a means to, "Protect yourself from expensive lawsuits and fines NOW!"

20-023W



99.     ExpressVPN promotes it service on the piracy website YTS next to specific movies available to be pirated.



100.    PIA acknowledges that its end users use its VPN service for piracy.



101.　　PIA instructs its users how to *optimize* use of its VPN service for piracy.



**F. Defendants' subscribers knew the Copyright Management Information**

**included in the files they distributed to other peers had been removed or altered without the authority of Plaintiffs.**

102.   A legitimate file copy of the Work includes copyright management information ("CMI") indicating the title.

103.   The initial seeder of the infringing file copies of Plaintiff's Work added wording to the file titles to "brand" the quality of piracy files he or she released and attract further traffic to his or her website.

104.   For example, the initial seeder of the infringing file copies of *Angel Has Fallen* added the wording "YTS" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the YTS website.

105.   The word YTS is not included in the file title of legitimate copies or streams of the Plaintiffs' Works.  The initial seeders of the Work altered the title to falsely include the words "YTS" in the CMI.

106.   The file copies Sharktech's subscribers distributed to other peers in the Swarm included the altered CMI in the file title.

107.   Sharktech's subscribers knew that FGT, YTS and RARBG were not the author of Plaintiffs' Works.

108.   Sharktech's subscribers knew that FGT, YTS and RARBG were not a licensed distributor of Plaintiffs' Works.  Indeed, the YTS website includes a warning to this effect.

109.   Defendants' subscribers knew that the CMI that included YTS and RARBG in the file names was false.

110.   Defendants' subscribers knew that the file copies of the Work that they distributed to other peers in the Swarm included the altered CMI without the authority of Plaintiffs.

111.   Defendants' subscribers knew that the CMI in the title they distributed to other peers in the Swarm included the altered CMI without the authority of Plaintiffs.

112.   Defendants' subscribers knew that the false or altered CMI in the titles would induce, enable, facility or conceal infringements of the Works when they distributed the false CMI, altered CMI or Works including the false or altered CMI.

113.   Namely, Defendants' subscribers knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent files originated to obtained unlicensed copies of the Work.

114.   By providing the website in the altered CMI to others, Defendants' subscribers induced, enabled and facilitated further infringements of the Work.

115.   Indeed, Defendants' subscribers such as PIA and Pango promote their VPN services for accessing piracy website such as YTS and RARBG.

***G.    Defendants had knowledge that their subscribers were infringing Plaintiffs' Works and distributing file copies of the Works with altered CMI but continued to provide service to their subscribers***

116.   Plaintiffs engaged MEU to generate Notices of infringements ("Notices") styled per 17 U.S.C. §512(c)(3) of the DMCA to be sent to service providers of IP addresses where MEU confirmed infringement of copyright protected content.

117.   Each Notice included at least the name of the copyright owner, the title of

the Work, the manner by which it was infringed, the infringing file name which includes the altered CMI, the IP address and port number at where infringement was confirmed and the time of infringement down to the second.  *See* Exhibit "4" (excerpt below).

Protocol: BITTORRENT
Infringed Work: The Outpost
Infringing FileName: The.Outpost.2020.1080p.Bluray.X264.DTS-EVO[TGx]
Infringing FileSize: 11854671795
Infringer's IP Address: 70.39.102.173
Infringer's Port: 51390
Initial Infringement Timestamp: 2021-03-14 02:01:46

118.    MEU determines the proper abuse contact email address for the service provider assigned the IP addresses at issue from publicly available information from ARIN.

119.    Plaintiffs' agent sends the Notice to the abuse contact email address.

120.    Sharktech is a member of ARIN and receives IP addresses from ARIN.

121.    Sharktech is required to update the WHOIS records for the IP addresses it reassigns or reallocates per its registration agreement with ARIN.

122.    Plaintiffs' agent has sent over 8800 Notices to Sharktech concerning infringements of copyright protected Works including Plaintiffs' at IP addresses assigned to Sharktech from ARIN.

