**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No.  1:21-cv-01261-SKC**

MILLENNIUM FUNDING, INC.
LHF PRODUCTIONS, INC.
HUNTER KILLER PRODUCTIONS, INC.
OUTPOST PRODUCTIONS, INC.
EVE NEVADA, LLC and
VOLTAGE HOLDINGS, LLC,

       Plaintiffs,

v.

SHARKTECH, INC. and
TIM MOUHIEDDINE TIMRAWI,

       Defendants.

---

**DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

---

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

SUMMARY OF THE COMPLAINT.................................................................. 2

LEGAL STANDARD........................................................................................ 5

ARGUMENT ................................................................................................... 6

    I.     Plaintiffs Fail to State a Claim for Contributory Copyright Infringement............ 6

          A.     The Standard for Contributory Infringement Liability ............................. 6

          B.     Plaintiffs Fail to Plead that Defendants' Infrastructure Services Are Incapable of Substantial Non-infringing Use ........................................... 8

          C.     Plaintiffs Fail to Plead that Defendants Actively Induced Infringement........................................................................................ 10

          D.     Plaintiffs' "Knowledge" Allegations Fail to State a Claim ..................... 12

    II.     Plaintiffs Fail to State a Claim for Vicarious Copyright Infringement............... 15

    III.    Plaintiffs Fail to Plausibly Allege Direct Infringement By Defendants' Customers, and Even if Customers Directly Infringe, Defendants Are Not Secondarily Liable. ....................................................................................... 18

    IV.   Plaintiffs Fail to State a Claim For Secondary Liability For DMCA Violations. ...................................................................................................... 20

    V.     Plaintiffs Fail to Allege an Alter Ego Relationship Between Defendants. .......... 22

    VI.   Plaintiffs Millennium Funding, Inc. and Eve Nevada, LLC Lack Standing........ 23

CONCLUSION................................................................................................. 24

Defendants Sharktech, Inc. ("Sharktech") and Tim Timrawi ("Timrawi") ("Defendants"), through undersigned counsel, move to dismiss Plaintiffs' Complaint ("Complaint") (Doc. 1) with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) and in support state the following:

## INTRODUCTION

Plaintiffs purport to be the copyright owners of various films, but are becoming better known as opportunistic litigants who have commenced a series of copyright infringement claims against online service providers on increasingly attenuated and unsupported theories of liability. This case involves allegations that by providing server, colocation and DDoS protection services (general-purpose Internet infrastructure services ("IaaS")), to other, third party online service providers (here, alleged to be three providers of Virtual Private Networks (VPNs) and one other IaaS provider), Defendants[1] are contributorily and vicariously liable for the infringing activities of end users at least three steps removed from Defendants. But, rather than suing the end users whom Plaintiff alleges infringe its rights, the myriad websites that facilitate such end users' infringement, or even the other online service providers, Plaintiffs instead ask this Court to entertain novel theories of tertiary liability against a general-purpose IaaS provider – theories that have never before been recognized by a federal district or appellate court.

All of Plaintiffs' claims fail as a matter of law. Plaintiffs' lawsuit is premised on the unsupportable notion that providers of general-purpose IaaS services like Defendants should be liable because their *customers* provide privacy-enhancing services that sometimes – but not always – are used to help Internet infringers anonymize their identities online. According to Plaintiffs, by spamming targets like Defendants with notices of claimed infringement alleging that unknown, unnamed individuals somewhere on the Internet have used an IP address provided by Defendants

---

[1] Plaintiffs have alleged that Defendants Sharktech and Timrawi are *alter egos*. Although these allegations fail to state a claim (*see* discussion at Section V, *infra*), this Motion refers to both defendants as the "Defendants."

(or by third parties who purchase connectivity and colocation services from Defendants), Plaintiffs can force their targets to act as the enforcer of Plaintiffs' rights. Under Plaintiffs' logic, anyone who does business with any other person who merely is alleged to provide services that can be used, as one purpose only, to mask or anonymize copyright infringers is a tortfeasor due to alleged failure to step in and enforce Plaintiffs' rights by terminating services to large swaths of the Internet. Of course, Plaintiffs never allege – because they cannot – that Defendants are engaged in direct infringement, offer products or services that are incapable of noninfringing purposes, induce infringement, supervise or control infringing activity, or directly profit from infringement.

Plaintiffs' theory is akin to demanding that a commercial airline that supplies FedEx with supplementary cargo space should be required to terminate FedEx as a customer because a few of FedEx's individual customers may use FedEx's services for illegal purposes – even though such individual customers could just as easily use UPS or the U.S. Post Office to effect the same actions, and even though the commercial airline serves customers of all kinds. So long as the defendant provides *any* facility or service whatsoever used by an infringer – no matter how passively or transiently – Plaintiffs can hold it liable. This is not the law. Plaintiffs have failed to state any claim for which relief can be granted, and the Court should dismiss the action with prejudice.[2]

## SUMMARY OF THE COMPLAINT

Despite its length and conclusory rhetoric, the Complaint contains few factual allegations to support Plaintiffs' claims. The gravamen of Plaintiffs' claims is that Defendants provided Internet Protocol ("IP") addresses to Defendants' "subscribers" – alleged to be one other IaaS provider and three VPN providers – which were in turn used by individual customers of

---

[2]     Failing to reject Plaintiffs' attenuated theories at this stage of the litigation is likely to open a floodgate of litigation against all Internet infrastructure providers, no matter how attenuated or speculative their connection is to end users actually engaged in infringement.

Defendant's customers ("End Users") to access certain websites and engage in unauthorized peer-to-peer file sharing using the BitTorrent protocol. Compl. ¶¶ 43-44, 58-67, 82, 88-91. The Complaint does not allege, because it cannot, that Defendants review the files or data transmitted, control the files or data transmitted, control the websites or personal computers of End Users or the BitTorrent websites that index allegedly infringing content, or otherwise supervise or control the infringing activities in any way. Defendants simply have no role in creating, displaying, hosting, or promoting the content complained of, nor do Defendants have any contractual or business relationship with End Users – and Plaintiffs do not contend otherwise. Rather, Plaintiffs simply assert that by providing IP addresses to their customers—who are themselves not plausibly alleged to be direct infringers[3]—Defendants incur copyright liability.

