**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. <u>1:21-cv-1261-SKC</u>

MILLENNIUM FUNDING, INC.,
VOLTAGE HOLDINGS, LLC,
LHF PRODUCTIONS, INC.,
OUTPOST PRODUCTIONS, INC.,
AFTER II MOVIE, LLC,
MILLENNIUM MEDIA, INC.,
WONDER ONE, LLC,
HITMAN TWO PRODUCTIONS, INC.,
MILLENNIUM IP, INC.,
I AM WRATH PRODUCTIONS, INC.,
KILLING LINK DISTRIBUTION, LLC,
VENICE PI, LLC,
RAMBO V PRODUCTIONS, INC.,
MON, LLC,
NIKOLA PRODUCTIONS, INC.,
BODYGUARD PRODUCTIONS, INC.,
YAR PRODUCTIONS, INC.,
DALLAS BUYERS CLUB, LLC, and
SF FILM, LLC,

      Plaintiffs,

v.

SHARKTECH, INC.,
PRIVATE INTERNET ACCESS, INC., and
DOES 1-5,

      Defendants.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

      Plaintiffs MILLENNIUM FUNDING, INC., VOLTAGE HOLDINGS, LLC, LHF

PRODUCTIONS, INC., OUTPOST PRODUCTIONS, INC., AFTER II MOVIE, LLC,

20-023W

MILLENNIUM MEDIA, INC., WONDER ONE, LLC, HITMAN TWO PRODUCTIONS, INC., MILLENNIUM IP, INC., I AM WRATH PRODUCTIONS, INC., KILLING LINK DISTRIBUTION, LLC, VENICE PI, LLC, RAMBO V PRODUCTIONS, INC., MON, LLC, NIKOLA PRODUCTIONS, INC., BODYGUARD PRODUCTIONS, INC., WONDER ONE, LLC, YAR PRODUCTIONS, INC., DALLAS BUYERS CLUB, LLC, and SF FILM, LLC ("Plaintiffs") file this First Amended Complaint against Defendants SHARKTECH, INC. ("Sharktech"), PRIVATE INTERNET ACCESS, INC., ("PIA") and DOES 1-5 ("Defendant") and allege as follows:

## I.      NATURE OF THE ACTION

1.      This matter arises under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act").

2.      The Plaintiffs allege that Defendant Sharktech is secondarily liable for: (a) copyright infringements in violation of 17 U.S.C. §§ 106 and 501; and (b) violations under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202.

3.      The Plaintiffs allege that Defendant Sharktech is liable for negligent and fraudulent misrepresentations under Colorado law.

4.      The Plaintiffs allege that Defendants PIA and DOES 1-5 are directly liable for copyright infringements and DMCA violations and also secondarily liable for copyright infringements.

## II.      JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et. seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question), 28

2

20-023W

U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition) and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

6.     Defendants solicit, transact, and/or do business within this jurisdiction, and have committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that their acts would cause injury in this jurisdiction.   As such, Defendants have sufficient contacts with this judicial district to permit the Court's exercise of personal jurisdiction over them.

7.     Defendant Sharktech operates a data center in Denver, Colorado.   *See* https://sharktech.net/data-centers/denver/ [last accessed on May 4, 2021] ("Sharktechs Denver, CO services are located at H5s data center campus, which is found within the heart of the citys technology sector.")

8.     Sharktech is a member of the American Registry of Internet Numbers ("ARIN"), having an ARIN handle "SHARK-9" and an address in Colorado for its SHARK-9 handle.



20-023W

9.      Defendant PIA's corporate office is in Greenwood Village, Colorado.  *See* https://www.privateinternetaccess.com/about-us [last accessed on July 27, 2021] (PIA Corporate office at 5555 DTC Parkway, Suite 360, Greenwood Village, Colorado).

10.     Sharktech provides servers and/or Internet Protocol ("IP") addresses from its data center in Denver, Colorado to its subscribers such as, upon information and belief, Pango, Inc., Tzulo, Inc., PIA, ExpressVPN and DOES 1-5.

11.     Plaintiffs' injuries arise out of Defendants' forum-related activities, namely Defendants' direct and contribution to infringements of Plaintiffs' copyright protected Works, and DMCA violations at IP addresses and servers controlled by Defendants in this District.

12.     Plaintiffs' injuries arise out of Sharktech's misrepresentations that Sharktech is the appropriate entity to contact for abuse at IP addresses in Colorado.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) - (c) because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; (b) the Defendants can or could be found, in this District; and/or (c) Defendants are subject to the court's personal jurisdiction with respect to the present action.  Additionally, venue is proper in this District pursuant 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendants or Defendants' agents reside and can be found in this District.

### III.     PARTIES

### A.   The Plaintiffs

14.     The Plaintiffs are the owners of the copyrights in the Works shown in Exhibit

4

"1".

15.     Each of Plaintiffs LHF Productions, Inc., Millennium Funding, Inc., Outpost Productions, Inc., Millennium Media, Inc., Hitman Two Productions, Inc., Millennium IP, Inc., Rambo V Productions, Inc., Nikola Productions, Inc., and Bodyguard Productions, Inc. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media, Inc. a production company and distributor of a notable catalog of major motion pictures.

16.     Each of Plaintiffs Voltage Holdings, LLC and After II Movie, LLC is a limited liability company registered under the laws of the State of Nevada, has principal offices in Los Angeles, California and is an affiliate of Voltage Pictures, a production company with a notable catalog of major award-winning motion pictures.

17.     MON, LLC is a limited liability company registered under the laws of the California, having principal office in Beverly Hills, California and is an affiliate of Voltage Pictures.

18.     Venice PI, LLC is a limited liability company registered under the laws of the State of California, having principal office in Los Angeles, California and is an affiliate of Voltage Pictures.

19.     Wonder One, LLC is a Wyoming limited liability company with its principal place of business in Sherman Oaks, CA.

20.     I am Wrath Production, Inc. is a California corporation with its principal place of business in Los Angeles, CA.

21.     Killing Link Distribution, LLC is a California limited liability company with its

20-023W

principal place of business in Beverly Hills, CA 90212.

22.     YAR Productions, Inc. is a New York corporation with its principal place of business at Monsey, New York.

23.     Dallas Buyers Club, LLC is a Texas limited liability company with its principal place of business at The Woodlands, TX.

24.     SF Film, LLC is a New York limited liability company with its principal place of business at Albany, New York.

## B.   The Defendants

25.     Defendant Sharktech, is, upon information and belief, a corporation organized under the laws of Montana with its principal place of operation in Henderson, Nevada.

26.     Sharktech operates data centers in Los Angeles, Denver, Chicago and Amsterdam.

27.     Sharktech provides servers, colocation and distributed denial of service ("DDoS") protection at its data centers.

28.     Sharktech is a member of ARIN, which is a nonprofit, member-based organization that manages and distributes Internet number resources such as IP addresses and Autonomous System Numbers.

29.     ARIN manages these resources within its service region, which is comprised of Canada, the United States, and many Caribbean and North Atlantic islands.

30.     Sharktech is required to update the Whois records for the IP addresses it reassigns or reallocates to its subscribers per its registration agreement with ARIN.

20-023W

31.     Defendant PIA is, upon information and belief, a corporation organized under the laws of Indiana with its principal place of operation in Colorado.