123.    Sharktech failed to update the ARIN records to show that these IP addresses were reassigned to its subscribers.

124.    For example, Plaintiffs' agent sent over 1500 Notices to Sharktech concerning infringement of the motion picture *Ava* at IP addresses assigned to Sharktech from ARIN.

20-023W

125.   Plaintiffs' agent sent 100 Notices to Sharktech concerning observed infringements at each of IP addresses 70.39.102.173, 174.128.240.190, 70.39.102.190 and174.128.240.189 (total of over 500 Notices for these five IP addresses).

126.   Upon information and belief, other rightsholders had similar Notices sent to Sharktech concerning infringing activity at IP addresses assigned to Sharktech from ARIN.

127.   Sharktech failed to terminate the subscribers or the accounts associated with these IP addresses or take any meaningful action in response to these Notices.

128.   Sharktech failed to even forward the Notices to its subscribers.

129.   Sharktech continued to provide service to the subscribers despite knowledge that its subscribers were using the service to engage and facilite massive piracy of copyright protected Works including the Copyright Plaintiffs'.

### H. Sharktech controls the conduct of its subscribers.

130.   Sharktech can terminate the accounts of its' subscribers at any time.

131.   Upon information and belief, Sharktech promptly terminates subscriber accounts when said subscribers failed to pay for the Service. https://sharktech.net/terms-of-service/ [last accessed on May 5, 2021] ("…Service will be interrupted on accounts that reach 4 days past due.")

132.   Sharktech monitors its subscribers' access to its service.  For example, Sharktech states that it "…will monitor Customer's bandwidth. Sharktech shall have the right to take corrective action if Customer's usage negatively impacts other clients."  Id.

### I. Sharktech does not have a safe harbor from liability.

133.   As part of the DMCA, Congress created a safe harbor that limits the liability

of a service provider for copyright infringement when their involvement is limited to, among other things, "transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(a). To benefit from this safe harbor, however, an ISP must demonstrate that it "has adopted and reasonably implemented...a policy that provides for the termination in appropriate circumstances of subscribers...who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

134.   Sharktech does not have a policy of terminating repeat infringers.

135.   Plaintiffs' agent has sent over 8,800 Notices to Sharktech concerning infringements at IP addresses Sharktech publishes as assigned to it.

136.   Sharktech has failed to terminate the accounts and/or take any meaningful actions against its subscribers such as Private Internet Access, Pango, ExpressVPN or Tzulo in response to these Notices consistent with a reasonably implemented policy for termination of subscribers and account holders of the service provider's system or network who are repeat infringers necessary to support a safe harbor from liability ("policy").

137.   Congress created a safe harbor that limits the liability of a service provider for copyright infringement "…by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider" does not have the requisite knowledge, "…responds expeditiously to remove or disable access to, the material…" and has the appropriate designated agent for receiving notices.  17 U.S.C. § 512(c)(1), (2).

138.   Sharktech leases use of its servers to its subscribers so that the

subscribers can host VPN networks on Sharktech's servers.

139.   Sharktech's subscribers store copies of Plaintiffs' Works on Sharktech's servers and use Sharktech's servers to distribute copies of Plaintiffs' Works.

140.   The over 8,800 Notices Plaintiffs' agent sent to Sharktech concerning infringements included information such as the IP addresses that Sharktech could have use to disable access to infringing material.

141.   Sharktech failed to respond and expeditiously to remove or disable access to the material in response to the over 8,800 Notices Plaintiffs' agent sent to Sharktech.

142.   Until Jan. 21, 2021, Sharktech failed to designate and register an agent with the Copyright Office as provided by 17 U.S.C. § 512(c)(2).

143.   Sharktech's conduct renders it ineligible for safe harbor immunity from copyright liability under the DMCA.

### J. The copyright infringements arise from Sharktech's advertisements.

144.   Sharktech advertises that its dedicated servers allow subscribers to "Enjoy 1Gbps connectivity to push large amounts of bandwidth" and that "All 1Gbps servers are unmetered so you'll never have to worry about an overage." https://sharktech.net/dedicated-servers/ [last accessed on May 7, 2021].