The remainder of the facts alleged in the Complaint consist of descriptions of: (1) Plaintiffs' alleged rights (Compl. ¶¶ 8-17, 38-40)[4], (2) how End Users share electronic files via the BitTorrent protocol, enabled by BitTorrent Client software that End Users install on their own computers (*id.* ¶¶ 46-57, 68-76), (3) various third-party websites ("Torrent Sites") that index files and facilitate copying and distributing via the BitTorrent protocol (*id.* ¶¶ 58-59), (4) alleged advertisements of Defendants' customers (*id.* ¶¶ 92-101), (5) conclusory allegations that Defendants' customers know that unspecified, unnamed End Users alter digital file names of the asserted copyrighted works (*id.* ¶¶ 102-114), (6) an allegation that as a result of various notices of claimed infringement purportedly styled under the Digital Millennium Copyright Act, Defendants had knowledge that the plaintiffs claimed that alleged infringement was being committed by someone, somewhere on the Internet using IP addresses provided by Sharktech, and that

---

[3]        *See* Section III *infra*.
[4]        As discussed in Section VI, *infra*, the copyright registration details corresponding to the copyright registration numbers attached as Exhibit 1 to the Complaint shows that at least two of the plaintiffs, Millennium Funding, Inc. and Eve Nevada, LLC, are not the owners of the copyrights alleged.

unspecified End Users had altered CMI (*id.* ¶¶ 102-125), (7) conclusions that Defendants control the conduct of Sharktech's customers (*id.* ¶¶ 130-132), and (8) conclusions that alleged copyright infringements committed by End Users using the BitTorrent protocol "arise from" Defendants' advertisements of a general nature. *Id.* ¶¶ 144-148. Critically, at any point, Defendants are *at least* three steps removed from any act of direct infringement.

Explanation of the key technical terms in the Complaint makes the attenuated nature of Plaintiffs' allegations even clearer.[5] An IP address is a numerical identifier assigned to each device connected to a computer network that uses the Internet Protocol for communication.[6] IP addresses permit devices to be identified and interface on the Internet and provides the location of the device in the network. *Id.* By definition, an IP address does not host, store or transmit information. *Id.* A VPN encrypts and secures data for all forms of internet traffic. *See generally Perfect 10, Inc. v. Giganews, Inc.*, No. CV-11-07098-AB (SHx), 2014 WL 8628034, *2 (C.D. Cal. Nov. 14, 2014), aff'd, 847 F.3d 657 (9th Cir. 2017); *VirnetX, Inc. v. Microsoft Corp.*, No. 6:07-CV-80, 2009 WL 2370727, * 3-5 (E.D. Tex. Jul. 30, 2009). Businesses commonly purchase and use VPNs to protect confidential information when their employees access the Internet in public places or foreign countries.[7] A VPN can also act as a proxy, supplying a new IP address to a given end user. *Id.* A VPN creates a secure, encrypted data tunnel between the End User's local network and a node in another location. *Id.* VPNs allow End Users to maintain online privacy and protect against having

---

[5]    The Court may take judicial notice of adjudicative facts "generally known" within the territorial jurisdiction of the Court, or which can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed .R. Evid. 201(b). The court may also "disregard allegations that are contradicted by matters properly subject to judicial notice." *Elf-Man, LLC v. Brown*, 996 F. Supp. 2d 1056, 1058 (E.D. Wa. 2014).

[6]    *See, e.g.*, "Internet Protocol: Darpa Internet Program Protocol Specification," Defense Advanced Research Projects Agency Information Processing Techniques Office, Sept. 1981, https://datatracker.ietf.org/doc/html /rfc791.

[7]    *See, e.g.,* "Federal Telework During the COVID-19 Pandemic: Cybersecurity Issues in Brief," Congressional Research Service R46310, Apr. 10, 2020, https://crsreports.congress.gov/product/pdf/R/R46310 (recommending use of VPNs, and noting increase in VPN usage during COVID-19 pandemic).

their search history tracked, gathered, viewed or sold. *Id.*[8]

## LEGAL STANDARD

A federal court deciding a Rule 12(b) motion to dismiss should begin by straining out the pleadings that consist only of "labels and conclusions, and a formulaic recitation of the elements of a cause of action," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and then considering whether the well-pleaded factual allegations "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A court must disregard any "legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555, and "look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). Moreover, the requirement to plead facts, not conclusions, applies to allegations of a defendant's intent or purpose as well as its conduct. *Iqbal*, 556 U.S. at 686-87.

A plaintiff fails to meet the plausibility requirement when the facts it pleads "are 'merely consistent with'" a defendant's liability. *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557). A plaintiff must allege "enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). Plausibility analysis is "a context-specific task that requires the reviewing court to draw on its judicial

---

[8]   Although VPNs may make it more difficult to detect Internet pirates, their use is not illegal and is necessary for the functioning of a secure Internet. Government departments, corporations and other organizations with sensitive data use VPN services to securely access and transmit data. *See id.*

experience and common sense." *Iqbal*, 556 U.S. at 679. "This pleading requirement serves two purposes: 'to ensure that a defendant is placed on notice of his or her alleged misconduct sufficient to prepare an appropriate defense,' and 'to avoid ginning up the costly machinery associated with our civil discovery regime on the basis of "a largely groundless claim.'" *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (quoting *Pace v. Swerdlow*, 519 F.3d 1067, 1076 (10th Cir. 2008) (Gorsuch, J., concurring)). Finally, when evaluating a Rule 12(b)(6) motion to dismiss, a court may properly consider exhibits attached to the complaint, all materials referenced in the complaint, and materials subject to judicial notice. *Pace*, 519 F.3d at 1072.