32.     PIA leased servers from Sharktech in Denver, CO and was allocated IP addresses from Sharktech that were used at the servers in Denver, CO.  *See* Exhibit "6" ("Initial IPv4 Allocation: 5 usable IPs/(29)…Denver Xeon E3 1270V2…174.128.242.234")

33.     PIA provides Virtual Private Network ("VPN") services to its customer ("end users").

34.     Defendants DOES 1-5 are, upon information and belief, VPN service providers that receive servers and colocation services and are allocated IP addresses from Sharktech at Sharktech's Denver facility to operate their VPN service.  Plaintiffs intends to subpoena Sharktech to learn the identities of DOES 1-5.  Further discovery may be necessary in some circumstances in order to be certain of the identity of the proper Defendant.  Plaintiff believes that information obtained in discovery will lead to the identification of each of DOES 1-5's true names and permit the Plaintiffs to amend this First Amended Complaint to state the same.  Plaintiff further believes that the information obtained in discovery may lead to the identification of additional infringing parties to be added to this First Amended Complaint as Defendants.  Plaintiffs will seek to amend this First Amended Complaint to include the proper names and capacities once determined. Plaintiffs are informed and believe, and based thereon allege, that each of the fictitiously named Defendants participated in and are responsible for the acts described in this First Amended Complaint and damages resulting therefrom.

## IV.     JOINDER

20-023W

35.     Pursuant to Fed. R. Civ. P. 20(a)(1), each of the Plaintiffs are properly joined because, as set forth in detail above and below, the Plaintiffs assert: (a) a right to relief arising out of the same transaction, occurrence, or series or transactions, namely (i) the use of Sharktech's services by its subscribers such as PIA and DOES 1-5 for infringing the copyrights in Plaintiffs' Works, (ii) the contribution to said copyright infringements by Sharktech, (iii); and (b) that there are common questions of law and fact.

36.     Pursuant to Fed. R. Civ. P. 20(a)(2), each of the Defendants was properly joined because, as set forth in more detail below, the Plaintiffs assert that the infringements complained of herein by each of the Defendants (a) arises out of the same transaction, occurrence, or series of transactions or occurrences, and (b) there are common questions of law and fact, particularly, PIA and DOES 1-5 lease servers and are allocated IP addresses from Sharktech, and use said servers and IP addresses to infringe Plaintiffs' Works.

## V.     FACTUAL BACKGROUND

### A.  The Plaintiffs Own the Copyrights to the Works

37.     The Plaintiffs are the owner of the copyrights in the motion pictures ("Works") as shown in Exhibit "1".  The Works are the subjects of copyright registrations, and this action is brought pursuant to 17 U.S.C. § 411.

38.     The Plaintiffs are the owners of the copyrights by virtue of original authorship, assignment and/or company reorganization.

39.     The Works are motion pictures currently offered for sale in commerce.

40.     Defendants had notice of Plaintiffs' rights through at least the credits

20-023W

indicated in the content of the motion pictures which bore proper copyright notices.

41.     Defendants also had notice of Plaintiffs' rights through general publication and advertising associated with the motion pictures, and packaging and copies, each of which bore a proper copyright notice.

42.     Defendant Sharktech also had notice of Plaintiffs' rights through notices that were sent to Sharktech's abuse contact as discussed below.

43.     Defendant PIA and DOES 1-5 also had notice of Plaintiffs' rights through notices that were sent to other data centers and forwarded to them.

**B. Sharktech's subscribers Infringe Plaintiffs' Copyrights.**

44.     Sharktech's subscribers include the service provider Tzulo, Inc. ("Tzulo") and VPN service providers such as Defendant PIA, Express VPN International Ltd. ("ExpressVPN") and Pango, Inc. ("Pango").

45.     Customers of Sharktech's subscribers ("end users") use BitTorrent and BitTorrent Client applications such as Popcorn Time to infringe Plaintiffs' exclusive rights of reproduction and distribution.

46.     The United States Trade Representative ("USTR") placed Popcorn Time on a list of examples of Notorious Markets engaged in and facilitating substantial piracy. See USTR, 2020 Review of Notorious Markets, Jan. 14, 2021, pg. 26, Available at https://ustr.gov/sites/default/files/files/Press/Releases/2020%20Review%20of%20Notori ous%20Markets%20for%20Counterfeiting%20and%20Piracy%20(final).pdf     [last accessed on March 5, 2021].

47.     Sharktech's subscribers distribute Plaintiffs' Works for these end users in

20-023W

violation of Plaintiffs' exclusive right of distribution.

48.     Sharktech's subscribers reproduce Plaintiffs' Works for these end users in violation of Plaintiffs' exclusive right of reproduction.

49.     BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

50.     The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

### 1.  The Initial Seed, Torrent, Hash and Tracker

51.     A BitTorrent user that wants to upload the new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using, for example, the Client he or she installed onto his or her computer.

52.     The initial user or seeder of a file used a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

53.     The initial seeder often modifies the file title of the Work to include a wording such as "TGx", "FGT", "RARBG" or "YTS" in the title of the torrent files and file copies in order to enhance a reputation for the quality of his or her torrent files and attract users to his or her piracy website.

54.     The Client takes the target computer file, the "initial seed," here the

20-023W

copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

55.     The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Works, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

56.     When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

57.     Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash identifier for each piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive.

58.     The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

59.     The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Work, on them and facilitates the exchange of data among the computers.

60.     Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

### 2. Torrent Sites

20-023W

61.    "Torrent sites" are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol.  There are numerous torrent websites including torrentgalaxy and the notorious YTS and RARBG websites.

62.    The YTS and RARBG websites were noted by the USTR as examples of Notorious Markets defined as an online marketplace reportedly engaged in and facilitating substantial piracy. *See* USTR, 2014 Out-of-Cycle Review of Notorious Markets, Mar. 5, 2015,                pg.                17,                Available                at https://ustr.gov/sites/default/files/2014%20Notorious%20Markets%20List%20- %20Published_0.pdf [last accessed on May 7, 2021]; *see also* USTR, *2018 Out-of-Cycle Review of Notorious Markets*, April 2019, pgs. 24, 27 Available at https://ustr.gov/sites/default/files/2018_Notorious_Markets_List.pdf [accessed on May 7, 2021].

### 3. End users access the torrent sites from Sharktech IP addresses

63.    End users (customers of Sharktech's subscribers) accessed torrent sites including the YTS website to upload and download Plaintiffs' copyrighted Work from IP addresses provided by Sharktech.

64.    The Sharktech IP address used by the end users then becomes a link to the infringing copies of Plaintiffs' Works.

65.    End user Robert O'Brien (a customer of Defendant PIA) accessed the torrent website YTS from IP address 174.128.226.10 in Denver and downloaded torrent files for Plaintiffs' Work *Angel Has Fallen* and *Distorted*.  *See* Decl. of Robert O'Brien at

20-023W

¶¶2-3, 6.

66.     An end user who registered for an account with the YTS website with the email address jclarkness@gmail.com accessed the torrent website YTS from IP address 174.128.227.226 and downloaded a torrent file for the Work *Hunter Killer*.

67.     An end user who registered for an account with the YTS website with the email address schmuckatelli2@gmail.com accessed the torrent website YTS from IP address 174.128.243.122 and downloaded a torrent file for the Work *London Has Fallen*.

68.     An end user who registered for an account with the YTS website with the email address mike@graystarr.com accessed the torrent website YTS from IP address 174.128.236.98 and downloaded a torrent file for the Work *London Has Fallen*.

69.     An end user who registered for an account with the YTS website with the email address amybluesoul@gmail.com accessed the torrent website YTS from IP address 199.115.97.202 and downloaded a torrent file for the Work *Extremely Wicked, Shockingly Evil and Vile*.