145.   Sharktech advertises colocation services for subscribers that includes a "1Gbps port".  https://sharktech.net/colocation/ [last accessed on May 7, 2021].

146.   Sharktech advertises that its Denver, CO data center can provide "240 Gbps Network Capacity".   https://sharktech.net/data-centers/denver/ [last accessed on May 7, 2021].

20-023W

147. Sharktech's subscribers such as ExpressVPN, PIA, and Pango are motivated to become customers from Sharktech's advertisements.

148. Sharktech's subscribers are motivated to become customers from the knowledge of Sharktech's practice of ignoring notices of infringements or failing to take any meaningful action.

## VI. FIRST CLAIM FOR RELIEF
### (Contributory Copyright Infringement based upon material contribution)

149. Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

150. Through its activities, Sharktech knowingly and intentionally took steps that are substantially certain to result in direct infringement of Copyright Plaintiffs' Copyrighted Works, and that have resulted in such direct infringement in violation of Plaintiffs' copyrights.

151. Despite Sharktech's knowledge that its subscribers such as ExpressVPN, PIA and Pango were using its service to engage in widescale copyright infringements, Sharktech has failed to take reasonable steps to minimize the infringing capabilities of its service.

152. Sharktech is liable as contributory copyright infringers for the infringing acts of its subscribers such as ExpressVPN, PIA and Pango. Sharktech has actual and constructive knowledge of the infringing activity of its subscribers. Sharktech knowingly caused and otherwise materially contributed to these unauthorized distributions of Copyright Plaintiffs' Works.

153. Sharktech's infringements were committed "willfully" within the meaning of

20-023W

17 U.S.C. § 504(c)(2).

154.   By engaging in the contributory infringement alleged in this Complaint, Sharktech deprived not only the producers of the Works from income that could have been derived when the respective film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy.  Sharktech's misconduct therefore offends public policy.

155.   Sharktech and Timrawi are merely alter egos, and thus Timrawi is liable for the acts of Sharktech.

## VII. SECOND CLAIM FOR RELIEF
### (Vicarious Infringement)

156.   Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

157.   Sharktech is vicariously liable for the infringing acts of its subscribers' infringements including but not limited to the subscribers' direct infringements of Plaintiffs' exclusive right to distribute copies of their Works.

158.   Sharktech has the right and ability to supervise and control the infringing activities that occur through the use of its service, and at all relevant times has derived a direct financial benefit from the infringement of Plaintiffs' copyrights.

159.   Sharktech has refused to take any meaningful action to prevent the widespread infringement by its subscribers including but not limited to ExpressVPN, PIA and Pango despite having actual knowledge.  Indeed, the ability of subscribers such as Pango to use Sharktech's service to distribute copies of Plaintiffs' Works while

28

concealing their end users' identities acts as a powerful draw for users of Sharktech's service.

160.    Sharktech is therefore vicariously liable for the unauthorized distribution of Plaintiffs' Works.

161.    Sharktech and Timrawi are merely alter egos, and thus Timrawi is liable for the acts of Sharktech.

## VIII. THIRD CLAIM FOR RELIEF
### (Secondary Liability for Digital Millennium Copyright Act Violations)

162.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

163.    Sharktech's subscribers encourage their end users to access torrent files for copying copyright protected Works from notorious movie piracy websites such as The Pirate Bay.

164.    Defendants' subscribers knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the Plaintiffs' copyright protected Works, distributed copyright management information ("CMI") that falsely included false wording such as "RARBG", "FGT" and "YTS" in violation of 17 U.S.C. § 1202(a)(2).

165.    Defendants' subscribers, without the authority of Plaintiffs, or the law, distributed removed or altered CMI knowing that the CMI had been removed or altered to include the wording "RARBG", "FGT" and "YTS" without the authority of Plaintiffs and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of Plaintiffs' copyright protected Works in violation of 17 U.S.C. § 1202(b)(2).