## ARGUMENT

Acknowledging that "[t]he Tenth Circuit has limited precedent on the issue of vicarious and contributory copyright liability," this Court has looked to the Ninth Circuit for guidance. *See Warner Recs. Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069, 1074 (D. Colo. 2020) (citing cases). According to the Supreme Court and the most recent Ninth Circuit authority, Plaintiffs have not alleged *facts* to support contributory or vicarious copyright infringement. In fact, Defendants have found no cases at all that support Plaintiffs' novel "tertiary" theory of liability.

**I.   Plaintiffs Fail to State a Claim for Contributory Copyright Infringement.**

**A.  The Standard for Contributory Infringement Liability**

Contributory copyright infringement is a form of secondary liability with roots in tort-law concepts of enterprise liability and imputed intent. *See Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 670 (9th Cir. 2017) (affirming district court's dismissal of claims); *Perfect 10, Inc. v. Visa Int'l. Serv. Ass'n*, 494 F.3d 788, 794-95 (9th Cir. 2007) (same). The U.S. Supreme Court has set the standard for contributory infringement liability: "One infringes contributorily by intentionally inducing or encouraging direct infringement . . . ." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). Within that standard, the Supreme Court identified two

categories of liability, summarized as follows: "Liability under our jurisprudence may be predicated on actively encouraging (or inducing) infringement through specific acts (as the Court's opinion develops) or on distributing a product distributees use to infringe copyrights, if the product is not capable of 'substantial' or 'commercially significant' noninfringing uses." *Id.* at 942 (Ginsburg, J., concurring) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984)). Thus, to state a contributory infringement claim, a plaintiff must show that the defendant either (1) provides a product or service incapable of substantial noninfringing uses or (2) intentionally and actively induces infringement "by clear expression or other affirmative steps taken to foster infringement." *Grokster*, 545 U.S. at 936-37. In addition, "mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a [defendant] to liability." *Id.* at 937.

The Ninth Circuit has looked to the teachings of the Supreme Court in *Grokster*, 545 U.S. at 915, 934-35, which held that contributory liability must be analyzed in light of "rules of fault-based liability derived from the common law," including that the defendant *intended* to encourage infringement through specific acts. *See, e.g.*, *Perfect 10, Inc., v. Amazon.com, Inc.*, 508 F.3d 1146, 1170-71 (9th Cir. 2007). In its most recent decision addressing the standard for contributory copyright infringement, the Ninth Circuit held that although intent may be imputed, material contribution requires "purposeful, culpable expression and conduct." *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142, 1148 (9th Cir. 2018) (affirming dismissal of contributory infringement claims) (citing *Grokster*, 545 U.S. at 937). The Ninth Circuit ruled that, "without allegations of intentional encouragement or inducement or infringement, an individual's failure to take affirmative steps" to police infringement is "insufficient to state a claim." *Cobbler Nevada*, 901 F.3d at 1145; *see also Grokster*, 545 U.S. at 939, n.12. A court cannot find contributory

infringement liability merely based on failure to take affirmative steps to prevent infringement, if the device or technology at issue is capable of substantial non-infringing uses. *Cobbler Nevada*, 901 F.3d at 1148. Consistent with Justice Ginsburg's concurrence in *Grokster*, the Ninth Circuit also discussed the "two strands of liability following *Sony* and *Grokster*." *Id.* at 1147. One is "distributing a product distributees use to infringe copyrights, if the product is not capable of 'substantial' or 'commercially significant' noninfringing uses"; the other is "actively encouraging (or inducing) infringement through specific acts." *Id.* (internal citations omitted). In sum, material contribution to infringement cannot "consist of merely providing the 'means to accomplish an infringing activity . . .'" *Sony*, 464 U.S. at 435 n.17. It requires *direct* contribution to the "infringing conduct …. Such participation must be substantial." *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Services Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) (citations omitted).

### B. Plaintiffs Fail to Plead that Defendants' Infrastructure Services Are Incapable of Substantial Non-infringing Use

Plaintiffs do not allege that Defendants' services are incapable of substantial non-infringing uses. To the contrary, Plaintiffs acknowledge that Defendants' services have substantial and commercially significant uses, including providing data centers, servers, colocation services and DDoS protection services. Compl. ¶ 20. All of these services enable the infrastructure of the Internet. The Complaint contains no allegations that Defendants specially or specifically adapt their services for infringing purposes. Providing IP addresses and general-purpose Internet infrastructure services can hardly be said to be distributing a product or service that is not "capable of substantial" or "commercially significant noninfringing uses." *Sony*, 464 U.S. at 442. Every single machine or device that connects to the Internet requires an IP address in order to route and receive information. Moreover, Plaintiffs also fail to allege that the VPN services provided by Defendants' customers are incapable of commercially significant noninfringing uses. To the

8

contrary, VPNs have legitimate and important functions, and are routinely used by governments and businesses to maintain Internet security and privacy. *See supra* at pp. 4-5.

Even before *Cobbler Nevada*, both the Ninth Circuit and its district courts dismissed theories of liability similar to those asserted by Plaintiffs here. In *Visa*, the Ninth Circuit affirmed the district court's dismissal of all claims, holding that because the defendants had no direct connection to the infringement, they did not materially contribute. 494 F.3d at 796. In so holding, the Ninth Circuit rejected a broad theory of secondary liability suggested by the plaintiff, under which a defendant could be liable for contributory infringement solely by virtue of providing services that make it easier for infringement to occur. *Id.* The plaintiff in that case argued that the defendants could refuse to process payments to the infringing websites and undermine their commercial viability. But the Ninth Circuit rejected any theory that mechanisms that may merely make infringement easier or more profitable give rise to contributory liability:

> Even though we must take this factual allegation as true, that Defendants have the power to undermine the commercial viability of infringement does not demonstrate that the Defendants materially contribute to that infringement. As previously noted, the direct infringement here is the reproduction, alteration, display and distribution of Perfect 10's images over the Internet. Perfect 10 has not alleged that any infringing material passes over Defendants' . . . systems, or that Defendants designed or promoted their . . . systems as a means to infringe.