70.     IP addresses 174.128.226.10, 174.128.227.226, 174.128.243.122, 174.128.236.98 and 199.115.97.202 were assigned to Sharktech from ARIN, and reassigned by Sharktech to its subscribers to use at the Denver, CO data center.

### 4.  The Peer Identification

71.     The BitTorrent Client will assign an identification referred to as a Peer ID to the computer so that it can share content (here the copyrighted Work) with other peers. The Peer ID incorporates the IP address of the BitTorrent swarm participant.

### 5.  Uploading and Downloading a Work Through a BitTorrent Swarm

20-023W

72.     Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Work) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

73.     The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file.  Defendant Sharktech's subscribers transmit the pieces to the peers.

74.     Once a peer receives a piece of the computer file, here a piece of the copyrighted Work, it starts transmitting that piece to the other peers.  Defendant Sharktech's subscribers transmit the pieces to the peers.

75.     In this way, all of the peers and seeders are working together in what is called a "swarm."

76.     Here, Sharktech's subscribers and end users (customers of Defendant Sharktech's subscribers) participated in a swarm and directly interacted and communicated with other members of the swarm through digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions, Plaintiffs' Works.

77.     Defendant Sharktech's subscribers distributed the end users' transmissions to other members of the swarm.

78.     In this way, and by way of example only, one initial seeder can create a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of

14

a computer file, like the Works here, upload the torrent onto a torrent site, and deliver a different piece of the copyrighted Work to each of the peers. The recipient peers then automatically begin delivering the piece they just received to the other peers in the same swarm.

79.     Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

***6. The Plaintiffs' Computer Investigator Identified Sharktech's IP Addresses as Participants in Swarms That Were Distributing Plaintiffs' Copyrighted Works.***

80.     The Plaintiffs retained Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform the Plaintiffs' copyrighted Works.

81.     MEU used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.

82.     MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

83.     The IP addresses, Unique Hash Numbers, and hit dates contained in Exhibit "2" accurately reflect what is contained in the evidence logs.

20-023W

84.     The logged information in Exhibit "2" show that Sharktech's subscribers distributed pieces of the Plaintiffs' copyrighted Works identified by the Unique Hash Number.

85.     End users' computers used the identified IP addresses in Exhibit "2" to connect to the investigative server from a computer in this District (at Sharktech's Denver facility) in order to transmit a full copy, or a portion thereof, of a digital media file identified by the Unique Hash Number through networks of Sharktech's subscribers.

86.     MEU's agent analyzed each BitTorrent "piece" distributed by the IP addresses listed on Exhibit "2" and verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Works.

87.     MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

***C. The Operator of the YTS website confirmed that the end users downloaded torrent files for copying the Work from the YTS website.***

88.     The YTS website operator maintained records of activity of registered user accounts. *See* Exhibit "3" at pg. 10 (Certificate of Authenticity).

89.     As shown in Exhibit "3", the records including the email address of the registered user account, the torrent files the registered account downloaded, the IP address from where the registered user accessed the YTS website, and the time.

90.     The records show end users downloaded the torrent file for reproducing the Work, the same file copy MEU's agent verified that re-assemblage of the pieces using a

16

BitTorrent Client results in a fully playable digital motion picture of the Works, from IP addresses assigned to Sharktech and in Denver, CO.

### D. Sharktech's subscribers reproduced and distributed copies of Plaintiffs' Works.

91.     Defendant Sharktech's subscribers distributed at least pieces of each of Plaintiffs' Works over network connections to other peers in the Swarm.

92.     Defendant Sharktech's subscribers reproduced at least pieces of each of Plaintiffs' Works within said network connections to distribute to the other peers in the Swarm.

93.     Defendant Sharktech's subscriber PIA reproduced and distributed copies of the Works *Angel Has Fallen* by the file name Angel Has Fallen (2019) [WEBRip] [720p] [YTS.LT] and *Distorted* by the file name Distorted (2018) [BluRay] [720p] [YTS.AM] from IP address 174.128.226.10.

94.     Defendant Sharktech's subscriber Pango reproduced and distributed copies of Plaintiff Eve's Work *Ava* by the file names: "Ava.2020.1080p.WEB-DL.DD5.1.H264-FGT"; "Ava.2020.1080p.WEBRip.x264-RARBG"; and "Ava (2020) [1080p] [BluRay] [5.1] [YTS.MX]" from IP address 174.128.250.122.

95.     Defendant Sharktech's subscriber Tzulo reproduced and distributed copies of Plaintiffs' Works *Angel Has Fallen* by the file name "Angel Has Fallen (2019) [WEBRip] [720p] [YTS.LT]"; *Ava* by the file names "Ava.2020.1080p.WEB-DL.DD5.1.H264-FGT" and "Ava (2020) [1080p] [BluRay] [5.1] [YTS.MX]"; *Extremely Wicked, Shockingly Evil and Vile* by the file name "Extremely.Wicked.Shockingly.Evil.and.Vile.2019.1080p.NF.WEBRip.DDP5.1.x264-

17

CM", *Outpost* by the file name "The Outpost (2020) [1080p] [WEBRip] [5.1] [YTS.MX]" from IP address 198.54.128.19.

96.     As admitted by Defendants, each "IP address is a numerical identifier assigned to each device connected to a computer network that uses the Internet Protocol for communication [and] permit devices to be identified and interface on the Internet and provides the location of the device in the network." Defendants' Motion to Dismiss [Doc. #18] at pg. 6.

97.     The IP addresses Sharktech provided to its VPN subscribers are indexes, references, pointers, and/or hypertext links that linked swarm participant to online locations such as Sharktech's own servers in Denver and/or the end user's computers containing unauthorized copies of Plaintiffs' Works or sources for distributing Plaintiffs' Works.

**E.  Sharktech's subscribers including Defendants PIA and DOES 1-5 intentionally induce piracy of copyright protected Works including Plaintiffs'.**

98.     Sharktech's VPN subscribers such as Defendants PIA and DOES 1-5 obtained services such as IP addresses and servers from Sharktech for the purpose of infringing copyright protected Works including Plaintiffs'.

99.     Sharktech's VPN subscribers such as Defendants PIA and DOES 1-5 promote their services for the purpose of infringing copyright protected Works including Plaintiffs'.

100.    Sharktech subscriber Pango promotes its VPN service under the brand name "Hotspot Shield" as a means for obtaining torrent files.

20-023W

101.   Pango even recommends notorious movie piracy sources to its end users such as Piratebay and KickAssTorrent for obtaining torrent files.



https://www.hotspotshield.com/blog/protect-torrent-downloads-hotspot-shield/   [last accessed on May 5, 2021].

102.   KickassTorrents and The Pirate Bay have also been identified by the USTR as examples of Notorious Markets.  *See* USTR *supra* 2014 at pgs. 5 and 15.

103.   Pango goes even further to warn its end users that if they don't use a VPN, they risk "…revealing your IP address in order to download the file - This opens you up to … monitoring from groups who try to stop torrenting services. A VPN will hide your own IP address and connect to the torrent service instead meaning there is no traceability back to your own device" in the context of discussing how to setup the Hotspot Shield to use BitTorrent for "…downloading files such as programs, movies and music from other users   worldwide."   https://www.hotspotshield.com/resources/vpn-for-torrenting/   [last accessed on May 5, 2021].



104.   ExpressVPN partners with piracy websites to promote its VPN service as a tool to pirate copyright protected content without getting caught.

105.   ExpressVPN promotes it service on the piracy website YTS with the message, "WARNING! Download only with VPN…" and describes its VPN service as a means to, "Protect yourself from expensive lawsuits and fines NOW!"