20-023W

166.   Defendants' subscribers, without the authority of Plaintiffs, or the law, distributed Plaintiffs' Copyright protected Works knowing that the CMI had been removed or altered to include the wording RARBG", "FGT" or "YTS", and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of the copyright protected Works in violation of 17 U.S.C. § 1202(b)(3).

167.   Particularly, the Defendants' subscribers knew that the CMI in the file names of the pieces had been altered to include the wording "RARBG", "FGT" or "YTS".

168.   Particularly, the Defendants' subscribers distributed the file names that included CMI that had been altered to include the wording "RARBG", "FGT" or "YTS".

169.   Defendants' subscribers knew that the wording "RARBG", "FGT" or "YTS" originated from notorious movie piracy websites which they themselves promoted.

170.   Defendants' subscribers' acts constitute violations under the Digital Millennium Copyright Act, 17 U.S.C. § 1202.

171.   Sharktech is secondarily liable for the DMCA violations of its subscribers. Sharktech has actual and constructive knowledge of its subscribers' DMCA violations. Sharktech knowingly caused and otherwise materially contributed to these DMCA violations.

172.   Sharktech is vicariously liable for the DMCA violations of its subscribers. Sharktech has the right and ability to supervise and control the DMCA violations that occur through the use of its service, and at all relevant times has derived a direct financial benefit from the DMCA violations complained of herein. Sharktech has refused to take any meaningful action to prevent the widespread DMCA violations by its subscribers.

20-023W

Indeed, the ability of Sharktech's subscribers to distribute torrent files from torrent websites such as YTS and the Pirate Bay that Sharktech's subscribers themselves promote and obtain file copies of the Works with altered CMI and distribute said copies while concealing their end users' activities acts as a powerful draw for subscribers of Sharktech. Sharktech is therefore vicariously liable for the DMCA violations.

173.   Plaintiffs are entitled to an injunction to prevent Sharktech from engaging in further violations of 17 U.S.C. § 1202.

174.   Plaintiffs are entitled to recover from Sharktech the actual damages suffered by Plaintiffs and any profits Sharktech has obtained as a result of its wrongful acts that are not taken into account in computing the actual damages. Plaintiffs are currently unable to ascertain the full extent of the profits Sharktech has realized by its violations of 17 U.S.C. § 1202.

175.   Plaintiffs are entitled to elect to recover from Sharktech statutory damages for its violations of 17 U.S.C. § 1202.

176.    Plaintiffs are further entitled to costs and reasonable attorneys' fees.

177.    Sharktech and Timrawi are merely alter egos, and thus Timrawi is liable for the acts of Sharktech.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that this Court:

(A) enter permanent injunctions enjoining Defendants from continuing to contribute to infringements of the Plaintiffs' copyrighted Works and DMCA violations;

(B) order Defendants to adopt a policy that provides for the prompt termination of

31

subscribers that engage in more than three infringements of copyright protected Works;

(C) order Defendants to block ports 6881-6889 on all of the servers under their control to prevent further pirating of Plaintiffs' Works via the BitTorrent protocol;

(D) award the Plaintiffs their actual damages from the copyright infringements and Defendants' profits in such amount as may be found; alternatively, at Plaintiffs' election, for statutory damages pursuant to 17 U.S.C. § 504(a) and (c) against Defendants jointly and severally;

(E) award the Plaintiffs actual damages from the DMCA violations and Defendants' profits in such amount as may be found; or, in the alternative, at Plaintiffs' election, for statutory damages per DMCA violation pursuant to 17 U.S.C. § 1203(c) for violations of 17 U.S.C. § 1202 against Defendants jointly and severally;

(F) award the Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505 and/or 17 U.S.C. § 1203(b)(5); and

(G) grant the Plaintiffs any and all other and further relief that this Court deems just and proper.

The Plaintiffs hereby demand a trial by jury on all issues properly triable by jury.

DATED: Kailua-Kona, Hawaii, May 7, 2021.

/s/ Kerry S. Culpepper
Kerry S. Culpepper
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone:    (808) 464-4047
Facsimile:    (202) 204-5181
E-Mail:        kculpepper@culpepperip.com
Attorney for Plaintiffs

20-023W