*Visa*, 494 F.3d at 800. Just like in *Visa*, although VPNs provided by Defendants' customers may make it easier for infringers to download content without detection, the reproduction, alteration, display and distribution of copyrighted works can all occur without VPNs. *Id.* at 796; *see also Elf-Man*, 996 F. Supp. 2d at 1059 (affirming dismissal, rejecting plaintiff's argument that internet subscribers have an affirmative duty to ensure their internet access cannot be used by a third party for an illegal purpose).  Because there can be no dispute that basic Internet infrastructure services meet the description of services widely used for non-infringing purposes as set forth in *Sony* and

*Grokster.* Plaintiffs fail to state a viable contributory infringement claim under this strand of the contributory infringement standard.

### C.  Plaintiffs Fail to Plead that Defendants Actively Induced Infringement

Plaintiffs also plead no facts showing contributory infringement via "purposeful, culpable expression and conduct." *See, e.g.*, *Cobbler Nevada*, 901 F.3d at 1148 (quoting *Grokster*, 545 U.S. at 937); *see also Iqbal*, 556 U.S. at 686-87 (the requirement to plead facts, not conclusions, applies to allegations of a defendant's intent or purpose as well as its conduct). The Supreme Court has held that under the inducement strand of the contributory infringement standard, "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Grokster*, 545 U.S. at 936-37. The Ninth Circuit has described the inducement theory as having "four elements: (1) the distribution of a device or product, (2) acts of infringement, (3) an object of promoting its use to infringe copyright, and (4) causation." *Giganews*, 847 F.3d at 672 (quotations and citations omitted).

Apart from empty conclusions, the Plaintiffs' theory of liability rests – wrongly – on Defendants' alleged *inaction*, such as failure to respond to notices of claimed infringement and failure to terminate subscribers. Compl. ¶¶ 151, 159, 172.  Plaintiffs have not made any allegations of active and "purposeful, culpable expression and conduct," *Cobbler Nevada*, 901 F.3d at 1148, or  that Defendants "clearly expressed" that they provide their services "with the object of promoting [their] use to infringe copyright," or otherwise took "affirmative steps to foster infringement." *Grokster*, 545 U.S. at 936-37. Nor do Plaintiffs allege that Defendants promote use of their services for the purposes of infringing copyright, or that their services have any causal relationship – or any direct relationship whatsoever – to the infringing acts of End Users. Plaintiffs allege only the legal conclusion (and only buried in a heading in the Complaint), that "the copyright

infringements arise from Sharktech's advertisements." Compl. p. 27, Heading "J". This bare conclusion is deeply implausible, and still does not allege clear expression of an object or intent to promote infringement. The sole *fact* alleged by Plaintiffs is that, like many Internet infrastructure providers, Defendants advertise high speed connectivity, secure colocation services, and network capacity. *Id.* ¶¶ 144-146. These advertisements do not "clearly express" that Defendants intend to promote their services to infringe copyright or otherwise take "affirmative steps" to foster infringement. Nor do Plaintiffs allege such intent. The conclusion that advertisements "motivate" Sharktech's customers to become customers does not satisfy the requirement to plead a clear expression of intent to promote infringement of copyright, or that any infringement is *caused* by the advertisements. Plaintiffs simply cannot and do not plausibly allege that advertisements of a general nature motivate and cause End Users to infringe copyright (Plaintiffs do not even allege that End Users know Sharktech exists), or motivate Sharktech's customers to become customers specifically to provide VPNs that might be used by End Users to conceal infringement.

*Visa* and *Giganews* rejected similar theories of liability. In *Visa*, the plaintiff alleged inducement because the defendants generally promoted their payment systems, but the Ninth Circuit held that this allegation did not establish that the defendants "'communicated an inducing message to their … users,' the classic example of which is an 'advertisement or solicitation that broadcasts a message *designed to stimulate others to commit violations*.'" 494 F.3d at 801 (quoting *Grokster*, 545 U.S. at 937) (emphasis added). In *Giganews*, the plaintiff tried to make a claim stick based on allegations that Giganews advertised that its product had certain features, such as built-in MP3 players and File Locators, that made it easier for users to search for downloadable music. 847 F.3d at 672. The Ninth Circuit held these allegations were insufficient to show that Giganews "itself promoted its product 'with the object' of infringing copyright." *Id.* (citation omitted in

original). Plaintiffs have therefore failed to state a claim under the inducement prong of a contributory liability claim.

### D.  Plaintiffs' "Knowledge" Allegations Fail to State a Claim

To the extent relevant to their contributory infringement claim, Plaintiffs fail to allege actual or constructive knowledge of alleged direct infringement. Although the Complaint alleges that Defendants have "actual knowledge" and/or "constructive knowledge" of certain infringing content (*see* Compl ¶¶ 152, 159, 171), as an initial matter, the Supreme Court ruled that "mere knowledge of infringing or of actual infringing uses would not be enough" to subject a provider to secondary infringement liability on a contributory infringement claim. *Grokster*, 545 U.S. at 937. And, both the Supreme Court and Ninth Circuit have rejected a constructive knowledge standard for contributory infringement. In *Sony*, the Supreme Court held that there is "no precedent in the law of copyright" for imposing secondary liability on the provider of products based on "constructive knowledge of the fact that their customers may use that equipment to make unauthorized copies of copyrighted material." *Sony*, 464 U.S. at 439. To the contrary, "*Grokster* tells us that contribution to infringement must be intentional for liability to arise." *Amazon.com*, 508 F.3d at 1170 (dismissing contributory infringement claims; knowledge could not be imputed to defendant). At a minimum, this requires "*actual* knowledge of *specific* acts of infringement." *Luvdarts LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) (quoting *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir. 2001)) (emphasis added). "[A]bsent any *specific* information which identifies infringing activity, a computer system operator cannot be liable for contributory infringement merely because the *structure of the system* allows for the exchange of copyrighted material." *Napster*, 239 F.3d at 1021 (emphasis added) (citing *Sony*, 464 U.S. at 436).