20-023W



106.   ExpressVPN even promotes it service on the piracy website YTS next to specific movies available to be pirated.



107.    ExpressVPN explicitly promotes it service on the piracy website YTS as an essential tool to pirate Plaintiffs' Works.   *See* Decl. of Kessner at ¶¶4-10 (ExpressVPN promotes its VPN service for downloading torrents for *Angel Has Fallen*, *Ava*, *Disturbing the Peace*, *Tesla*, *The Second*, *The Outpost*, and *The Professor and the Madman*).

108.    PIA acknowledges that its end users use its VPN service for piracy.



109.    PIA instructs its users how to *optimize* use of its VPN service for piracy.



110.    Defendants PIA and DOES 1-5 (Sharktech's subscribers) actively promote their VPN Service for the purpose of movie piracy, including of infringing Plaintiffs' Works.

20-023W

111.   End users use Defendants PIA and DOES 1-5's VPN service exactly as explained and encouraged – to infringe copyright protected content while logged into the VPN service so they can conceal their illicit activities.

112.   Defendants PIA and DOES 1-5 promote their VPN service as a tool to engage in massive copyright infringement to entice end users to purchase their VPN service.

113.   Defendants PIA and DOES 1-5 even promote their VPN service on the websites of notorious piracy platforms such as YTS by including so-called "warnings" that the piracy platform user will be exposed if they continue pirating without using a VPN.

114.   Based upon Defendants PIA and DOES 1-5's subscribers' encouragement that their VPN service can be used to "safely" operate piracy apps such as Popcorn Time and visit torrent sites such as Pirate Bay, Kickass Torrents, YTS and Extratorrents and pirate, end users purchase the VPN service, install piracy apps such as Popcorn Time on their devices and/or visit torrent sites to infringe copyright protected content including Plaintiffs' while using Defendants PIA and DOES 1-5's VPN service.

115.   Defendants PIA and DOES 1-5 have the capability to log their end users' access to their VPN service but purposely delete the logged information so that they can promote their service as a means to pirate copyright protected Works anonymously.

116.   Defendants PIA and DOES 1-5 interfere with standard technical measures used by copyright holders to identify or protect copyright works by purposefully deleted their end users' logged information. *See* 17 U.S.C. § 512(i)(1)(B).

117.   Defendants PIA and DOES 1-5 specifically admit that they deleted their end

20-023W

users' logged information to protect the end users' piracy activities in promotions and advertisements. *See e.g.* Ernesto, "Which VPN Providers Really Take Privacy Seriously in 2021?", June 14, 2021, https://torrentfreak.com/best-vpn-anonymous-no-logging/#tf-comments [last accessed on Aug. 1, 2021] (In response to questions concerning BitTorrent activity, PIA states "We do not store any logs relating to traffic, session, DNS or metadata. There are no logs kept for any person or entity to match an IP address and a timestamp to a current or former user of our service. In summary, we do not log, period.")

118.   Defendants PIA and DOES 1-5 do not have a safe harbor from liability because they have not "adopted and reasonably implemented...a policy that provides for the termination in appropriate circumstances of subscribers...who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

**F. Defendants' subscribers knew the Copyright Management Information included in the files they distributed to other peers had been removed or altered without the authority of Plaintiffs.**

119.   A legitimate file copy of the Work includes copyright management information ("CMI") indicating the title.

120.   The initial seeder of the infringing file copies of Plaintiff's Work added wording to the file titles to "brand" the quality of piracy files he or she released and attract further traffic to his or her website.

121.   For example, the initial seeder of the infringing file copies of *Angel Has Fallen* added the wording "YTS" to the file titles to brand the quality of piracy files he or

20-023W

she released and attract further traffic to the YTS website.

122.    For example, the initial seeder of the infringing file copies of *The Outpost* added the wording "TGx" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the torrentgalaxy website.

123.    The words YTS or TGx are not included in the file title of legitimate copies or streams of the Plaintiffs' Works.  The initial seeders of the Work altered the title to falsely include the words such as "YTS" or "TGx" in the CMI.

124.    The file copies Sharktech's subscribers such as PIA distributed to other peers in the Swarm included the altered CMI in the file title.

125.    Sharktech's subscribers such as PIA knew that TGx, FGT, YTS and RARBG were not the author of Plaintiffs' Works.

126.    Sharktech's subscribers such as PIA knew that TGx, FGT, YTS and RARBG were not a licensed distributor of Plaintiffs' Works.  Indeed, the YTS website includes a warning to this effect.

127.    Defendant Sharktech's subscribers such as PIA knew that the CMI that included TGx, FGT, YTS and RARBG in the file names was false.

128.    Defendant Sharktech's subscribers such as PIA knew that the file copies of the Work that they distributed to other peers in the Swarm included the altered CMI without the authority of Plaintiffs.

129.    Defendant Sharktech's subscribers such as PIA knew that the CMI in the title they distributed to other peers in the Swarm included the altered CMI without the authority of Plaintiffs.

20-023W

130.   Defendant Sharktech's subscribers such as PIA knew that the false or altered CMI in the titles would induce, enable, facility or conceal infringements of the Works when they distributed the false CMI, altered CMI or Works including the false or altered CMI.

131.   Namely, Defendant Sharktech's subscribers such as PIA knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent files originated to obtained unlicensed copies of the Work.

132.   By providing the website information in the altered CMI to others, Defendant Sharktech's subscribers induced, enabled and facilitated further infringements of the Work.

133.   Indeed, Defendant Sharktech's subscribers such as PIA and Pango promote their VPN services for accessing piracy website such as YTS and RARBG.

**G.  Sharktech had knowledge that its subscribers were infringing Plaintiffs' Works and distributing file copies of the Works with altered CMI and that the IP addresses it provided to the subscribes were links to infringing activity but continued to provide service to their subscribers**

134.   Plaintiffs engaged MEU to generate Notices of infringements ("Notices") styled per 17 U.S.C. §512(c)(3) of the DMCA to be sent to service providers of IP addresses where MEU confirmed infringement of copyright protected content.

135.   Each Notice included at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which includes the altered CMI, the IP address and port number at where infringement was confirmed

20-023W

and the time of infringement down to the second.   *See* Exhibits "4" and "5" (excerpts below).

> Protocol: BITTORRENT
> Infringed Work: The Outpost
> Infringing FileName: The.Outpost.2020.720p.GPLAY.WEBRip.900MB.x264-GalaxyRG[TGx]
> Infringing FileSize: 940063994
> Infringer's IP Address: 70.39.102.165
> Infringer's Port: 52098
> Initial Infringement Timestamp: 2021-02-10 00:11:17

> Protocol: BITTORRENT
> Infringed Work: The Hitmans Wifes Bodyguard
> Infringing FileName: The.Hitmans.Wifes.Bodyguard.2021.EXTENDED.1080p.WEBRip.x265-RARBG
> Infringing FileSize: 1942629641
> Infringer's IP Address: 70.39.102.165
> Infringer's Port: 49934
> Initial Infringement Timestamp: 2021-07-25 06:10:02

136.    MEU determines the proper abuse contact email address for the service provider assigned the IP addresses at issue from publicly available information from Whois records of ARIN.

137.    Plaintiffs' agent sends the Notice to the abuse contact email address.

138.    Sharktech is a member of ARIN and receives IP addresses from ARIN.

139.    Sharktech is required to update the Whois records for the IP addresses it reassigns or reallocates per its registration agreement with ARIN.  *See* Decl. of Eric Smith at ¶15.

140.    Plaintiffs' agent has sent over 8800 Notices to Sharktech concerning infringements of copyright protected Works including Plaintiffs' at IP addresses assigned to Sharktech from ARIN.