Plaintiffs try to sidestep the defects in their pleadings by invoking the allegation that they

sent thousands of notices of claimed infringement purportedly styled under the safe-harbor provisions of the DMCA to Defendants.[9] While Defendants are indeed entitled to safe harbor protections, Plaintiffs' notices of claimed infringement put the cart before the horse – whether the DMCA's limitation on remedies applies is irrelevant until Plaintiffs plead and prove contributory infringement liability in the first place. *See Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) ("These safe harbors limit liability but do not affect the question of ultimate liability under the various doctrines of direct, vicarious, and contributory liability . . .") (internal quotations omitted); *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 555 (4th Cir. 2004) ("the DMCA is irrelevant to determining what constitutes a prima facie case of copyright infringement").

Moreover, Plaintiffs do not offer or allege facts showing what action Defendant was supposed to take in response to their purported DMCA notices (other than terminating customers wholesale, presumably affecting VPN service to wide swaths of the Internet in the midst of a global pandemic). Nor do the notices provide information about *specific* acts of infringement such that Defendants *could* take any remedial action, the failure of which would constitute a clear expression or other affirmative steps to foster infringement.[10] The notices appended to the Complaint fail to comply with the requirements of Section 512(c)(3) of the DMCA, which also states that non-compliant notices "shall not be considered . . . in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. § 512(c)(3)(B); *Rosen v. Hosting Servs., Inc.*, 771 F. Supp. 2d 1219, 1222 (C.D. Cal. Aug.

---

[9]     Plaintiffs do not clearly allege that Sharktech is a hosting provider under Section 512(c) of the DMCA such that it has any obligation to take action in response to a DMCA notice in order to receive the benefit of Section 512(c)'s safe harbor. According to the bulk of Plaintiffs' allegations, Sharktech provides transitory digital network communications as described in Section 512(a) of the DMCA. Section 512(a) contains no specific notice requirements.

[10]     In *Amazon.com*, the Ninth Circuit required a showing of a defendant's substantial assistance to infringement plus actual knowledge of specific infringements, coupled with a failure to take "simple measures" to prevent further harm to copyrighted works. 508 F.3d at 1172. In so doing, the Ninth Circuit stressed that the *Grokster* standard was the ultimate touchstone in assessing culpable intent. *See id.* Even if Defendants knew of specific infringements, the Complaint does not identify "simple measures" that Defendants could take in response to the notices.

16, 2010) (defective notice "insufficient as a matter of law to impart actual knowledge"); *see also CCBill, LLC*, 488 F.3d at 1111-13; *Luvdarts*, 710 F.3d at 1073 (affirming dismissal; vague and general notifications that infringement is occurring are insufficient to establish knowledge).

A review of the notices appended to the Complaint shows that they are defective, vague and too general to satisfy the knowledge prong for alleging a contributory liability claim. They fail to identify *specific* infringing information or show that the information is available on Defendants' systems, such that Defendant can take simple steps to remediate the infringement. For example, the notice appended as Exhibit 4 to Plaintiffs' complaint is defective under Section 512(c)(3) of the DMCA because it: (a) lacks a physical or electronic signature; (b) fails to identify any copyright registration number; and (c) fails to provide an online link to the infringing material, a screenshot of the infringing work, or other information that would allow Sharktech to review or identify the location of the infringing work. 17 U.S.C. § 512(c)(3). The notice identifies an IP address, but does not identify the infringer behind the IP address. *See, e.g.*, *Cobbler Nevada*, 901 F.3d at 1145-46 ("multiple devices and individuals may be able to connect via an IP address . . . ."). Because the notices described in and appended to the Complaint provide only the name of the infringed work and infringing file name and the infringer's IP address and port, the notice communicates only that an unspecified infringer, somewhere in the world, used an IP address assigned to Sharktech by ARIN and provided by one of Sharktech's customers to download infringing content.[11] In short, the notice does not provide information that would permit Sharktech to locate and remove infringing content on the Internet, nor do Plaintiffs allege that Sharktech has this practical ability. *See Napster*, 239 F.3d at 1021. Plaintiffs' suggested remedy is effectively that Sharktech should

---

[11]    While the IP address permits the routing of information to the End User's personal computer, Plaintiffs do not plausibly allege that content is actually stored or hosted by Sharktech. The content is stored elsewhere (presumably, on the infringer's own hard drive or via a cloud service provider in privity with the infringer).

terminate the accounts of its customers because the *structure of the system* allows for (or here, may be used to obscure) the exchange of copyrighted material.[12] This is precisely the result the Supreme Court rejected in *Sony*, 464 U.S. at 436, and it should be rejected here.

## II.  Plaintiffs Fail to State a Claim for Vicarious Copyright Infringement.

Vicarious infringement is a concept related to, but distinct from, contributory infringement. While contributory infringement is based on tort-law principles of enterprise liability and imputed intent, vicarious infringement's roots lie in the agency principles of *respondeat superior. Visa*, 494 F.3d at 802. To state a claim for vicarious liability for copyright infringement, a plaintiff must allege (1) that the defendant possesses the *right and ability* to supervise the infringing conduct *and* (2) that the defendant has an *obvious and direct financial interest* in the infringing activity. *Id.* (emphasis added). Notably, the alleged control must be *related* to the infringing activity: "[T]he parties' paths must cross on a daily basis, and the character of this intersection must be such that the party against whom liability is sought is in a position to control the personnel and *activities responsible for the direct infringement*." *Banff Ltd. V. Limited, Inc.*, 869 F. Supp. 1103, 1109 (S.D.N.Y. 1994) (emphasis added). There must be a connection between the two parties with respect to the infringing acts. *Id.*, 869 F. Supp. at 1108 (citing *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1553 (9th Cir. 1989)).