20-023W

141.   Sharktech failed to update the ARIN records to show that these IP addresses were reassigned or reallocated to its subscribers.

142.   For example, Plaintiffs' agent sent over 1500 Notices to Sharktech concerning infringement of the motion picture *Ava* at IP addresses assigned to Sharktech from ARIN.

143.   Plaintiffs' agent sent 100 Notices to Sharktech concerning observed infringements at each of IP addresses 70.39.102.173, 174.128.240.190, 70.39.102.190 and174.128.240.189 (total of over 500 Notices for these five IP addresses).

144.   Upon information and belief, other rightsholders had similar Notices sent to Sharktech concerning infringing activity at IP addresses assigned to Sharktech from ARIN.

145.   Sharktech failed to terminate the subscribers or the accounts associated with these IP addresses or take any meaningful action in response to these Notices.

146.   Sharktech failed to even forward the Notices to its subscribers.

147.   Sharktech could have taken simple measures to stop its subscribers from continuing to reproduce and/or distribute Plaintiffs' works but did not.

148.   For example, Sharktech could have temporarily "null-routed" the IP addresses to disable the link to the infringing activity and stop further piracy of Plaintiffs' works.

149.   For example, Sharktech could have temporarily suspended the subscriber's account to stop further piracy of Plaintiffs' works.

150.   For example, Sharktech could have blocked or mandated that its VPN subscribers block certain ports such as ports 6881-6889 that are used for BitTorrent.

29

151.   If Sharktech had even forwarded the Notices to its VPN subscribers, the VPN subscriber could have null-routed the IP address or suspended the end user.

152.   If Sharktech had even forwarded the Notices to its subscribers, the subscriber could have forwarded the Notices to the end user who may have likely ceased the conduct.  *See* Decl. of Rober O'Brien at ¶13 ("I would have immediately ceased…had I received any of these notices earlier or had my service been temporarily terminated.")

153.   Sharktech continued to provide service to the VPN subscribers despite knowledge that its subscribers were using the service to engage and facilitate massive piracy of copyright protected Works including the Copyright Plaintiffs'.

154.   Sharktech purposefully failed to do anything about its VPN subscribers flagrant piracy including failing to even forward the Notices on to its VPN subscribers because it was motivated to continue receiving payments from its VPN subscribers and was concerned that its VPN subscribers would cancel their service if it forwarded the notices to its VPN subscribers.

155.   Upon information and belief, Tim Timrawi, an officer of Sharktech, was motivated to not take any action against its VPN subscribers' piracy because he was concerned that these VPN subscribers would cease to be Sharktech customers and just route their traffic through other VPN providers.  *See* Decl. of Tim Timrawi [Doc. #17-1] at ¶2 ("…the same VPN traffic could be routed via VPN providers in other countries…).

### H. Sharktech controls the conduct of its subscribers.

156.   Sharktech can terminate the accounts of its' subscribers at any time.

157.   Upon information and belief, Sharktech promptly terminates subscriber accounts when said subscribers failed to pay for the Service.  Terms of Service at ¶4,

30

20-023W

https://sharktech.net/terms-of-service/ [last accessed on Aug. 1, 2021] ("…Service will be interrupted on accounts that reach 4 days past due.")

158.    Sharktech explicitly states that it maintains and controls ownership of all IP addresses.   *See* at ¶13a ("Sharktech shall maintain and control ownership of all Internet Protocol numbers and addresses that may be assigned to Customer by Sharktech, and Sharktech reserves the right to change or remove any and all such Internet Protocol numbers and addresses, in its sole and absolute discretion").

159.    Sharktech monitors its subscribers' access to its service.   For example, Sharktech states that it "…will monitor Customer's bandwidth. Sharktech shall have the right to take corrective action if Customer's usage negatively impacts other clients."  Id. at ¶13b.

160.    Sharktech states that it will null-route a subscriber's service "…to prevent interference to the service Sharktech provides to other clients."  Id.

*I. Sharktech does not have a safe harbor from liability.*

161.    As part of the DMCA, Congress created a safe harbor that limits the liability of a service provider for copyright infringement when their involvement is limited to, among other things, "transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(a). To benefit from this safe harbor, however, an ISP must demonstrate that it "has adopted and reasonably implemented...a policy that provides for the termination in appropriate circumstances of subscribers...who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

20-023W

162.    Sharktech does not have a policy of terminating repeat infringers.

163.    Plaintiffs' agent has sent over 8,800 Notices to Sharktech concerning infringements at IP addresses Sharktech publishes as assigned to it.

164.    Sharktech has failed to terminate the accounts and/or take any meaningful actions against its subscribers such as Private Internet Access, Pango, ExpressVPN or Tzulo in response to these Notices consistent with a reasonably implemented policy for termination of subscribers and account holders of the service provider's system or network who are repeat infringers necessary to support a safe harbor from liability ("policy").

165.    Congress created a safe harbor that limits the liability of a service provider for copyright infringement "…by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider" does not have the requisite knowledge, "…responds expeditiously to remove or disable access to, the material…" and has the appropriate designated agent for receiving notices.  17 U.S.C. § 512(c)(1), (2).

166.    Sharktech leases use of its servers to its subscribers so that the subscribers can host VPN networks on Sharktech's servers.

167.    Sharktech's subscribers store copies of Plaintiffs' Works on Sharktech's servers and use Sharktech's servers to distribute copies of Plaintiffs' Works.

168.    Sharktech allocates and/or assigns IP addresses to its subscribers that the subscribers use as links to access infringing copies of Plaintiffs' Works at Sharktech's servers and/or end users' computers.

169.    The over 8,800 Notices Plaintiffs' agent sent to Sharktech concerning

20-023W

infringements included information such as the IP addresses that Sharktech could have used to disable access to the infringing material and/or activity.

170.    Sharktech failed to respond and expeditiously remove or disable access to the material and/or activity in response to the over 8,800 Notices Plaintiffs' agent sent to Sharktech.

171.    Until Jan. 21, 2021, Sharktech failed to designate and register an agent with the Copyright Office as provided by 17 U.S.C. § 512(c)(2).

172.    Sharktech's conduct renders it ineligible for safe harbor immunity from copyright liability under the DMCA.

***J. The copyright infringements arise from Sharktech's advertisements.***

173.    Sharktech advertises that its dedicated servers allow subscribers to "Enjoy 1Gbps connectivity to push large amounts of bandwidth" and that "All 1Gbps servers are unmetered so you'll never have to worry about an overage." https://sharktech.net/dedicated-servers/ [last accessed on May 7, 2021].

174.    Sharktech advertises colocation services for subscribers that includes a "1Gbps port".  https://sharktech.net/colocation/ [last accessed on May 7, 2021].

175.    Sharktech advertises that its Denver, CO data center can provide "240 Gbps Network Capacity".  https://sharktech.net/data-centers/denver/ [last accessed on May 7, 2021].

176.    Sharktech's subscribers such as ExpressVPN, PIA, and Pango are motivated to become customers from Sharktech's advertisements.

177.    Sharktech's subscribers are motivated to become customers from the

20-023W

knowledge of Sharktech's practice of ignoring notices of infringements or failing to take any meaningful action.

178.   The ability and availability for Sharktech's VPN subscribers to distribute copyright protected Works including Plaintiffs from Sharktech's servers and IP addresses while concealing their identity from the public Whois ARIN records is a draw for subscribers and at least one of their motivations to become customers of Sharktech.