Here, Plaintiffs do not allege facts showing that Defendants have the right and ability to supervise infringing conduct. Defendants do not have access to the content of communications passing through or over their infrastructure facilities, editorial or control rights over the hosting or transmission of infringing works, or the ability to dictate the products and services sold by their

---

[12]     If entertained, this ham-fisted proposal would interrupt the businesses of VPN service providers and the activities of countless businesses, government agencies and individuals who use commercial VPN services for legitimate reasons. This is a sledgehammer, not a scalpel – a far cry from the "simple measures" envisioned in *Amazon.com*.

customers. As discussed at length herein, Plaintiffs have alleged a novel theory of tertiary liability in which they assert that Defendants are liable for alleged copyright infringement by entities or individuals over whom Defendants have no control, despite the reality – *acknowledged by Plaintiffs* – that Defendants are at least three steps removed from the BitTorrent activities of End Users. Plaintiffs' sole allegation regarding control is that Defendants can terminate customers from its services if they do not pay. Compl. ¶ 131. This allegation certainly does not allege control over the alleged direct infringers – the End Users who engage in BitTorrent sharing. Nor does it plausibly allege control over Defendants' customers, who stand between the End Users and Defendants. Allegations that the ability to refuse to provide services to third parties is tantamount to the right and ability to "supervise" the infringing activity are simply insufficient to state a claim for vicarious liability. *See Visa*, 494 F.3d at 802-03. In *Visa*, the plaintiff alleged that the defendants knew of copyright infringement on certain websites and, on this basis, could have stopped processing credit card payments to the infringing websites. These allegations were not, however, sufficient to establish vicarious liability because they did not support a finding that Defendants have the *legal* right and ability to "control" the *infringing activity*. *Id.* Similarly, the Ninth Circuit in *Amazon.com* rejected a vicarious liability claim even though defendant Google's own policies stated that it reserved the right to monitor entities that violate others' copyrights. *Amazon.com, Inc.*, 508 F.3d at 1173-74. There, the court correctly held that even if Google took action to terminate a partnership based on alleged rights violations, this did not provide Google with the right and ability to stop direct infringement by third-party websites. *Id.*

So too here. The entire thrust of Plaintiffs' claims is that Defendants turn a "blind eye" to improper use of VPN services by End Users. This theory seeks to turn Defendants into police, prosecutor, judge and jury of alleged infringements occurring across the entire Internet, even

though Sharktech has no visibility into the content of any material passing through its facilities and, like a telephone company or broadband provider, lacks the legal right or ability to supervise or control customers' activities. It seeks to force Defendants to impose an effective boycott or blockade against any VPN service provider so long as Plaintiffs have accused those companies of infringements, and regardless of whether any such alleged direct infringement is verified or verifiable. This proposed approach is unsupported by law and unworkable as a practical matter.[13]

Moreover, even if Defendants did have the right to terminate customers' accounts for reasons other than non-payment, this would not stop the conduct complained of by Plaintiffs. While termination might temporarily reduce some minute number of infringing activities concealed via use of a VPN, an infringing End User could simply purchase VPNs from other providers or take a chance and exchange BitTorrent files without shielding their identity via a VPN. As the Ninth Circuit pointed out in *Visa*, "[t]he mere ability to withdraw a . . . 'carrot' [that might facilitate infringement or make it more profitable] does not create the 'stick' of 'right and ability to control' that vicarious infringement requires." 494 F.3d at 803, 806 ("the power to stop profiteering" cannot be conflated "with the right and ability to control infringement").

Plaintiffs also fail to allege facts satisfying the second prong of a vicarious liability claim – an "obvious and direct" financial interest in the infringing activity. Plaintiffs must demonstrate "a causal link" between the infringing activities and a financial benefit to Defendants. *Giganews*, 847 F.3d at 673. This demands more than a bare allegation that Sharktech's customers were "drawn" to Defendants to obtain access to infringing content. *Id.* The draw must be respect to the specific, infringing content at issue. *Id.* at 674. Here, Plaintiffs fail to allege any "causal link"

---

[13]     It is also profoundly unwise as a policy matter, creating overenforcement risk in which companies like Sharktech would be encouraged – by threats of their own liability – to cut off business with companies merely because they may have been accused, perhaps wrongly, of infringement or contributory infringement.

between the infringing activities of End Users and Defendants. Nor can Plaintiffs plausibly allege that Defendants' customers are drawn to Defendant's general-purpose infrastructure services to "access" infringing content. According to Plaintiffs, that content resides on the systems and servers of the End Users engaged in copyright infringement via the BitTorrent protocol.[14] Compl. ¶¶ 47, 56. Of note, Plaintiffs do not allege that Defendants function as an Internet service provider (e.g., Verizon) in privity with End Users. Nor do Plaintiffs allege that Defendants' customers pay Defendants for IP addresses specifically for the purpose of infringing Plaintiffs' works. By definition, every single activity – infringing or otherwise – that occurs on the Internet requires an IP address, but that does not result in vicarious liability for the provider of IP addresses, especially where the provider has no control over downstream End Users. In sum, Plaintiffs have failed to plead a theory of vicarious liability consistent with the common law principles of agency and *respondeat superior*, which require a high degree of control over the alleged tortfeasor. This Court should not expand vicarious liability principles beyond those set forth under common law. *See Meyer v. Holley*, 537 U.S. 280 (2003).

### III. <u>Plaintiffs Fail to Plausibly Allege Direct Infringement By Defendants' Customers, and Even if Customers Directly Infringe, Defendants Are Not Secondarily Liable.</u>

The Complaint alleges direct infringement by End Users. But Plaintiffs try to sidestep the fact that Defendants are at least three steps removed from any act of alleged direct infringement by morphing their theory of direct liability, suggesting that Defendants' "subscribers" are also engaged in direct infringement by "distributing" infringing content over the Internet. *See* Compl. ¶¶ 45, 74, 88, 151, 159. To the extent Plaintiffs do allege direct infringement by Defendants'

---

[14]    While Plaintiffs make one conclusory allegation that Defendant's "subscribers" store copies of Plaintiffs' works on Sharktech's servers, this allegation contradicts Plaintiffs' entire summary of how End Users exchange files via BitTorrent from their own computers, using the BitTorrent Client, and should therefore be disregarded. *See* Compl. ¶ 139. Even if the Court takes this allegation as true, Plaintiffs still do not allege that such storage (which is not possible) is anything more than transitory, or that Defendants know about, control, or directly profit from such storage.

customers, these allegations fail as a matter of law.