179.   Sharktech directly profits from its VPN subscribers' distribution of Plaintiffs' copyright protected Works without authorization.  As Sharktech's VPN subscribers induce more end users who wish to pirate Plaintiffs' Works, Sharktech's VPN subscribers purchase more services such as server space and IP addresses from Sharktech.

***K. Sharktech intentionally misrepresents material information in the Whois records of ARIN.***

180.   Defendant Sharktech allocates or reassigns IP addresses in Colorado to its subscribers.

181.   Sharktech allocated IP address block 174.128.226.8/29 to its subscriber PIA between 7/15/2018 and 9/1/2020.

182.   Sharktech allocated IP address blocks 174.128.250.120/29; 2610:150:8022:5::0/108 to its subscriber Pango from June 17, 2020.

183.   Sharktech allocated IP address blocks 174.128.248.176/30; 70.39.103.80/28; 2610:150:8019::1:a300/120; 198.54.128.0/24 and 2607:9000:2000::/36 to its subscriber Tzulo from Jan. 13, 2020.

184.   Despite allocating or reassigning IP addresses to its subscribers, Sharktech

34

publishes ARIN Whois records indicating Sharktech as the proper abuse contact at these IP addresses in violation of its registration agreement with ARIN rather than the contact of the subscriber.  *See* Decl. of Eric Smith at ¶¶11-14.

185.   Despite allocating or reassigning these IP addresses to its subscribers, Sharktech knowingly failed to update the ARIN Whois records to indicate its subscriber as the proper abuse contact at these IP addresses in violation of its registration agreement with ARIN.

186.   For example, Sharktech states in the ARIN Whois records concerning IP address 174.128.226.10 (and the complete range 174.128.224.0 - 174.128.255.255) in Denver, Co.   "FOR ABUSE RELATED QUESTIONS PLEASE EMAIL ABUSE AT SHARKTECH.NET".   *See*   Decl.   of   Smith   at   ¶17.

20-023W

187.   For example, although Sharktech previously allocated IP address 174.128.248.178 to its subscriber Tzulo, on Dec. 11, 2020, Sharktech knowingly published Whois ARIN records that indicate that the proper abuse contact is Sharktech.

188.   In contradiction to Sharktech's emphatic statements in the ARIN records in all capital letters that **<u>Sharktech</u>** is the appropriate party to handle abuse, Sharktech now disavows any responsibility for abusive activity at these IP addresses.  For example, Sharktech's officer Tim Timrawi now states that "Sharktech does not operate or control the infrastructure that it provides to its customers – the customer do…When Sharktech receives [notices]…there is nothing Sharktech can do…"  Decl. of Tim Timrawi [Doc. #17-1].  Sharktech further states it "…do[es] not have…control rights over the hosting or transmission of infringing works, or the ability to dictate…their customers", "lacks the legal right or ability to supervise or control customers' activities," and that it is "…at least three steps removed from any act…".   Defendants' Motion to Dismiss [Doc. #18] at pgs. 16-18.

189.   Defendant Sharktech's failure to update the Whois ARIN records and/or publishing false Whois ARIN records for these IP addresses that it reassigned and/or reallocated to its subscriber and no longer have control rights over activity or any legal right or ability to control constitute misrepresentations of material facts.

190.   Plaintiffs' agent relied on Sharktech's misrepresented information in the Whois ARIN records to determine the appropriate party to send the notices of infringements ("Notices").

191.   Plaintiffs' agent had a right to rely on the Whois ARIN records to determine

36

the appropriate party to send the Notices.

192.    Relying on the Whois ARIN records is consistent with IT industry practices. *See* Decl. of Smith at ¶20.

193.    Courts throughout the US have relied on the identification information of the Whois ARIN records when approving warrants and subpoenas.

194.    Rightsholders such as Plaintiffs are third party beneficiaries to Sharktech's agreement with ARIN to update the Whois ARIN records when Sharktech allocates or reassigns IP addresses to its subscribers such as PIA.  Rightsholders rely on the Whois records to stop abuse.

195.    Sharktech intended for rightsholders such as Plaintiff to rely on the false information Sharktech publishes in the Whois records of ARIN.

196.    In reliance on Sharktech's misrepresented information in the ARIN Whois records, Plaintiffs' agent sent notices of infringement to Sharktech's abuse contact.

197.    Sharktech failed to inform Plaintiffs' agent that the IP addresses at issue had been allocated to its subscriber.

198.    Sharktech failed to even forward the notices to its subscriber.

199.    Plaintiffs have suffered damages as a result of Sharktech's misrepresentation.  If Sharktech published accurate information in the ARIN Whois records, Plaintiffs' agent would have sent the Notices directly to Sharktech's subscribers so that the subscribers would take simple measures to stop further piracy of the Works.

## VI. FIRST CLAIM FOR RELIEF
### (Direct Copyright Infringement against PIA and DOES 1-5)

200.    Plaintiffs re-allege and incorporate by reference the allegations contained

20-023W

in each of the foregoing paragraphs.

201.   Plaintiffs are the registered copyright owners of the Works, each of which contains an original work of authorship.

202.   Defendants PIA and DOES 1-5 actively promote their VPN service for piracy and encourage their customers ("end users") to use their VPN service for piracy.

203.   Defendants PIA and DOES 1-5 transmit, route, or provide connections for transmitting copies of Plaintiffs' Works through a network under their control including servers provided by Sharktech.

204.   Defendants PIA and DOES 1-5 distributed at least a piece of the copyright protected Works to others.

205.   Defendants PIA and DOES 1-5 make copies of said Works on said network when transmitting, routing, or providing connections for transmitting copies of Plaintiffs' Works through said network.

206.   Defendants PIA and DOES 1-5 encourage their end users to use the network to distribute and reproduce copies of Plaintiffs' Works.

207.   Defendants PIA and DOES 1-5 interfere with standard technical measures used by copyright holders to identify or protect copyright works by purposefully deleting their end users' log information. *See* 17 U.S.C. § 512(i)(1)(B).

208.   Plaintiffs did not authorize, permit, or provide consent to Defendants PIA and DOES 1-5 to copy, reproduce, distribute, publicly perform, or display their Works.

209.    As a result of the foregoing, Defendants PIA and DOES 1-5 violated the Plaintiffs' exclusive rights to reproduce the Works in copies, in violation of 17 U.S.C. §§

20-023W

106(1) and 501.

210. As a result of the foregoing, Defendants PIA and DOES 1-5 violated the Plaintiffs' exclusive rights to distribute copies of the Works in copies, in violation of 17 U.S.C. §§ 106(3) and 501.

211. Defendants PIA and DOES 1-5's infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

212. The Plaintiffs have suffered damages that were proximately caused by each of the Defendants PIA and DOES 1-5's copyright infringements including, but not limited to lost sales, price erosion, and a diminution of the value of its copyrights.

### VII. SECOND CLAIM FOR RELIEF
### (Contributory Copyright Infringement based upon material contribution against Sharktech)

213. Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

214. Sharktech knowingly supplies the services such as IP addresses and servers to its subscribers despite actual and/or constructive knowledge that its subscribers use the machinery to infringe Plaintiffs' exclusive rights.

215. Sharktech's subscribers promote their service that incorporates the services provided by Sharktech for the purpose of infringing copyright protected Works including Plaintiffs.

216. Through its activities, Sharktech knowingly and intentionally took steps that are substantially certain to result in direct infringements of Copyright Plaintiffs' Copyrighted Works, and that have resulted in such direct infringements in violation of

20-023W

Plaintiffs' copyrights.

217.    Despite Sharktech's knowledge that its subscribers such as ExpressVPN, PIA and Pango were using its service to engage in widescale copyright infringements, Sharktech has failed to take simple measures or any reasonable steps to minimize the infringing capabilities of its service.