Violation of a copyright owner's exclusive right of distribution requires: (a) distribution of "copies" or "phonorecords" of the copyrighted work, (b) to the public, (c) "by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). The Copyright Act defines both "copies" and "phonorecords" as material objects. 17 U.S.C. § 101. Here, Plaintiffs have alleged no facts showing that Defendants' customers have distributed – knowingly or otherwise – *any* material objects in which Plaintiffs' copyrighted works are fixed, *and* that such distribution constituted a sale, rental, lease or loan. These facts are required to plead direct infringement.

In addition to the Copyright Act's plain language, in cases arising in the context of the Internet, in which a defendant's system is alleged to have been merely used to create, display or distribute a copy by a third party, there must be some element of "volition or causation" to establish direct infringement by the system or service provider. *Netcom*, 907 F. Supp. at 1370. "'[V]olition in this context does not really mean an act of willing or choosing or an act of deciding'; rather, 'it . . . stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts.'" *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 731 (9th Cir. 2019) (plaintiff failed to provide evidence that Zillow selected material for upload, download, transmission or storage, or instigated copying, storage, or distribution; Zillow acted passively, at the request of its users) (quoting *Giganews*, 847 F.3d at 666). "Stated differently, '*direct* liability must be premised on conduct that can reasonably be described as the *direct cause* of the infringement.'" *Id.*

Here, the Complaint alleges that *End Users* cause all allegedly infringing conduct – they download BitTorrent Clients, access Torrent Sites, request VPNs to conceal their identities, and exchange infringing files via the BitTorrent protocol. Compl. ¶¶ 48-76. Plaintiffs do not allege that

Sharktech commits any of these acts. Nor do Plaintiffs allege that VPN service providers, by merely responding to a request for a VPN and providing "tunnels" for the transfer of information, are involved in volitional acts, such as the selection of infringing materials or the instigation of copying or distribution. *See Zillow*, 918 F.3d at 731.

Even if this Court finds that Plaintiffs have, somehow, alleged a plausible claim of direct copyright infringement by Defendants' customers (and they have not), Plaintiffs still fail to state claims of contributory or vicarious liability against Defendants for all of the reasons set forth above. Specifically, Plaintiffs fail to allege facts that show Defendants: (1) operate technology substantially incapable of non-infringing purposes; (2) induced infringement by clear expressions designed to stimulate others to commit infringement; (3) had actual and specific knowledge of infringement; (4) had the right and ability to control their customers; or (5) had an obvious and direct interest in the underlying infringements.

**IV. <ins>Plaintiffs Fail to State a Claim For Secondary Liability For DMCA Violations.</ins>**

The Copyright Act prohibits (1) knowingly providing or distributing false "copyright management information" ("CMI") with the intent to induce, enable, facilitate or conceal infringement (17 U.S.C. § 1202(a)) or (2) intentionally removing or altering CMI, or distributing works knowing that CMI has been removed or altered, if the defendant knows, or has reasonable grounds to know, that the removal or alteration will induce, enable, facilitate or conceal an infringement. 17 U.S.C. § 1202(b). To state a claim for a 1202(b) violation, Plaintiffs must plausibly allege "that the Defendants–or those for whom [Defendants may be] vicariously liable– possessed actual knowledge of the unauthorized change to the copyright management information . . . ." *Gordon v. Nextel Communs. & Mullen Advertising, Inc.*, 345 F.3d 922, 926-27 (6th Cir. 2003). This requires proving a mental state that has "a more specific application than the universal possibility of encouraging infringement; specific allegations as to how identifiable

infringements 'will' be affected are necessary." *Stevens v. CoreLogic, Inc.*, 899 F.3d 666, 674 (9th Cir. 2018). "[T]he plaintiff must provide evidence from which one can infer that future infringement is likely . . . to occur *as a result* of the removal or alteration of CMI." *Id.* at 675.

Here, the only CMI alleged to be at issue are the titles of the copyrighted works asserted. Plaintiffs scarcely allege predicate liability for removal or alteration of CMI in violation of the Copyright Act, let alone secondary liability for such removal or alteration by Defendants' customers. And no facts alleged state a claim for secondary liability against Defendants themselves. As an initial matter, Plaintiffs do not allege that any CMI associated with the works infringed was in fact removed or altered. The Complaint is silent regarding the manner in which Plaintiffs' "titles" or CMI are in fact legitimately used. Without this fact, Plaintiffs cannot show removal or alteration of CMI. All that Plaintiffs allege is that unnamed, unknown *End Users* responsible for the initial seed files of the copyrighted works allegedly exchanged via BitTorrent *added* terms to the digital file names. Compl. ¶¶ 102-105.

Moreover, even if the Court decides that Plaintiffs have alleged facts sufficient to plead removal or alteration of CMI by End Users, Plaintiffs fail to plausibly allege facts showing that Defendants' customers (much less Defendants) knew CMI was removed or altered by End Users, *and* knowingly transmitted files with removed or altered CMI with the intent to induce, enable, facilitate or conceal infringement or knowing that future infringement is likely to occur "as a result" of the removal. *Stevens*, 899 F.3d at 675. Regarding these activities, Plaintiffs allege labels and conclusions and the bare elements of a claim. *See* Compl. ¶¶ 165-171. This is insufficient. *See Twombly*, 550 U.S. at 555.

Plaintiffs' allegations that Defendants are secondarily liable for alleged alteration of CMI by End Users are even more remote and implausible. Plaintiffs' theory is premised on a threadbare

recitation of a contributory and vicarious liability claim. Compl. ¶ 171-172. The sole *fact* asserted to support Plaintiffs' conclusions is that Sharktech received notices of claimed infringement containing the digital file names of the allegedly infringing works. Compl. ¶ 117. Notwithstanding the fact that these notices are deficient and do not claim direct infringement by Defendants' subscribers (*see supra* at Section I.D.), Plaintiffs do not provide allegations explaining how Defendants, upon receipt of such a notice, would know: (a) the original, legitimate file name of the allegedly infringed work; or (b) that the digital file name provided in the notice had been altered in any way. In fact, in the notices referenced in paragraph 117 and Exhibit 4 of the Complaint, the file name identified does not contain any of the terms FGT, YTS or RARBG, which Plaintiffs allege is the information added to allegedly "alter" CMI. Nor do Plaintiffs plead allegations supporting the elements of a contributory or vicarious copyright infringement claim according to the authority discussed at length in this Motion. Every other allegation with respect to this claim is asserted solely against Defendants' subscribers, and is insufficient to show that *Defendants* are secondarily or vicariously liable according to the applicable legal authority.