218.    Despite having the ability to do so, Sharktech refuses to even null-route the IP addresses of its subscribers where specific infringing activity has been identified and informed.

219.    Sharktech is liable as a contributory copyright infringer for the infringing acts of its subscribers such as ExpressVPN, PIA and Pango.  Sharktech has actual and constructive knowledge of the infringing activity of its subscribers.  Sharktech knowingly caused and otherwise materially contributed to these unauthorized distributions of Copyright Plaintiffs' Works.

220.    Sharktech's infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

221.    By engaging in the contributory infringement alleged in this First Amended Complaint, Sharktech deprived not only the producers of the Works from income that could have been derived when the respective film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy.  Sharktech's misconduct therefore offends public policy

**VIII. THIRD CLAIM FOR RELIEF**
**(Vicarious Infringement against Sharktech only)**

20-023W

222.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

223.    Sharktech is vicariously liable for the infringing acts of its subscribers' infringements including but not limited to the subscribers' direct infringements of Plaintiffs' exclusive right to distribute and reproduce copies of their Works.

224.    Sharktech has the right and ability to supervise and control the infringing activities that occur through the use of its service, and at all relevant times has derived a direct financial benefit from the infringement of Plaintiffs' copyrights.

225.    Sharktech has refused to take any meaningful action to prevent the widespread infringement by its subscribers including but not limited to ExpressVPN, PIA and Pango despite having actual knowledge.  Indeed, the ability of subscribers such as Pango to use Sharktech's service to distribute copies of Plaintiffs' Works while concealing that the IP addresses they use had been reallocated or reassigned to them and their end users' identities acts as a powerful draw for users of Sharktech's service.

226.    Sharktech's subscribers are also motivated to become subscribers of Sharktech due to their knowledge that they can pirate Plaintiffs' Works without any consequence because of Sharktech's policy of ignoring notices of infringement.

227.    Sharktech's subscribers are also motivated to become subscribers of Sharktech due to their knowledge of Sharktech's policy of failing to update the ARIN Whois records so that copyright owners could not send notices of infringements to them and thereby pirate Plaintiffs' Works without any consequence.

228.    Sharktech is therefore vicariously liable for the unauthorized distribution of

41

Plaintiffs' Works.

## IX. FOURTH CLAIM FOR RELIEF
### (Contributory Copyright Infringement based upon intentional inducement against Defendants PIA and DOES 1-5)

229.   Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

230.   Defendants PIA and DOES 1-5 intentionally induced the infringement of Plaintiffs' exclusive rights under the Copyright Act, including infringement of Plaintiffs' exclusive rights to reproduce, publicly perform, and distribute copies of their Works.

231.   As instructed and encouraged by Defendants PIA and DOES 1-5, their customers ("end users") purchase and install the VPN service of Defendants PIA and DOES 1-5 to conceal their identities while engaging in movie piracy.

232.   As instructed and encouraged by Defendants PIA and DOES 1-5, end users install piracy applications such as Popcorn Time on their devices while assigned IP addresses by the Defendants PIA and DOES 1-5' VPN services to conceal their identities.

233.   Defendants PIA and DOES 1-5's end users use piracy applications to connect to sources that publicly perform and/or distribute copies of Plaintiffs' Works while anonymously connected to the Internet by Defendants PIA and DOES 1-5's VPN service.

234.   Defendants PIA and DOES 1-5's end users connect to notorious piracy websites such as YTS to download torrent files to reproduce and distribute copies of Plaintiffs' Works while anonymously connected to the Internet by Defendants PIA and DOES 1-5's VPN service exactly as promoted and encouraged to do by Defendants PIA and DOES 1-5.

20-023W

235.    Defendants PIA and DOES 1-5 induce direct infringements of Plaintiffs' Works by encouraging the end users to use movie piracy applications such as Popcorn Time and to access websites such as YTS that facilitate, enable, and create direct links between their customers and infringing sources, and by actively inducing, encouraging, and promoting their VPN services as a means to "safely" use movie piracy applications for blatant copyright infringement by assuring customers that their identification information will be concealed.

236.    Defendants PIA and DOES 1-5's intentional inducement of the infringement of Plaintiffs' rights in their Copyrighted Works constitutes a separate and distinct act of infringement.

## X. FIFTH CLAIM FOR RELIEF
### (DMCA Violations against Defendants PIA and DOES 1-5)

237.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

238.    Defendants PIA and DOES 1-5 encourage their end users to access torrent files for copying copyright protected Works from notorious movie piracy websites such as The Pirate Bay, Torrentgalaxy and YTS.

239.    Defendants PIA and DOES 1-5 knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the Plaintiffs' copyright protected Works, distributed copyright management information ("CMI") that included false wording such as "TGx", "RARBG", "FGT" and "YTS" in violation of 17 U.S.C. § 1202(a)(2).

240.    Defendants PIA and DOES 1-5, without the authority of Plaintiffs, or the law, distributed removed or altered CMI knowing that the CMI had been removed or altered to

43

20-023W

include the wording "TGx", "RARBG", "FGT" or "YTS" without the authority of Plaintiffs and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of Plaintiffs' copyright protected Works in violation of 17 U.S.C. § 1202(b)(2).

241.    Defendants PIA and DOES 1-5, without the authority of Plaintiffs, or the law, distributed Plaintiffs' Copyright protected Works knowing that the CMI had been removed or altered to include the wording "TGx", RARBG", "FGT" or "YTS", and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of the copyright protected Works in violation of 17 U.S.C. § 1202(b)(3).

242.    Particularly, Defendants PIA and DOES 1-5 knew that the CMI in the file names of the pieces had been altered to include the wording "TGx", "RARBG", "FGT" or "YTS".

243.    Particularly, Defendants PIA and DOES 1-5 distributed the file names that included CMI that had been altered to include the wording "TGx", "RARBG", "FGT" or "YTS".

244.    Defendants PIA and DOES 1-5 knew that the wording "TGx", "RARBG", "FGT" or "YTS" originated from notorious movie piracy websites which they themselves promoted.

245.    Defendants' subscribers' acts constitute violations under the Digital Millennium Copyright Act, 17 U.S.C. § 1202.

246.    Plaintiffs are entitled to an injunction to prevent Defendants PIA and DOES 1-5 from engaging in further violations of 17 U.S.C. § 1202.

247.   Plaintiffs are entitled to recover from Defendants PIA and DOES 1-5 the actual damages suffered by Plaintiffs and any profits Defendants PIA and DOES 1-5 have obtained as a result of their wrongful acts that are not taken into account in computing the actual damages. Plaintiffs are currently unable to ascertain the full extent of the profits Defendants PIA and DOES 1-5 have realized by its violations of 17 U.S.C. § 1202.

248.   Plaintiffs are entitled to elect to recover from Defendants PIA and DOES 1-5 statutory damages for its violations of 17 U.S.C. § 1202.

249.   Plaintiffs are further entitled to costs and reasonable attorneys' fees.

## X. SIXTH CLAIM FOR RELIEF
### (Secondary Liability for DMCA Violations against Sharktech)

250.   Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

251.   Sharktech is secondarily liable for the DMCA violations of its subscribers. Sharktech has actual and constructive knowledge of its subscribers' DMCA violations. Sharktech knowingly caused and otherwise materially contributed to these DMCA violations.