**V.**  **Plaintiffs Fail to Allege an *Alter Ego* Relationship Between Defendants.**

In assessing *alter ego* allegations, this Court applies the law of the jurisdiction of formation, which is Montana law. *See In re ms55, Inc.*, No. 10-CV-00042-PAB, 2011 WL 1084967, at *6 (D. Colo. Mar. 21, 2011); Compl. ¶ 18. A plaintiff must allege and prove that (1) the corporation is a mere agent or alter ego of the parent company [or its sole member]; *and* (2) "the corporate cloak must have been used to defeat public convenience, justify wrong, perpetrate fraud, or to defend crime." *Hando v. PPG Indus., Inc.*, 236 Mont. 493, 498, 771 P.2d 956, 960 (Mont. 1989).

Plaintiffs' sole allegations regarding *alter ego* liability are that Defendant Timrawi closely holds and controls Defendant Sharktech, makes policy decisions for Sharktech, "dominates" Sharktech, has a "unity of interest" with Sharktech such that "the fiction of a separate existence

would … sanction a fraud or promote injustice", and "benefits from the infringements of Sharktech." Compl. ¶¶ 27-34. These allegations are not sufficient to state a claim for *alter ego* liability under Montana law. When evaluating whether one corporation is merely an alter ego of another, Montana courts disregard as insufficient bare allegations that one party fully owns another, that the entities use the same people as directors or officers, or are engaged in the same business enterprise. *Fischer v. Int'l Student Exch., Inc.*, CV-14-52-BU-DWM, 2015 WL 2095237, *3 (D. Mont. May 5, 2015) (citing *Hando*, 771 P.2d at 960). Instead, courts will look at factors including "sharing of the same address or name, the commingling of funds, undercapitalization of the subsidiary and failure to maintain separate business records." *Hando*, 771 P.2d at 960. Plaintiffs allege no facts related to these factors. Montana courts will also disregard potentially relevant statements when they are "not facts as much as recitation of the elements required to pierce the corporate veil." Here, Plaintiffs have merely recited elements and alleged some unity of interest that would "sanction a fraud," without any facts pertaining to what that fraud might be. In addition, Plaintiffs must plausibly allege that Defendants specifically used the corporate form "to defeat public convenience, justify wrong, perpetrate fraud, or to defend crime." *Id.* Conclusory allegations regarding these factors are insufficient to defeat a motion to dismiss. *Id.* at 961; *see also Fischer*, 2015 WL 2095237, at *4; *Little v. Grizzly Mfg.*, 195 Mont. 419, 424, 636 P.2d 839, 842 (Mont. 1981) (granting defendants' motion to dismiss, holding that the corporation itself must be formed with the intent to avoid personal liability, and corporation's officer must have personally committed a tort). Because Plaintiffs have alleged no facts demonstrating these points, including any specific facts showing that Timrawi abuses the corporate form to avoid liability, Plaintiffs' *alter ego* theory must be dismissed and Defendant Timrawi dismissed from the instant litigation.

### VI. <u>Plaintiffs Millennium Funding, Inc. and Eve Nevada, LLC Lack Standing.</u>

To state a claim for copyright infringement, a plaintiff must allege ownership of the

allegedly infringed material and violation of at least one exclusive right of copyright holders. 17 U.S.C. § 106. Here, Plaintiffs allege that: (a) Millennium Funding, Inc. owns the motion picture and screenplay rights in the film *Angel Has Fallen* (Compl. ¶ 11 and Ex. A), (b) Eve Nevada, LLC owns the motion picture rights in the film *Ava*. (Compl. ¶ 16 and Ex. A), and (c) Voltage Holdings, LLC owns the motion picture and screenplay rights in *Extremely Wicked, Shockingly Vile and Evil*. However, a review of U.S. Copyright Office records corresponding to the copyright registration numbers attached as Exhibit A to the Complaint, which are properly considered on a motion to dismiss (*see Pace*, 519 F.3d at 1072), shows that the owners of these registrations are Fallen Productions, Inc., Voltage Holdings, LLC and Wicked Nevada LLC, respectively. *See* Ex. A hereto. Plaintiffs do not allege that any assignment of rights has taken place between these respective entities. Accordingly, Plaintiffs Millennium Funding, Inc., Eve Nevada, LLC (to the extent related to claims in copyright registration PA0002235557), and Voltage Holdings, LLC lack standing to maintain their claims, and all claims pertaining to copyright in the motion picture and screenplay for *Angel Has Fallen* and *Extremely Wicked, Shockingly Vile and Evil*, and pertaining to copyright in the motion picture *Ava,* must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully requests that the Court dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6), with prejudice.

Respectfully submitted this 12th day of July, 2021.

*s/Airina L. Rodrigues*

Airina L. Rodrigues

Andrea M. LaFrance, #50222

BROWNSTEIN HYATT FARBER SCHREK, LLP

410 Seventeenth Street, Suite 2200

Denver, CO   80202-4432

Telephone:      303-223-1100

Fax:                 303-223-1111

Email:  arodrigues@bhfs.com

            alafrance@bhfs.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of July, 2021, I electronically filed the foregoing **DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel:

Kerry Steven Culpepper
Joshua J. Lee
CULPEPPER IP, LLLC
75-170 Hualalai Road
Suite B204
Kailua Kona, HI 96740
Telephone: 808-464-4047
Fax: 202-204-5181
Email: kculpepper@culpepperip.com
        joshua.lee@culpepperip.com

*Attorneys for Plaintiffs*

*s/Kate M. Meade*
Kate M. Meade, Paralegal
BROWNSTEIN HYATT FARBER SCHRECK, LLP
410 17th Street, Suite 2200
Denver, CO 80202
*phone*: 303-223-1100; *fax*: 303-223-1111