252.   Sharktech is vicariously liable for the DMCA violations of its subscribers. Sharktech has the right and ability to supervise and control the DMCA violations that occur through the use of its service, and at all relevant times has derived a direct financial benefit from the DMCA violations complained of herein. Sharktech has refused to take any meaningful action to prevent the widespread DMCA violations by its subscribers. Indeed, the ability of Sharktech's subscribers to distribute torrent files from torrent websites such as YTS and the Pirate Bay that Sharktech's subscribers themselves

45

promote and obtain file copies of the Works with altered CMI and distribute said copies while concealing their end users' activities acts as a powerful draw for subscribers of Sharktech. Sharktech is therefore vicariously liable for the DMCA violations.

253.    Plaintiffs are entitled to an injunction to prevent Sharktech from continuing to contribute to violations of 17 U.S.C. § 1202.

254.    Plaintiffs are entitled to recover from Sharktech the actual damages suffered by Plaintiffs and any profits Sharktech has obtained as a result of its wrongful acts that are not taken into account in computing the actual damages. Plaintiffs are currently unable to ascertain the full extent of the profits Sharktech has realized by its violations of 17 U.S.C. § 1202.

255.    Plaintiffs are entitled to elect to recover from Sharktech statutory damages for its violations of 17 U.S.C. § 1202.

256.    Plaintiffs are further entitled to costs and reasonable attorneys' fees.

## XI. SEVENTH CLAIM FOR RELIEF
### (Negligent Misrepresentation against Sharktech)

257.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

258.    Defendant Sharktech states in the Whois records of ARIN that it is the proper abuse contact for certain IP addresses.

259.    Defendant Sharktech's statement that it is the proper abuse contact for said certain IP addresses is false because Sharktech has allocated or reassigned said IP addresses to subscribers that have their own end users.

260.    Defendant Sharktech knew that its statement in the Whois records that it is

46

the proper abuse contact for said certain IP addresses was false when it updated the Whois records.

261.    Defendant Sharktech knows that its statement in the Whois records of ARIN that it is the proper abuse contact for said certain IP addresses is false, but it purposefully fails to update the Whois records.

262.    Defendant Sharktech fails to exercise reasonable care or competence in publishing and maintaining the information in the Whois records.  Indeed, Sharktech is obligated per its registration agreement with ARIN to update the Whois records when it assigns or reallocates IP addresses to its subscribers.

263.    Plaintiffs relied on Sharktech's misrepresentations when determining the proper abuse contact for sending notices of infringement at the certain IP addresses.

264.    Plaintiffs had a right to rely on Sharktech's misrepresentations in the Whois records.

265.    Sharktech knew that rightsowner including Plaintiffs were relying on Sharktech's misrepresentations when determining the proper abuse contact for sending notices of infringement at the certain IP addresses.

266.    Rights owners such as Plaintiffs are third party beneficiaries of Sharktech's agreement with ARIN to properly update the Whois records so that they can promptly contact the responsible party to stop abuse.

267.    Plaintiffs have suffered damages based upon Sharktech's misrepresentations.  Plaintiffs' agents have been unable to promptly send notices to the appropriate party that could and would have taken actions to stop further infringements

20-023W

of their Works.

268.    The acts and misrepresentations of Defendant Sharktech constitute negligent misrepresentation. Such conduct was the cause of Plaintiffs' damages, and Plaintiffs have incurred damage as a result of Sharktech's misrepresentations.

## XII. EIGHTH CLAIM FOR RELIEF
### (Fraudulent Misrepresentation against Sharktech)

269.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

270.    Defendant Sharktech falsely states in the Whois records that it is the proper abuse contact for said certain IP addresses.   In contradiction to this statement, Sharktech's officer Tim Timrawi now states that "Sharktech does not operate or control the infrastructure that it provides to its customers – the customer do…When Sharktech receives [notices]…there is nothing Sharktech can do…"   Declaration of Tim Timrawi [Doc. #17-1].   Sharktech further states it "…do[es] not have…control rights over the hosting or transmission of infringing works, or the ability to dictate…their customers", "lacks the legal right or ability to supervise or control customers' activities," and that it is "…at least three steps removed from any act…".   Defendants' Motion to Dismiss [Doc. #18] at pgs. 16-18.

271.    Plaintiffs had a right to rely on Sharktech's misrepresentations in the Whois records.   Indeed, Sharktech is obligated per its registration agreement with ARIN to update the Whois records.

272.    Plaintiffs have suffered damages based upon Sharktech's misrepresentations.   Plaintiffs' agents have been unable to send notices to the

48

appropriate party that could have and would have taken actions to stop further infringements of their Works.

273.    The acts and misrepresentations of Defendant Sharktech constitute fraud and fraudulent misrepresentation. Such conduct was the cause of Plaintiffs' damages, and Plaintiffs have incurred damage as a result of Sharktech's fraudulent acts and representations.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court:

(A) enter permanent injunctions enjoining Defendants PIA and DOES 1-5 from committing DMCA violations and infringing and contributing to infringements of the Plaintiffs' copyrighted Works;

(B)  enter permanent injunctions ordering Defendants PIA and DOES 1-5 to stop interfering with standard technical measures by deleting end user log information;

(C) enter permanent injunctions enjoining Defendant Sharktech from continuing to contribute to infringements of the Plaintiffs' copyrighted Works and ordering Sharktech to update the Whois records of ARIN for all IP addresses it reassigns or reallocates to VPN subscribers;

(D) order Defendant Sharktech to adopt a policy that provides for the prompt suspension of subscribers for which it receives more than three unique notices of infringements of copyright protected Works and/or DMCA violations unless within 72 hours unless said subscriber makes a counter notification;

(E) order Defendants to block subscribers and end users from accessing notorious

piracy websites of foreign origin including those listed in the annual trade report of Notorious Foreign Markets published by the United States Government such as (a) YTS; (b) Piratebay; (c) Rarbg; (d) 1337x; and (e) Popcorntime on networks under their control to prevent further pirating of Plaintiffs' Works;

(F) award the Plaintiffs their actual damages from the copyright infringements and Defendants' profits in such amount as may be found; alternatively, at Plaintiffs' election, for statutory damages pursuant to 17 U.S.C. § 504(a) and (c);

(G) award the Plaintiffs actual damages from the DMCA violations and Defendants' profits in such amount as may be found; or, in the alternative, at Plaintiffs' election, for statutory damages per DMCA violation pursuant to 17 U.S.C. § 1203(c) for violations of 17 U.S.C. § 1202;

(H) award the Plaintiffs actual and punitive damages for Defendant Sharktech's negligent misrepresentations and/or fraudulent misrepresentations;

(I) award the Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505 and/or 17 U.S.C. § 1203(b)(5); and

(J) grant the Plaintiffs any and all other and further relief that this Court deems just and proper.

The Plaintiffs hereby demand a trial by jury on all issues properly triable by jury.

DATED: Kailua-Kona, Hawaii, Aug. 1, 2021.

/s/ Kerry S. Culpepper
Kerry S. Culpepper
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone:   (808) 464-4047

20-023W

Facsimile:   (202) 204-5181
E-Mail:      kculpepper@culpepperip.com
Attorney for Plaintiffs

20-023W

51

---

## CERTIFICATE OF SERVICE

---

I hereby certify that on the date below I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Andrea M. LaFrance     alafrance@bhfs.com, kmeade@bhfs.com, pchesson@bhfs.com

Airina Lynn Rodrigues     arodrigues@bhfs.com, kmeade@bhfs.com

Laura B. Langberg     llangberg@bhfs.com, kmeade@bhfs.com

DATED: Kailua-Kona, Hawaii, August 1, 2021.

CULPEPPER IP, LLLC

/s/ Kerry S. Culpepper
Kerry S. Culpepper
Attorney for Plaintiffs

20-023W