**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. <u>1:21-cv-1261-RM-SKC</u>

MILLENNIUM FUNDING, INC.,
VOLTAGE HOLDINGS, LLC,
LHF PRODUCTIONS, INC.,
OUTPOST PRODUCTIONS, INC.,
AFTER II MOVIE, LLC,
MILLENNIUM MEDIA, INC.,
WONDER ONE, LLC,
HITMAN TWO PRODUCTIONS, INC.,
MILLENNIUM IP, INC.,
I AM WRATH PRODUCTIONS, INC.,
KILLING LINK DISTRIBUTION, LLC,
VENICE PI, LLC,
RAMBO V PRODUCTIONS, INC.,
MON, LLC,
NIKOLA PRODUCTIONS, INC.,
BODYGUARD PRODUCTIONS, INC.,
YAR PRODUCTIONS, INC.,
DALLAS BUYERS CLUB, LLC,
SF FILM, LLC,
SCREEN MEDIA VENTURES, LLC,
SPEED KILLS PRODUCTIONS, INC.,
LAUNDRY FILMS, INC.,
CINELOU FILMS, LLC,
BADHOUSE STUDIOS, LLC,
HANNIBAL CLASSICS INC., and
JUSTICE EVERYWHERE PRODUCTIONS LLC,

       Plaintiffs,

v.

PRIVATE INTERNET ACCESS, INC.,
EXPRESS VPN INTERNATIONAL LTD (a BVI Limited Company), and
EXPRESS VPN INTERNATIONAL LTD (an Isle of Man Limited Company),

       Defendants.

20-023W

---

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiffs MILLENNIUM FUNDING, INC., VOLTAGE HOLDINGS, LLC, LHF PRODUCTIONS, INC., OUTPOST PRODUCTIONS, INC., AFTER II MOVIE, LLC, MILLENNIUM MEDIA, INC., WONDER ONE, LLC, HITMAN TWO PRODUCTIONS, INC., MILLENNIUM IP, INC., I AM WRATH PRODUCTIONS, INC., KILLING LINK DISTRIBUTION, LLC, VENICE PI, LLC, RAMBO V PRODUCTIONS, INC., MON, LLC, NIKOLA PRODUCTIONS, INC., BODYGUARD PRODUCTIONS, INC., YAR PRODUCTIONS, INC., DALLAS BUYERS CLUB, LLC, SF FILM, LLC, SCREEN MEDIA VENTURES, LLC, SPEED KILLS PRODUCTIONS, INC., LAUNDRY FILMS, INC., CINELOU FILMS, LLC, BADHOUSE STUDIOS, LLC, HANNIBAL CLASSICS INC., and JUSTICE EVERYWHERE PRODUCTIONS LLC ("Plaintiffs") file this Second Amended Complaint against Defendants SHARKTECH, INC. ("Sharktech"), PRIVATE INTERNET ACCESS, INC., ("PIA"), EXPRESS VPN INTERNATIONAL LTD (a BVI Limited Company) and EXPRESS VPN INTERNATIONAL LTD (an Isle of Man Limited Company), (both ExpressVPN entities collectively referred to as "ExpressVPN") and allege as follows:

## I.    INTRODUCTION

1.    An individual that pirates copyright protected content in the United States from her home Internet service via peer-to-peer (P2P) networks such as the BitTorrent Protocol puts herself in great legal peril because her Internet Protocol ("IP") address is publicly exposed.  A copyright owner can subpoena her Internet service provider for log records to obtain her subscriber identification and seek statutory damages for copyright

2

20-023W

infringement that can be as high as $150,000.  This risk is known among prolific pirates and feared.

2.      Against this background, Defendants promote their Virtual Private Network ("VPN") services as an essential tool for individuals who wish to pirate content using P2P networks by emphasizing that they provide their end users "anonymous" usage by, for example, deleting end users' log access records so that their identities cannot be disclosed to copyright owners.

3.      Defendants even promote their VPN services as essential tools to use notorious piracy applications and access torrent files from notorious movie piracy websites such as YTS without getting caught although they sometimes attempt to

4.      As discussed below, although Defendant PIA attempts to use the codeword "privacy", employees of Defendant PIA explicitly advocate use of its service for piracy – one is even a member of "The Pirate Party" –  and participate in the operation of the notorious website The Pirate Bay.  Even worse, after Defendant PIA was served with a subpoena for identification of one its end users that accessed pirated content from the website YTS using its VPN service, Defendant PIA issued a warning to its end users that Plaintiffs' counsel was "extorting" YTS users.

5.      Emboldened by Defendants' promises that their identities cannot be disclosed, Defendants' end users use their VPN services not only to engage in widespread movie piracy, but other outrageous criminal conduct such as harassment, illegal hacking and murder.  When these crimes become public, Defendants use these tragic incidents as opportunities to boast about their VPN services.

20-023W

6.     As discussed below, even after an officer of Defendant ExpressVPN plead guilty to using a VPN service to hack into devices of Americans on behalf of a foreign government, Defendant ExpressVPN reiterated its support for him.

## II.     NATURE OF THE ACTION

7.     This matter arises under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act").

8.     The Plaintiffs allege that Defendants are: (a) directly liable for copyright infringements in violation of 17 U.S.C. §§ 106, 501 and 602; and (b) secondarily liable for copyright infringements and violations under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202.

9.     The Plaintiffs allege that Defendant PIA is liable for breach of contract in violation of the laws of Colorado and/or Hawaii.

## III.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et. seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition) and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

11.     Defendants solicit, transact, and/or do business within this jurisdiction, and have committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that their acts would cause injury in this jurisdiction.   As such, Defendants have sufficient contacts with this judicial district to permit the Court's exercise of personal jurisdiction over them.

20-023W

12.     Defendants lease servers and are assigned Internet Protocol ("IP") addresses at non-party Sharktech's data center in Denver, Colorado.

13.     Defendant PIA's corporate office is in Greenwood Village, Colorado.  *See* https://www.privateinternetaccess.com/about-us [last accessed on Nov. 5, 2021] (PIA Corporate office at 5555 DTC Parkway, Suite 360, Greenwood Village, Colorado).

14.     Plaintiffs' injuries arise out of Defendants' forum-related activities, namely Defendants' direct and contribution to infringements of Plaintiffs' copyright protected Works, and DMCA violations at IP addresses and servers controlled by Defendants in this District.

15.     Plaintiffs' injuries arise out of PIA's breach of a settlement agreement to resolve claims alleged in this case such as *inter alia* the First Amended Complaint.

16.     In the alternative, the Court has jurisdiction over Defendant ExpressVPN pursuant to Fed. R. Civ. P. 4(k)(2), the so-called federal long-arm statute, for at least the following reasons: (1) Plaintiffs' claims arise under federal law; (2) ExpressVPN purposely directs its electronic activity into the United States ("US") and targets and attract a substantial number of users in the US and, more particularly, this District; (3) ExpressVPN does so with the manifest intent of engaging in business or other interactions with the US; (4) ExpressVPN is not subject to jurisdiction in any state's courts of general jurisdiction; and (5) exercising jurisdiction is consistent with the US Constitution and laws.

17.     ExpressVPN purposefully targets the US market by using many US-based sources for operating its services and promotes its service as providing access to US servers.

5

20-023W

18.     ExpressVPN (Isle of Man) registered the trademark "EXPRESSVPN" for the services that are the subject of Plaintiffs' claims with the USPTO and thus in the US.

19.     To register the trademarks, ExpressVPN (Isle of Man) signed declarations under the penalty of perjury affirming their intent to provide services in the US.

20.     ExpressVPN (BVI) uses US payment providers such as Paypal to receive funds in US dollars from US residents.

21.     ExpressVPN (BVI) uses the US company Amazon Web Servers for hosting the websites expressvpn.com and vpnconsumer.com.

22.     Through about October of 2011, ExpressVPN (BVI) used the US domain registrar 1&1 Internet, Inc. in Chesterbrook, PA to register the website domain expressvpn.com.

23.     ExpressVPN (BVI) promotes the availability of multiple servers in over 20 US locations.

20-023W



24.     Upon information and belief, ExpressVPN secretly does business in the US under the name VPN Consumer Network.

25.     ExpressVPN used an address in San Francisco, CA when registering for services with ARIN under the name VPN Consumer Network and the handle VCN-38.

26.     ExpressVPN leases servers and IP addresses from the US companies

20-023W

Web2Objects, LLC (New York), Leaseweb, Inc. (Virginia) and Sharktech, Inc. (Nevada) for its VPN service.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) - (c) because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; (b) the Defendants can or could be found, in this District; and/or (c) Defendants are subject to the court's personal jurisdiction with respect to the present action.  Additionally, venue is proper in this District pursuant 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendants or Defendants' agents reside and can be found in this District.

## IV.     PARTIES

### A.   The Plaintiffs

28.     The Plaintiffs are the owners of the copyrights in the Works shown in Exhibit "1".

29.     Each of Plaintiffs LHF Productions, Inc., Millennium Funding, Inc., Outpost Productions, Inc., Millennium Media, Inc., Hitman Two Productions, Inc., Millennium IP, Inc., Rambo V Productions, Inc., Nikola Productions, Inc., and Bodyguard Productions, Inc. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media, Inc. a production company and distributor of a notable catalog of major motion pictures.

30.     Each of Plaintiffs Voltage Holdings, LLC and After II Movie, LLC is a limited liability company registered under the laws of the State of Nevada, has principal offices in Los Angeles, California and is an affiliate of Voltage Pictures, a production company

20-023W

with a notable catalog of major award-winning motion pictures.

31.     MON, LLC is a limited liability company registered under the laws of the California, having principal office in Beverly Hills, California and is an affiliate of Voltage Pictures.

32.     Venice PI, LLC is a limited liability company registered under the laws of the State of California, having principal office in Los Angeles, California and is an affiliate of Voltage Pictures.

33.     Wonder One, LLC is a Wyoming limited liability company with its principal place of business in Sherman Oaks, CA.

34.     I am Wrath Production, Inc. is a California corporation with its principal place of business in Los Angeles, CA.

35.     Killing Link Distribution, LLC is a California limited liability company with its principal place of business in Beverly Hills, CA 90212.

36.     YAR Productions, Inc. is a New York corporation with its principal place of business at Monsey, New York.

37.     Dallas Buyers Club, LLC is a Texas limited liability company with its principal place of business at The Woodlands, TX.

38.     SF Film, LLC is a New York limited liability company with its principal place of business at Albany, New York.

39.     Screen Media Ventures, LLC is a Delaware limited liability company with its principal place of business at New York, NY.

40.     SPEED KILLS PRODUCTIONS, INC. is a Wyoming corporation with its

9

principal place of business at West Hollywood, CA.

41.    LAUNDRY FILMS, INC. is a California corporation with its principal place of business in Venice, California.

42.    CINELOU FILMS, LLC is a California limited liability company with its principal place of business in California.

43.    BADHOUSE STUDIOS, LLC is a Wyoming limited liability company with its principal place of business at West Hollywood, CA.

44.    HANNIBAL CLASSICS INC., is a California corporation with its principal place of business at West Hollywood, CA.

45.    JUSTICE EVERYWHERE PRODUCTIONS LLC is a Georgia limited liability company with its principal place of business at Los Angeles, CA, 90067.

### B.   The Defendants

46.    Defendant PIA is, upon information and belief, a corporation organized under the laws of Indiana with its principal place of operation in Colorado.

47.    Non-party Kape Technologies PLC ("Kape") is, upon information and belief, a foreign company incorporated in the Isle of Man and is the owner of Defendant PIA.

48.    Kape was previously known as Crossrider until it changed its name change in 2018 to disassociate from its prior business of distributing malware that infects users' devices to effectively hijack a browser session and insert advertisements when a partnered website is visited.  *See* Rae Hodge, "What is Kape Technologies? What you need to know about the parent company of CyberGhost VPN", CNet, 8/12/2020, https://www.cnet.com/tech/services-and-software/what-is-kape-technologies-what-you-

20-023W

need-to-know-about-the-parent-company-of-cyberghost-vpn/ [last accessed on 11/11/2021] ("…Crossrider. The UK-based company was cofounded by an ex-Israeli surveillance agent and a billionaire previously convicted of insider trading who was later named in the Panama Papers. It produced software which previously allowed third-party developers to hijack users' browsers via malware injection, redirect traffic to advertisers and slurp up private data.")

49.     Kape and PIA are mere alter egos.

50.     PIA and Kape have many of the same corporate officers.

51.     Upon information and belief, Moran Laufer is an officer of both PIA and Kape.

52.     PIA and Kape share many of the same resources.  Employees of PIA use email addresses with domain KAPE.COM identifying themselves as employees of Kape.

53.     PIA and Kape fail to maintain corporate formalities of separate existence. Employees of PIA use email addresses with domain kape.com identifying themselves as employees of Kape.

54.     Upon information and belief, Kape pays the salaries and expenses of employees of PIA.

55.     Kape directs and dictates the business decisions of PIA.  For example, Dr. Venetia Argyropoulou, an officer of Kape and, upon information and belief, a resident of Cyprus and a practicing lawyer in Greece and Cyprus directs and dictates legal decisions for PIA including the decision for PIA to breach a settlement agreement with Plaintiffs.

56.     Dr. Argyropoulou even dictates mundane decisions of PIA such as whether

the general counsel of PIA could execute a waiver of personal service in this action.

57.     There is such a unity of interest between Kape and PIA that the individuality, or separateness, of Kape and PIA have ceased and the facts are such that an adherence to the fiction of the separate existence of PIA and Kape would, under the particular circumstances, sanction a fraud or promote injustice.

58.     Kape is owner of the VPN services CyberGhost and ZenGuard.

59.     Kape recently entered into an agreement to purchase Defendant ExpressVPN.

60.     Kape is the owner and/or exercises effective control of publications such as VPNMENTOR.COM and WIZCASE.COM.

61.     As explained below, Kape promotes its VPN services PIA and CyberGhost and also ExpressVPN explicitly for piracy in its publications.

62.     Defendant ExpressVPN (BVI) is, upon information and belief, a limited company organized under the laws of the British Virgin Islands with its principal place of business in Tortola, British Virgin Island.

63.     Defendant ExpressVPN (Isle of Man) is, upon information and belief, a limited company organized under the laws of the Isle of Man with its principal place of business in Glen Vine, Isle of Man.

64.     Upon information and belief, the same individuals/entities own ExpressVPN (BVI) and ExpressVPN (Isle of Man).

65.     Upon information and belief, ExpressVPN (BVI) and ExpressVPN (Isle of Man) are mere alter egos of each other and therefore are referred to collectively as

20-023W

ExpressVPN.

66.     There is such a unity of interest between ExpressVPN (BVI) and ExpressVPN (Isle of Man) that the individuality, or separateness, of ExpressVPN (BVI), and ExpressVPN (Isle of Man) have ceased, and the facts are such that an adherence to the fiction of the separate existence of ExpressVPN (BVI) and ExpressVPN (Isle of Man) would, under the particular circumstances, sanction a fraud or promote injustice.

67.     ExpressVPN uses the dba VPN Consumer Network and VPN Consumer Network Services entities to commit fraudulent misrepresentations.

68.     VPN Consumer Network and VPN Consumer Network Services allocate/reassign IP addresses to ExpressVPN but intentionally publishes false ARIN Whois records to show that VPN Consumer Network Services (in Panama) is the proper abuse contact.

69.     Accordingly, rightsholders such as Plaintiffs are hindered from sending notices directly to ExpressVPN.

70.     Defendants lease servers from data centers across the world and are allocated IP addresses from said data centers.

71.     Defendants lease servers from Sharktech in Denver, CO and were allocated IP addresses from Sharktech.

72.     As discussed more fully below, Defendants purposefully choose data centers that do not publish reassignments of their IP address assignments/allocations to Defendants.

73.     Defendants provide VPN services to their customers ("end users").

20-023W

74.     A VPN is a type of Internet Service that provides access to the Internet. A conventional ISP will assign its end user an IP address and log the end users' access to the Internet while using the assigned IP address.  In comparison, many VPN providers provide their end users "anonymous" usage by, for example, deleting end users' log access records, assigning their end users IP addresses that are simultaneously shared among many users, and/or encrypting traffic.

75.     Defendants promote their VPN services as a tool that can be used to pirate copyright protected content without getting caught.

76.     Defendant ExpressVPN even partners with notorious movie piracy websites to promote their VPN service as an essential tool for movie piracy.

77.     Emboldened by Defendants' promises that their identities cannot be disclosed, Defendants' end users use the VPN services not only to engage in widespread movie piracy, but other outrageous criminal conduct such as sharing child pornography, harassment, illegal hacking and murder.

78.     On June 6, 2018, Ross M. Colby was convicted of two felonies for using PIA VPN service to hack into the computer systems of the company Embarcadero.

79.     The same PIA IP addresses that were used to access Mr. Colby's personal email and Facebook accounts was used for the illegal hacking.  Upon information and belief, Mr. Colby was a PIA end user.

80.     Between December 2015 and March 2016, Preston McWaters used PIA's VPN service to make false bomb threats to schools and stalk a former female co-worker under a fake email address and Twitter accounts he created under the name of her

14

boyfriend.  When a search warrant was executed on Mr. McWater's home, a mobile phone including the PIA mobile app was found.  Upon information and belief, Mr. McWaters was a PIA end user.

81.    PIA boasted that it had no logs to disclose to law enforcement concerning these serious crimes of Ross M. Colby and Preston McWaters.

82.    An unknown ExpressVPN end user used the VPN services to hide details concerning the assassination of the Russian Ambassador to Turkey, Andrei Karlov in 2017.  *See* https://www.comparitech.com/blog/vpn-privacy/expressvpn-server-seized-in-turkey-verifyies-no-logs-claim/ [last accessed on Nov. 7, 2021].

83.    ExpressVPN used this tragic incident to tout its VPN service by bragging that law enforcement could not find information to locate the murder suspects even though their server was seized.  https://torrentfreak.com/expressvpn-anonymous-review/ [last accessed on Nov. 4, 2021] ("Not storing any sensitive information also protects user privacy and security in the event of law enforcement gaining physical access to servers. This was proven in a high-profile case in Turkey in which law enforcement seized a VPN server leased by ExpressVPN but could not find any server logs that would enable investigators to link activity to a user or even determine which users, or whether a specific user, were connected at a given time").

84.    ExpressVPN end user Frank Beyer admitted to using the VPN service in connection with the disgusting act of downloading sexual videos of prepubescent children.  *See* United States of America v. Frank Richard Beyer, 0:19-cr-60360-RAR (S.D. FL), Affidavit of Nicholas P. Masters in Support of Criminal Complaint [Doc. #1] at ¶20

20-023W

("He also admitted to…using a Virtual Private Network…offered through ExpressVPN…")

85.    Upon information and belief, Frank Beyer also used the ExpressVPN service to share copies of copyright protected Works including *Angel Has Fallen*.

86.    Upon information and belief, ExpressVPN engages in the same conduct as its end users.   ExpressVPN proudly employs as its chief information officer Daniel Gericke, an individual that has admitted to using VPN services to hack into devices of American residents on the behalf of a foreign government.

87.    On Sept. 7, 2021, Mr. Gericke entering into a deferred prosecution agreement ("DPA") requiring him to make a payment of $335,000 to resolve a Department of Justice investigation regarding violations of U.S. export control, computer fraud and access device fraud laws.

88.    In the DPA, Mr. Gericke admitted to: (1) knowingly and willfully conspiring, in violation of Title 18, United States Code, Section 371, to violate the Arms Export Control Act ("AECA") and the International Traffic in Arms Regulations ("ITAR"); and (2) knowingly conspiring, in violation of Title 18, United States Code, Section 371, to commit access device fraud, and computer fraud and abuse, in violation of Title 18 United States Code, Sections       1029      and      1030.      https://www.justice.gov/opa/press-release/file/1432621/download [last accessed on 11/6/2021].

89.    Despite admitting to using a VPN to hack into the device of Americans on behalf of a foreign government, on Sept. 27, 2021 ExpressVPN released an official statement stating that "…Daniel fits into our mission as a company, past, present, and future."  https://www.expressvpn.com/blog/daniel-gericke-expressvpn/ [last accessed on

20-023W

11/6/2021].



At the same time, while we in no way wish to diminish the sincerity of the concerns we've heard, we want to reassure you that we have considered them extensively and do not share them. To help you understand how we can be so confident, we need to share with you exactly how Daniel fits into our mission as a company, past, present, and future.

90.     Upon information and belief, PIA engages in the same conduct as its end users.  PIA proudly employs as its head of "Privacy" Rick Falkvinge, the founder of the first "Pirate Party" whose aim is to abolish intellectual property laws. https://www.privateinternetaccess.com/blog/author/rick/ [last accessed on 11/4/2021].



91.     As head of the "Pirate Party", Rick Falkvinge has pushed for legalization of possession of child pornography.  *See* Sverigesradio, "The Pirate Party wants to legalize

20-023W

17

the         possession        of         child       pornography"       Aug        5,        2020,

https://sverigesradio.se/artikel/3899644   [last   accessed   on   11/6/2021]   (English

Translation: "Rick Falkvinge wants to get rid of both the ban on possessing child

pornography from 1999 and the ban on watching child pornography…")

92.      Rick Falkvinge and his Pirate Party begin hosting the notorious piracy

website "The Pirate Bay" in 2010 after an injunction was obtained by several movie

studios against the previous host provider.  *See* https://torrentfreak.com/the-pirate-party-

becomes-the-pirate-bays-new-host-100518/ [last accessed on 11/6/2021] (""Today, on

18 May, the Swedish Pirate Party took over the delivery of bandwidth to The Pirate Bay,"

says the Party's Rick Falkvinge in a statement. "We got tired of Hollywood's cat and

mouse game with the Pirate Bay so we decided to offer the site bandwidth," he adds. "It

is time to take the bull by the horns and stand up for what we believe is a legitimate

activity."")

93.      Rick Falkvinge states that a reason to use a VPN service that "create no

logs" is to avoid "the people behind Expendables 3 are on a suing spree".

> It's also interesting to see how effective VPNs are at protecting end-users
> who manufacture unlicensed copies of knowledge and culture from the
> monopolized copyright industry – apparently, the people behind
> Expendables 3 are on a suing spree, but hitting a no-log VPN on an end-
> address is literally a dead end – there's nowhere to go from there. (Which
> is another reason to only use VPN services that a) create no logs, b) don't
> demand personal information in the first place – like allowing payment with
> bitcoin.)

https://www.privateinternetaccess.com/blog/with-the-copyright-industry-disliking-vpns-

in-public-you-know-theyre-doing-good/ [last accessed on Nov. 4, 2021].

20-023W

privateinternetaccess.com/blog/with-the-copyright-industry-disliking-vpns-in-public-you-know-theyre-doing-good/

copyright industry is yapping about here. (Also, it should be noted that the Hulu service is already mistreating its customers in this way.)

The next step is predictable from the SOPA debate – it's pressuring payment providers to refuse service to VPN services, in a blatant display of the cartelization of the few payment providers. (There's a double reason to only use a VPN that accepts bitcoin, right there: try shutting off bitcoin payments.)

It's also interesting to see how effective VPNs are at protecting end-users who manufacture unlicensed copies of knowledge and culture from the monopolized copyright industry – apparently, the people behind Expendables 3 are on a suing spree, but hitting a no-log VPN on an end-address is literally a dead end – there's nowhere to go from there. (Which is another reason to only use VPN services that a) create no logs, b) don't demand personal information in the first place – like allowing payment with bitcoin.)

94.     Some of the Plaintiffs in this action such as Millennium Media, Inc. are "the people behind Expendables 3" referred to by PIA.

95.     PIA's employee Caleb Chen publishes articles on PIA's website advocating use of the PIA VPN service for piracy.

96.     In 2020, Caleb Chen published an article on the PIA website entitled "Popular torrenting site YTS provides IP address logs to copyright lawyers to extort you with" to warn PIA end users and stated within his article "…for non Indian users of YTS, it seems like a pretty damn good idea [to use a VPN]."

when trying to torrent privately is bad enough, knowing that your logs will actually be given up to copyright infringement lawyers and end up being used against you in legal proceedings is a real life and ongoing worst case scenario for torrenters around the world. These sites are really a point of vulnerability for torrenters, both in terms of functionality and apparently liability. Many governments seek to block torrent sites – though countries like <u>India have confirmed that visiting a blocked torrent site with the use of a VPN is not illegal</u>. In fact, for non Indian users of YTS, it seems like a pretty damn good idea.

The post <u>Popular torrenting site YTS provides IP address logs to copyright lawyers to extort you with</u> appeared first on <u>Privacy News Online</u> by Private Internet Access VPN.

**C. Non-Parties**

97.     Choopa is a US based host provider that, upon information and belief, provides US IP addresses and servers to Defendants.

98.     Sharktech is US based host provider that, upon information and belief, provides US IP addresses and servers to Defendants.

99.     Web2Objects LLC is a US based host provider that, upon information and belief, provides US IP addresses and servers to Defendants.

100.    Leaseweb is US based host provider that, upon information and belief, provides US IP addresses and servers to Defendants.

101.    M247 is a foreign based host provider that, upon information and belief, provides US IP addresses and servers to Defendants.

20-023W

102.    DataCamp Limited is a foreign based host provider that, upon information and belief, provides US IP addresses and servers to Defendants.

103.    Because of the nature of Defendants' operations, Plaintiffs cannot ascertain all IP addresses used by Defendants and thus the entire scope of Defendants' infringing activities.   However, Defendants are in possession of the IP addresses that were assigned to them from their host providers.   Plaintiff believes that information obtained in discovery will lead to the identification of IP address where Works of theirs or of affiliated entities were infringed and permit the Plaintiffs to identify the IP addresses and times where many of their Works were infringed thousands of times and to amend this Second Amended Complaint to join these entities as Plaintiffs.  Plaintiff further believes that the information obtained in discovery may lead to the identification of additional infringing parties to be added to this Second Amended Complaint as Defendants.  Plaintiffs will seek to amend this Second Amended Complaint to include the proper names and capacities once determined.

## V.    JOINDER

104.    Pursuant to Fed. R. Civ. P. 20(a)(1), each of the Plaintiffs are properly joined because, as set forth in detail above and below, the Plaintiffs assert: (a) a right to relief arising out of the same transaction, occurrence, or series or transactions, namely (i) the use of host providers' services such as Sharktech and M247 by Defendants for directly infringing and contributing to infringements of the copyrights in Plaintiffs' Works and DMCA violations, (ii) there are common questions of law and fact.

105.    Pursuant to Fed. R. Civ. P. 20(a)(2), each of the Defendants was properly

20-023W

joined because, as set forth in more detail below, the Plaintiffs assert that the infringements complained of herein by each of the Defendants (a) arises out of the same transaction, occurrence, or series of transactions or occurrences, and (b) there are common questions of law and fact.

106.    Defendants lease servers and are allocated IP addresses from Sharktech, and use said servers and IP addresses to infringe Plaintiffs' Works.

107.    Defendants lease servers and are allocated IP addresses from M247 and use said servers and IP addresses to infringe Plaintiffs' Works.

108.    Defendants use Kape as an alter ego or marketing partner to explicitly promote their VPN services for the purpose of blatant piracy.

109.    Upon information and belief, Defendants are controlled by Kape.

110.    Further, the Plaintiffs assert that the breach of contract complained of herein by Defendant PIA (a) arises out of the same transaction, occurrence, or series of transactions or occurrences, and (b) there are common questions of law and fact.

111.    Upon information and belief, ExpressVPN induced PIA to breach the contract (settlement agreement) and conspired with PIA and its alter ego Kape to try to deceive Plaintiffs into inadvertently releasing ExpressVPN from a separate lawsuit.

## VI.    FACTUAL BACKGROUND

### A.  The Plaintiffs Own the Copyrights to the Works

112.    The Plaintiffs are the owner of the copyrights in the motion pictures ("Works") as shown in Exhibit "1".  The Works are the subjects of copyright registrations, and this action is brought pursuant to 17 U.S.C. § 411.

20-023W

113.   The Plaintiffs are the owners of the copyrights by virtue of original authorship, assignment and/or company reorganization.

114.   The Works are motion pictures currently offered for sale in commerce.

115.   Defendants had notice of Plaintiffs' rights through at least the credits indicated in the content of the motion pictures which bore proper copyright notices.

116.   Defendants also had notice of Plaintiffs' rights through general publication and advertising associated with the motion pictures, and packaging and copies, each of which bore a proper copyright notice.

117.   Defendants also had notice of Plaintiffs' rights through notices that were sent to them from their host providers such as Sharktech.

118.   Defendant PIA also had notice of Plaintiffs' rights through a subpoena that was served on it on 10/25/2018 by Plaintiff Venice PI, LLC in Civil Action No. 18-cv-192 ("The ShowBox lawsuit") in the District of Hawaii concerning infringing activity at IP address 173.239.236.38.

119.   PIA also had notice of Plaintiffs' rights through a subpoena that was served on it on 1/17/2020 by Plaintiff Venice PI, LLC in Civil Action No. 19-cv-169 ("The YTS lawsuit") in the District of Hawaii concerning infringing activity at IP address 91.207.175.82.

120.   Indeed, thereafter Caleb Chen of PIA published an article warning its end users that Plaintiffs' counsel had obtained user logs from the piracy website YTS in the YTS lawsuit.

121.   PIA also had notice of Plaintiffs' rights through a subpoena that was served

20-023W

on it in Civil Action No. 20-cv-3170-PAB-NRN in the District of Colorado concerning infringing activity at IP addresses 194.59.251.68 and 193.37.252.19.

122.   Defendant ExpressVPN also had notice of Plaintiffs' rights from being served with a lawsuit by many of the same Plaintiffs in Civil Action No. 21-cv-643 in the Eastern District of Virginia.

***B. Defendants and their end users Infringe Plaintiffs' Copyrights.***

123.   Defendants advertise their VPN service for allowing their end users to bypass regional restrictions of streaming platforms to stream copies of copyright protected content including Plaintiffs' Works from locations Plaintiffs have not authorized the platform to stream the Works.

124.   Defendant PIA advertises its VPN service for allowing their end users to "unblock Netflix USA".



"Private Internet Access (PIA) is one of the leading VPN service providers, specializing in encrypted tunnels with several levels of security, offering an affordable alternative to pricey premium VPNs. It is fast and safe enough, allowing to unblock Netflix USA and download torrents on all the servers. Besides, it follows the no-logs policy."

125.   PIA states that its VPN service "Puts An End To Geo-Restrictions On Your Favorite Content." https://www.privateinternetaccess.com/unblock-websites-vpn [last

20-023W

accessed on 11/4/2021].



126.    PIA even stated in a Reddit forum that it was working on a project to unblock

Netflix.                                                                                          *See*

https://www.reddit.com/r/PrivateInternetAccess/comments/8s2z6h/netflix_on_pia/    [last

accessed on 11/4/2021].



127.   In 2019, PIA announced that it had secured a means for its end users to access Netflix from its "U.S., U.K. and Canada servers." https://www.reddit.com/r/PrivateInternetAccess/comments/ddc6w4/announcement_netflix_and_other_streaming_services/ [last accessed on 11/4/2021].



128.    Defendant ExpressVPN advertises its service for allowing its end users not located in the United States to stream content restricted to United States locations to their non-United States location in violation of Plaintiffs' exclusive rights to authorize distribution, public performance and/or reproduction of their Works.    *See* https://www.expressvpn.com/vpn-service/netflix-vpn [last accessed on Nov. 5, 2021].





129.    Many legal platforms such as Netflix will "blacklist" IP addresses of known VPN providers to prevent violation of geographic restrictions.  *See* Jacoby Parker, How does Netflix detect and block VPN use?, Aug. 16, 2021 https://www.techradar.com/vpn/how-does-netflix-detect-and-block-vpn-use [last accessed on 10/23/2021]. Accordingly, VPN providers such as Defendants have an incentive to not publicly reveal the IP addresses assigned to them so that they are not blacklisted and their end users prevented from streaming or distributing content from unauthorized regions.

130.    When Netflix begin blacklisting IP addresses of VPN providers, Defendant PIA's Caleb Chen criticized this practice and stated that "The Internet is its own jurisdiction". https://torrentfreak.com/netflix-vpn-crackdown-a-year-of-frustrations-

170120/ [last accessed on 11/18/2021].



🔒 torrentfreak.com/netflix-vpn-crackdown-a-year-of-frustrations-170120/

believe.

"It is an odd time when one can pay for a service and not be provided said service when not in the 'correct physical' geographical location. The Internet is its own jurisdiction," PIA's Caleb Chen says.

131.   Defendants and their customers ("end users") use BitTorrent and BitTorrent Client applications such as Popcorn Time to infringe Plaintiffs' exclusive rights of reproduction and distribution.

132.   The United States Trade Representative ("USTR") placed Popcorn Time on a list of examples of Notorious Markets engaged in and facilitating substantial piracy. See USTR, 2020 Review of Notorious Markets, Jan. 14, 2021, pg. 26, Available at https://ustr.gov/sites/default/files/files/Press/Releases/2020%20Review%20of%20Notorious%20Markets%20for%20Counterfeiting%20and%20Piracy%20(final).pdf          [last accessed on March 5, 2021].

133.   Defendants distribute Plaintiffs' Works in violation of Plaintiffs' exclusive right of distribution.

134.   Defendants distribute Plaintiffs' Works for their end users in violation of Plaintiffs' exclusive right of distribution.

135.   Defendants reproduce Plaintiffs' Works in violation of Plaintiffs' exclusive right of reproduction.

136.   Defendants reproduce Plaintiffs' Works for their end users in violation of

20-023W

Plaintiffs' exclusive right of distribution.

**1. *Defendants and their end users use BitTorrent to engage in piracy.***

137.    BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

138.    The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

139.    In a report from January 2011, a survey conducted by the firm Envisional estimated that 11.4 percent of all Internet traffic involved the unauthorized distribution of non-pornographic copyrighted content via BitTorrent.

140.    A more recent study by Sandvine determined that file-sharing accounts for 3 percent of global downstream and 22 percent of upstream traffic, with 97% of that traffic in turn being BitTorrent.   *See* Sandvine, "The Global Internet Phenomena Report", October    2018,    https://www.sandvine.com/hubfs/downloads/phenomena/2018-phenomena-report.pdf [last accessed on May 27, 2021].

141.    BitTorrent is overwhelmingly used for piracy.  *See* David Price, "NetNames Piracy   Analysis:   Sizing   the   Piracy   Universe",   September   2013,   pg.   18, http://creativefuture.org/wp-content/uploads/2016/01/netnames-sizing_piracy_universe-FULLreport-sept2013.pdf [last accessed on Oct. 1, 2021] ("Of all unique visitors to

20-023W

bittorrent portals in January 2013, it is estimated that 96.28% sought infringing content during the month…")

### 2. The Initial Seed, Torrent, Hash and Tracker

142.   A BitTorrent user that wants to upload the new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using, for example, the Client he or she installed onto his or her computer.

143.   The initial user or seeder of a file used a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

144.   The initial seeder often modifies the file title of the Work to include a wording such as "TGx", "FGT", "RARBG" or "YTS" in the title of the torrent files and file copies in order to enhance a reputation for the quality of his or her torrent files and attract users to his or her piracy website.

145.   The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

146.   The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Works, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

147.   When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

20-023W

148.    Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash identifier for each piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive.

149.    The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

150.    The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Work, on them and facilitates the exchange of data among the computers.

151.    Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

### 3. Torrent Sites

152.    "Torrent sites" are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol.  There are numerous torrent websites including torrentgalaxy and the notorious YTS and RARBG websites.

153.    The YTS and RARBG websites were noted by the USTR as examples of Notorious Markets defined as an online marketplace reportedly engaged in and facilitating substantial piracy. *See* USTR, 2014 Out-of-Cycle Review of Notorious Markets, Mar. 5, 2015,                    pg.                    17,                    Available                    at https://ustr.gov/sites/default/files/2014%20Notorious%20Markets%20List%20-

20-023W

%20Published_0.pdf [last accessed on May 7, 2021]; *see also* USTR, *2018 Out-of-Cycle Review of Notorious Markets*, April 2019, pgs. 24, 27 Available at https://ustr.gov/sites/default/files/2018_Notorious_Markets_List.pdf [accessed on May 7, 2021].

154.   PIA recommends that individuals use VPN services such as its when using YTS to download torrent files to avoid Plaintiffs' counsel.

**4. End users access the torrent sites from Sharktech IP addresses**

155.   End users accessed torrent sites including the YTS website to upload and download Plaintiffs' copyrighted Work from IP addresses provided by Defendants, which Defendants received from host providers such as Sharktech in Denver.

156.   The IP address used by the end users then becomes a link to the infringing copies of Plaintiffs' Works.

157.   End user Robert O'Brien (an end user of Defendant PIA) accessed the torrent website YTS from IP address 174.128.226.10 in Denver and downloaded torrent files for Plaintiffs' Work *Angel Has Fallen* and *Distorted*.  *See* Decl. of Robert O'Brien at ¶¶2-3, 6.

158.   End user Harry Beasor (an end user of Defendant PIA) accessed the torrent website YTS from IP address 91.207.175.82 and downloaded torrent files for Plaintiffs' Work *London Has Fallen* and *Mechanic: Resurrection*.  *See* Aff. of Harry E. Beasor at ¶7.

159.   End user Bryan Deem (an end user of Defendant PIA) accessed the torrent website YTS from IP address 193.37.252.37 and downloaded torrent files for Plaintiffs' Works *The Hitman's Bodyguard* and *The Last Full Measure*.  *See* Decl. of Bryan Deem

20-023W

at ¶2.

160.   End user Brandon Brady (an end user of Defendant PIA) accessed the torrent website YTS from IP address 212.103.49.162 and downloaded torrent files for Plaintiff's Work *The Last Full Measure*.  *See* Decl. of Brandon Brady at ¶2.

161.   End user Cassandra Luker (an end user of Defendant PIA) accessed the torrent website YTS from IP address 199.116.115.143 and downloaded torrent files for Plaintiff's Work *London Has Fallen*.  *See* Decl. of Cassandra Luker at ¶¶2-3.

162.   End user Beth Wiecher (an end user of Defendant PIA) accessed the torrent website YTS from IP address 173.244.44.69 and downloaded a torrent file for Plaintiff's Work *London Has Fallen*.  *See* Decl. of Beth Wiecher at ¶¶2-3.

163.   End User Dale Powers (an end user of Defendant PIA) accessed the torrent website YTS from IP address 193.37.252.19 and downloaded a torrent file for Plaintiff's Work *Angel Has Fallen*.  *See* Decl. of Dale Powers at ¶¶2-4.

164.   End user Derek Dueker (an end user of Defendant ExpressVPN) accessed the torrent website YTS from IP address 64.20.60.59 and downloaded torrent files for Plaintiffs' Works *Olympus Has Fallen*, *London Has Fallen, Angel Has Fallen* and *Hunter Killer*.  *See* Decl. of Derek Dueker at ¶¶2-4.

165.   End user Andrew Grumbling (an end user of Defendant ExpressVPN) accessed the torrent website YTS from IP address 185.245.86.115 and downloaded torrent files for Plaintiffs' Works *Hellboy* and *Angel Has Fallen*.  *See* Decl. of Andrew Grumbling at ¶¶2-3.

166.   End user Tayah Durnan (an end user of Defendant ExpressVPN) accessed

20-023W

the torrent website YTS from IP address 104.143.92.63 and downloaded torrent files for Plaintiff's Work *Rambo V: Last Blood*.  *See* Decl. of Tayah Durnan at ¶¶2-3.

167.   End user Cecilia Peacock (an end user of Defendant ExpressVPN) accessed the torrent website YTS from IP address 167.160.167.233 and downloaded torrent files for Plaintiff's Work *And So It Goes*.  *See* Decl. of Cecilia Peacock at ¶¶2-3.

### 5.  The Peer Identification

168.   The BitTorrent Client will assign an identification referred to as a Peer ID to the computer so that it can share content (here the copyrighted Work) with other peers. The Peer ID incorporates the IP address of the BitTorrent swarm participant.

### 6.  Uploading and Downloading a Work Through a BitTorrent Swarm

169.   Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Work) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

170.   The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file.  Defendants transmit the pieces to the peers.

171.   Once a peer receives a piece of the computer file, here a piece of the copyrighted Work, it starts transmitting that piece to the other peers.  Defendants' end users transmit the pieces to the peers.

172.   In this way, all of the peers and seeders are working together in what is called a "swarm."

20-023W

173.   Here, Defendants and their end users  participated in a swarm and directly interacted and communicated with other members of the swarm through digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions, Plaintiffs' Works.

174.   Defendant distributed their end users' transmissions to other members of the swarm.

175.   In this way, and by way of example only, one initial seeder can create a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of a computer file, like the Works here, upload the torrent onto a torrent site, and deliver a different piece of the copyrighted Work to each of the peers. The recipient peers then automatically begin delivering the piece they just received to the other peers in the same swarm.

176.   Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

**7. The Plaintiffs' Computer Investigator Identified Defendants' IP Addresses as Participants in Swarms That Were Distributing Plaintiffs' Copyrighted Works.**

177.   Sharktech, Web2Objects and M247 reassigned IP addresses to Defendants.

178.   Choopa reassigned IP addresses to Defendant PIA.

20-023W

179.    Leaseweb reassigned IP addresses to Defendant ExpressVPN.

180.    Upon information and belief, DataCamp reassigned IP addresses to Defendant ExpressVPN.

181.    The Plaintiffs retained Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform the Plaintiffs' copyrighted Works.

182.    MEU used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.

183.    MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

184.    The IP addresses, Unique Hash Numbers, and hit dates contained in Exhibit "2" accurately reflect what is contained in the evidence logs.

185.    The logged information such as, for example, in Exhibit "2" shows that Defendants and/or Defendants' end users distributed copies of the Plaintiffs' copyrighted Works identified by the Unique Hash Number.

186.    Defendants and/or their end users' computers used the IP addresses to connect to the investigative server from a computer (including one in this District at Sharktech's Denver facility as shown in Exhibit "2") in order to transmit a full copy, or a portion thereof, of a digital media file identified by the Unique Hash Number through networks (such as of Sharktech's) controlled by Defendants.

20-023W

187.    MEU's agent analyzed each BitTorrent "piece" distributed by the IP addresses listed and verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Works.

188.    MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

**C. The Operator of the YTS website confirmed that the Defendants' end users downloaded torrent files for copying the Work from the YTS website.**

189.    The YTS website operator maintained records of activity of registered user accounts for IP addresses associated with data centers used by Defendant such as Choopa, M247, DataCamp, and Sharktech.  *See* Exhibit "3" (Sharktech YTS users) at pg. 10 (Certificate of Authenticity).

190.    The YTS website operator maintained records of activity of registered user accounts.  *See* Exhibit "3" at pg. 10 (Certificate of Authenticity).

191.    As shown in Exhibit "3", the records including the email address of the registered user account, the torrent files the registered account downloaded, the IP address from where the registered user accessed the YTS website, and the time.

192.    The records show end users downloaded the torrent file for reproducing the Work, the same file copy MEU's agent verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Works, from IP addresses assigned to Sharktech and in Denver, CO.

**D. Defendants and their end users reproduced and distributed copies of Plaintiffs'**

*Works.*

193.    Defendants' and/or their end users distributed at least pieces of each of Plaintiffs' Works over network connections to other peers in the Swarm.

194.    Defendants' and/or their end users reproduced at least pieces of each of Plaintiffs' Works within said network connections to distribute to the other peers in the Swarm.

195.    End user Robert O'Brien (an end user of Defendant PIA) from IP address 174.128.226.10 in Denver distributed copies of Plaintiffs' Work *Angel Has Fallen* by the file name Angel Has Fallen (2019) [WEBRip] [720p] [YTS.LT] and *Distorted* by the file name Distorted (2018) [BluRay] [720p] [YTS.AM].  *See* Decl. of Robert O'Brien at ¶¶2-3, 6.

196.    End user Harry Beasor (an end user of Defendant PIA) from IP address 91.207.175.82 distributed copies of Plaintiffs' Work *London Has Fallen* and *Mechanic: Resurrection*.  *See* Aff. of Harry E. Beasor at ¶7.

197.    End user Bryan Deem (an end user of Defendant PIA) from IP address 193.37.252.37 distributed copies of Plaintiffs' Works *The Hitman's Bodyguard* and *The Last Full Measure*.  *See* Decl. of Bryan Deem at ¶2.

198.    End user Brandon Brady (an end user of Defendant PIA) from IP address 212.103.49.162 distributed copies of Plaintiff's Work *The Last Full Measure*.  *See* Decl. of Brandon Brady at ¶2.

199.    End user Cassandra Luker (an end user of Defendant PIA) from IP address 199.116.115.143 distributed copies of Plaintiff's Work *London Has Fallen*.  *See* Decl. of

20-023W

Cassandra Luker at ¶¶2-3.

200.   Defendant PIA exported a copy of the Work to Australia when Cassandra Luker downloaded a copy of the Work and also imported a copy of the Work to United States from Australia when Cassandra Luker distributed a copy of the Work.

201.   End user Beth Wiecher (an end user of Defendant PIA) from IP address 173.244.44.69 distributed copies of Plaintiff's Work *London Has Fallen*.  *See* Decl. of Beth Wiecher at ¶¶2-3.

202.   End user Dale Powers (an end user of Defendant PIA) from IP address 193.37.252.19 distributed copies of Plaintiff's Work *Angel Has Fallen*.  *See* Decl. of Dale Powers at ¶¶2-4.

203.   Defendant PIA exported a copy of the Work to Australia when Dale Powers downloaded a copy of the Work and also imported a copy of the Work to United States from Australia when Dale Powers distributed a copy of the Work.

204.   End user Derek Dueker (an end user of Defendant ExpressVPN) from IP address 64.20.60.59 distributed copies of Plaintiffs' Works *Olympus Has Fallen*, *London Has Fallen, Angel Has Fallen* and *Hunter Killer*.  *See* Decl. of Derek Dueker at ¶¶2-4.

205.   End user Andrew Grumbling (an end user of Defendant ExpressVPN) from IP address 185.245.86.115 distributed copies of Plaintiffs' Works *Hellboy* and *Angel Has Fallen*.  *See* Decl. of Andrew Grumbling at ¶¶2-3.

206.   End user Tayah Durnan (an end user of Defendant ExpressVPN) from IP address 104.143.92.63 distributed copies of Plaintiff's Work *Rambo V: Last Blood*.  *See* Decl. of Tayah Durnan at ¶¶2-3.

20-023W

207.    Defendant ExpressVPN exported a copy of the Work to Australia when Tayah Durnan downloaded a copy of the Work and also imported a copy of the Work to United States from Australia when Tayah Durnan distributed a copy of the Work.

208.    End user Cecilia Peacock (an end user of Defendant ExpressVPN) from IP address 167.160.167.233 distributed copies of Plaintiff's Work *And So It Goes*.  *See* Decl. of Cecilia Peacock at ¶¶2-3.

209.    Each IP address is a numerical identifier assigned to each device connected to a computer network that uses the Internet Protocol for communication and permits devices to be identified and interface on the Internet and provides the location of the device in the network..

210.    The IP addresses Defendants provide are indexes, references, pointers, and/or hypertext links that linked swarm participant to online locations such as Sharktech's own servers in Denver and/or the end user's computers containing unauthorized copies of Plaintiffs' Works or sources for distributing Plaintiffs' Works.

***E.  Defendants intentionally induce piracy of copyright protected Works including Plaintiffs'.***

211.    Defendants obtained services such as IP addresses and servers from host providers such as Sharktech for the purpose of infringing copyright protected Works including Plaintiffs'.

212.    Defendants promote their services for the purpose of infringing copyright protected Works including Plaintiffs' (i.e. – piracy).

213.    Defendant PIA acknowledges that its end users use its VPN service for

20-023W

piracy.



214.    PIA instructs its users how to *optimize* use of its VPN service for piracy.



215.    PIA warned its end users that Plaintiffs' counsel had obtained log

20-023W

information for users of the piracy website YTS after it received a subpoena in that case.

216.    PIA's parent company and alter ego Kape promotes PIA's VPN service for piracy on its website.

217.    Kape warns that "Risks of Torrenting in the US" include "Copyright trolls… that locate and penalize users who download copyrighted content." https://www.vpnmentor.com/blog/downloading-torrents-in-the-u-s/ [last accessed on 11/5/2021].

## What Are the Risks of Torrenting in the US

**Torrenting in the US can present some serious challenges.** On top of legal risks, there are various cyber threats you are vulnerable to whenever you torrent in the US. Find out more about the 3 major risks of torrenting below.

### Copyright trolls

**Copyright trolls are companies that locate and penalize users who download copyrighted content.** They're usually third parties, hired to act on behalf of big movie studios and music labels. Copyright trolls use deep packet inspection (DPI) to track your downloads and visited sites. Once they find someone downloading illegal files, they hand out a settlement letter that can sometimes come with fines of up to $100K. The team at vpnMentor doesn't condone illegal torrenting, but even if you didn't download copyrighted content intentionally and only did it by accident, you'd be exposing yourself to copyright trolls.

218.    Kape states that PIA's kill switch is great for protecting users that want to pirate.    https://www.vpnranks.com/reviews/private-internet-access/ [last accessed on Nov. 4, 2021] ("I'd recommend users to keep the Kill Switch enabled at all times, especially if you're performing sensitive tasks like downloading torrents in a country with strict laws against online piracy").

20-023W

## PIA VPN Kill Switch

The PIA VPN Kill Switch disconnects your internet if you lose your VPN connection for one reason or the other. This stops your actual IP address from getting exposed to your local ISP or the site you are visiting.

I'd recommend users to keep the Kill Switch enabled at all times, especially if you're performing sensitive tasks like downloading torrents in a country with strict laws against online piracy.

The Kill Switch will ensure that your real identity remains hidden even in case of sudden connection interruptions.

## Encrypted Wi-Fi

What makes PIA a standout VPN service from its competitors is its encrypted Wi-Fi feature. When you use Private Internet Access on your Wi-Fi, it protects the device through WPA protocol first. Therefore, you have to provide an authentication key before using the VPN on Wi-Fi devices, which makes your connection sessions more secure.

## PIA SOCKS5 Proxy

PIA SOCKS5 proxy offers an **additional layer of authentication** as it only allows authorized users when it comes to accessing the servers. In addition, it provides an appreciable connection speed as compared to other protocols.

This makes SOCKS5 good for purposes such as downloading and streaming. The popular usage of the protocol involves downloading torrents because it usually results in faster speeds.

However, it must be remembered that if you're in a country with strict laws against torrenting, the wiser decision would be to stick to more secure protocols like OpenVPN even if it results in slightly slower speeds. This is because SOCKS5 has weaker security as compared to other VPN protocols.

219.    Kape states here that "The safest way to torrent in the US is by using a VPN" and recommends Private Internet Access and ExpressVPN because each "Works with: The Pirate Bay, RARBG, 1337x, YTS, Netflix, Hulu…and more".

20-023W

## 1. ExpressVPN — Highly Secure With Fast Speeds for Torrenting in the US

 

**Try ExpressVPN >**

- ✓ Strict zero-logs policy, military-grade 256-bit encryption, and an automatic kill switch to protect your privacy while torrenting in the US
- ✓ Unlimited data and lightning-fast speeds to torrent in the US without lag
- ✓ A vast network of P2P servers that allow you to torrent from anywhere
- ✓ 5 simultaneous device connections
- ✓ 30-day money-back guarantee
- ✓ Works with: The Pirate Bay, RARBG, 1337x, YTS, Netflix, Hulu, HBO Max, and more
- ✓ Compatible with: Windows, Mac, iOS, Android, Linux, routers, and more

20-023W

## 4. PIA — P2P-Supporting Servers for Fast Torrenting in the US

 

**Try Private Internet Access >**

- ✓ No-logs policy, AES 256-bit encryption, and an automatic kill switch to keep you secure while you torrent in the US

- ✓ Unlimited data and decent speeds to torrent in the US without buffering

- ✓ 29,650 servers in 70 countries, with most locations offering P2P support

- ✓ 10 simultaneous device connections

- ✓ 30-day money-back guarantee

- ✓ Works with: The Pirate Bay, RARBG, 1337x, YTS, Netflix, HBO Now, and more

- ✓ Compatible with: Mac, Windows, Linux, Android, iOS, and more

☀ **November 2021 Update:** PIA doesn't usually have deals or discounts (it's already so affordable), but right now you can **get a new subscription for a crazy 84% off**!

220.    PIA's parent company and alter ego Kape promotes ExpressVPN's VPN service for using the piracy app "ShowBox".   *See* https://www.vpnmentor.com/blog/is-showbox-safe-it-is-but-only-if-you-do-this/ [last accessed on 11/4/2021].

221.    Here Defendant PIA's parent company Kape acknowledges that ShowBox is "illegal in most Western countries" and that "There is also a risk that Hollywood studios…in litigation against…Showbox could actually sue end users….You can insulate yourself from these risks by using a VPN…"

20-023W

## Is Showbox Legal?

Showbox, which is considered to have mostly pirated content, is **illegal in most Western countries** with strict intellectual property and copyright laws.

However, there is a gray area for users. **In many cases, streaming pirated content online is considered legal,** even if the website in question does not own the pertinent copyright or licensing. What is almost universally considered illegal is downloading pirated content to your own device.

There is also a risk that Hollywood studios or TV producers in litigation against websites offering Showbox could actually **sue end users**. Some of these websites now warn users that their **IP addresses and browsing history could be made available** to interested parties through their ISP.

You can insulate yourself from these risks by using a VPN. **VPNs prevent ISPs from being able to view your online activity or personal data** and passing it on to third parties such as studios, producers, and law firms.

**VPNs also allow you to bypass the geo-restrictions** that some countries use to block Showbox, allowing you to get through to the service's servers and the content you want to watch.

222.    Indeed, some of the Plaintiffs in this action joined other rightsholders and filed a lawsuit against operators of the ShowBox app and websites that promoted ShowBox app in the District of Hawaii (1:18-cv-192).  Plaintiffs served a subpoena on Defendant PIA concerning the operator of the ShowBox's use of PIA's VPN service.

223.    Plaintiffs' investigator, Eric Smith, confirmed that Showbox can be used to download, reproduce, and distribute copies of copyright protected Works such as "I Feel Pretty" and "Hunter Killer" exactly as promoted and encouraged by Defendants.

224.    Defendant PIA's parent company and alter ego Kape promotes ExpressVPN's VPN service promotes as "reliable" torrent sites: The Pirate Bay; YTS; 1337x; RARBG and Limetorrents for the user to use after the users has gotten "a reputable VPN" with "military-grade encryption and hides your IP address".  The military-grade language include a link to the ExpressVPN website. https://www.vpnmentor.com/blog/torrent-beginners-bittorrent-explained/ [last accessed

20-023W

on 11/5/2021].

### Step 6: Download a safe torrent

Downloading a safe torrent is crucial because the wrong one can be filled with malware. Hackers usually fill torrents with malware and disguise them to wreak havoc. Therefore, **make sure you only download torrents that have been verified for safety**.

A good place to start is to use a trustworthy torrent site that's well established. **Don't download a torrent from an obscure site that you found off a Google search**, as Google often displays the URLs of fake sites.

Some reliable torrent sites include:

- The Pirate Bay
- YTS
- 1337x
- RARBG
- Limetorrents

225.   Defendant PIA's parent company and alter ego Kape promotes ExpressVPN's VPN service for using the piracy apps and piracy websites such as "MoviesJoy", "Popcorn Time" "SubsMovies".  *See* https://www.vpnmentor.com/blog/best-alternatives-to-flixtor-get-free-movies-tv/ [last accessed on 11/4/2021].

226.   Here Defendant PIA's parent company and alter ego Kape warns its readers to use a VPN to make it "nearly impossible" to get caught infringing copyrights.

## Protection from Legal Consequences of Copyright Violations

It's perfectly **legal to watch a video on a website that has secured rights to distribute it**. However, if the website is not authorized to show the video, you could get pulled into legal battles over copyright infringement.

By encrypting your traffic and masking your IP address, **VPNs make it nearly impossible for anyone to trace your online activity back to you**. So even if the streaming website gets in trouble for violating copyright laws, you won't.

227.    Defendant PIA's parent company and alter ego Kape explicitly promotes notorious piracy website such as YTS, 1337x, RARBG and the Pirate Bay and states that ExpressVPN can be used to "…stop you from getting in trouble for torrenting if it's banned in your country or you accidentally download copyrighted material." https://www.vpnmentor.com/blog/best-elitetorrent-alternatives/    [last accessed on 11/4/2021].

228.    Defendants pay commissions to marketing affiliates that promote their VPN services for piracy.

229.    Defendant ExpressVPN also pays a marketing commission to Kape to promote its service for piracy.

230.    Upon information and belief, Defendants pay these marketing affiliates a percentage of the subscription fee for each end user they refer that pays for a subscription for the VPN service.

231.    Defendants' marketing affiliate "ProPrivacy" recommended PIA, CyberGhost and ExpressVPN as three of the top five VPNs "you will need to use…to torrent with YTS safely and avoid getting into trouble."

20-023W

49

https://proprivacy.com/comparison/vpn-yts [last accessed on 11/4/2021].



232.   Upon information and belief, the operator of notorious piracy website YTS was a marketing affiliate of ExpressVPN.

233.   The YTS website operator promoted Express VPN's VPN service as a tool to pirate copyright protected content without getting caught.

234.   The YTS website operator promoted Express VPN's VPN service with the message, "WARNING! Download only with VPN…" and describes its VPN service as a means to, "Protect yourself from expensive lawsuits and fines NOW!"



235.   The YTS website operator promotes Express VPN's VPN service next to specific movies available to be pirated.

20-023W



236.    The YTS website operator explicitly promotes ExpressVPN service on the piracy website YTS as an essential tool to pirate Plaintiffs' Works.  *See* Decl. of Kessner at ¶¶4-10 (ExpressVPN promotes its VPN service for downloading torrents for *Angel Has Fallen*, *Ava*, *Disturbing the Peace*, *Tesla*, *The Second*, *The Outpost*, and *The Professor and the Madman*).

237.    The YTS website operator explicitly promotes ExpressVPN service on the piracy website YTS as an essential tool to pirate *2 Guns*.

20-023W



238.    The YTS website operator explicitly promotes ExpressVPN service on the piracy website YTS as an essential tool to pirate *Hurricane Heist*.

239.    The YTS website operator explicitly promotes ExpressVPN service on the piracy website YTS as an essential tool to pirate *And So it Goes*.

240.    The YTS website operator explicitly promotes ExpressVPN service on the piracy website YTS as an essential tool to pirate *The Last Full Measure*.

241.    The YTS website operator explicitly promotes ExpressVPN service on the piracy website YTS as an essential tool to pirate *Lone Survivor*.

242.    The YTS website operator explicitly promotes ExpressVPN service on the piracy website YTS as an essential tool to pirate *Universal Soldier: Day of Reckoning*.

20-023W

243.   Defendant ExpressVPN actively promotes its VPN service for the purpose of movie piracy, including the infringing of Plaintiffs' Works.

244.   ExpressVPN emphasizes that its service has "No restriction" and its end users can "Stream or download anything…with your IP address hidden…"

ExpressVPN with the push of a button.



## No restrictions

Stream or download anything, from any of our servers, anywhere on Earth, with your IP address hidden from prying eyes.

245.   In response to a question of whether BitTorrent and other file-sharing traffic is allowed on all ExpressVPN servers, ExpressVPN replied that "ExpressVPN allows all traffic, including BitTorrent and other file-sharing traffic (without rerouting), from all of our VPN servers." *See* https://torrentfreak.com/expressvpn-anonymous-review/ [last accessed on Nov. 5, 2021].

**TF:** Is BitTorrent and other file-sharing traffic allowed on all servers? If not, why? Do you provide port forwarding services? Are any ports blocked?

**ExpressVPN:** We do not believe in restricting or censoring any type of traffic. ExpressVPN allows all traffic, including BitTorrent and other file-sharing traffic (without rerouting), from all of our VPN servers. At the moment, we do not support port forwarding.

246.   End users use Defendants' VPN services exactly as explained and encouraged – to infringe copyright protected content while logged into the VPN service

so they can conceal their illicit activities.

247.   Defendants promote their VPN service as a tool to engage in massive copyright infringement to entice end users to purchase their VPN service.

248.   Based upon Defendants' encouragement that their VPN service can be used to "safely" operate piracy apps such as Popcorn Time and visit torrent sites such as Pirate Bay, Kickass Torrents, YTS and Extratorrents and pirate, end users purchase the VPN service, install piracy apps such as Popcorn Time on their devices and/or visit torrent sites to infringe copyright protected content including Plaintiffs' while using Defendants' VPN service.

249.   Defendants have the capability to log their end users' access to their VPN service but purposely delete the logged information so that they can promote their service as a means to pirate copyright protected Works anonymously.

250.   Defendants also purposely delete the logged information so that they can use their service as a means to pirate copyright protected Works anonymously.

251.   Defendants interfere with standard technical measures used by copyright holders to identify or protect copyright works by purposefully deleted their and their end users' logged information. *See* 17 U.S.C. § 512(i)(1)(B).

252.   Defendants specifically admit that they deleted their end users' logged information to protect the end users' piracy activities in promotions and advertisements. *See e.g.* Ernesto, "Which VPN Providers Really Take Privacy Seriously in 2021?", June 14, 2021, https://torrentfreak.com/best-vpn-anonymous-no-logging/#tf-comments [last accessed on Aug. 1, 2021] (In response to questions concerning BitTorrent activity, PIA

20-023W

states "We do not store any logs relating to traffic, session, DNS or metadata. There are no logs kept for any person or entity to match an IP address and a timestamp to a current or former user of our service. In summary, we do not log, period.")

253.   Defendants do not have a safe harbor from liability because they have not "adopted and reasonably implemented...a policy that provides for the termination in appropriate circumstances of subscribers...who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

**F. Defendants' subscribers knew the Copyright Management Information included in the files they distributed to other peers had been removed or altered without the authority of Plaintiffs.**

254.   A legitimate file copy of the Work includes copyright management information ("CMI") indicating the title.

255.   The initial seeder of the infringing file copies of Plaintiff's Work added wording to the file titles to "brand" the quality of piracy files he or she released and attract further traffic to his or her website.

256.   For example, the initial seeder of the infringing file copies of *Angel Has Fallen* added the wording "YTS" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the YTS website.

257.   For example, the initial seeder of the infringing file copies of *The Outpost* added the wording "TGx" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the torrentgalaxy website.

258.   The words YTS or TGx are not included in the file title of legitimate copies

or streams of the Plaintiffs' Works.  The initial seeders of the Work altered the title to falsely include the words such as "YTS" or "TGx" in the CMI.

259.    The file copies Defendants distributed to other peers in the Swarm included the altered CMI in the file title.

260.    Defendants' end users knew that TGx, FGT, YTS and RARBG were not the author of Plaintiffs' Works.

261.    Defendants' end users knew that TGx, FGT, YTS and RARBG were not a licensed distributor of Plaintiffs' Works.  Indeed, the YTS website includes a warning to this effect.

262.    Defendants' end users knew that the CMI that included TGx, FGT, YTS and RARBG in the file names was false.

263.    Defendants' end users knew that the file copies of the Work that they distributed to other peers in the Swarm included the altered CMI without the authority of Plaintiffs.

264.    Defendants' end users knew that the CMI in the title they distributed to other peers in the Swarm included the altered CMI without the authority of Plaintiffs.

265.    Defendants' end users knew that the false or altered CMI in the titles would induce, enable, facility or conceal infringements of the Works when they distributed the false CMI, altered CMI or Works including the false or altered CMI.

266.    Namely, Defendants' end users knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent files originated to obtained unlicensed copies of the Work.

20-023W

267. Indeed, some of Defendants' end users have registered accounts with piracy website such as YTS.

268. By providing the website information in the altered CMI to others, Defendants' end users induced, enabled and facilitated further infringements of the Work.

269. Indeed, Defendants promote their VPN services for accessing piracy website such as YTS and RARBG.

***G. Defendants had knowledge that their end users were infringing Plaintiffs' Works and distributing file copies of the Works with altered CMI and that the IP addresses they provided to their end users were links to infringing activity but continued to provide service to their end users***

270. Plaintiffs engaged MEU to generate Notices of infringements ("Notices") styled per 17 U.S.C. §512(c)(3) of the DMCA to be sent to service providers of IP addresses where MEU confirmed infringement of copyright protected content.

271. Each Notice included at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which includes the altered CMI, the IP address and port number at where infringement was confirmed and the time of infringement down to the second. *See* Exhibits "4" and "5" (excerpts below).

```
Protocol: BITTORRENT
Infringed Work: The Outpost
Infringing FileName: The.Outpost.2020.720p.GPLAY.WEBRip.900MB.x264-GalaxyRG[TGx]
Infringing FileSize: 940063994
Infringer's IP Address: 70.39.102.165
Infringer's Port: 52098
Initial Infringement Timestamp: 2021-02-10 00:11:17


Protocol: BITTORRENT
Infringed Work: The Hitmans Wifes Bodyguard
Infringing FileName: The.Hitmans.Wifes.Bodyguard.2021.EXTENDED.1080p.WEBRip.x265-RARBG
Infringing FileSize: 1942629641
Infringer's IP Address: 70.39.102.165
Infringer's Port: 49934
Initial Infringement Timestamp: 2021-07-25 06:10:02
```

272.    MEU determines the proper abuse contact email address for the service provider assigned the IP addresses at issue from publicly available information from Whois records of ARIN.

273.    Plaintiffs' agent sends the Notice to the abuse contact email address for the host provider associated with the IP addresses.

274.    Upon information and belief, the host provider forwarded these Notices to Defendants.

275.    Upon information and belief, other rightsholders had similar Notices sent to host providers concerning infringing activity at IP addresses assigned to Defendants.

276.    Just between March and September of this year, Plaintiffs' agent sent thousands of Notice to Sharktech confirming infringements of the motion pictures: 211; After We Collided; Angel Has Fallen; Automata; Ava; Bedeviled (ExpressVPN only); Before I Go to Sleep; Between Worlds; Blackbird; Boyka: Undisputed IV; Criminal; Dallas

20-023W

Buyers Club; Day of the Dead: Bloodline (ExpressVPN only); Dead Trigger; Distorted; Disturbing the Peace; Extremely Wicked, Shockingly Evil and Vile; Hellboy; Homefront; Hunter Killer; I Am Wrath (PIA only);I Feel Pretty; Jolt; Kill Chain; Lansky; Leatherface; London Has Fallen; Look Away; Mechanic: Resurrection; Olympus Has Fallen; Once Upon A Time in Venice; Rambo: Last Blood; Run Hide Fight; Shock and Awe; Singularity (PIA only); SKIN (PIA only); Speed Kills; Status Update (ExpressVPN only); Survivor; Tesla; The 2nd; The Expendables 3; The Hitman's Bodyguard; The Hitman's Wife's Bodyguard; The Humbling; The Outpost; The Professor and the Madman; The Protégé; and Till Death.

277.    For example, just between February and September of this year, Plaintiffs' agent sent Sharktech 1151 Notices concerning infringements of *Hitman's Wife's Bodyguard* at IP addresses Sharktech reassigned to PIA.

278.    Upon information and belief, Sharktech forwarded each of the Notices to dmca@privateinternetaccess.com and john@privateinternetaccess.com.

279.    For example, just between March and September of this year, Plaintiffs' agent sent Sharktech 247 Notices concerning infringements of *Hitman's Wife's Bodyguard* at IP addresses Sharktech reassigned to ExpressVPN.

280.    Upon information and belief, Sharktech forwarded each of the Notices to services@expressvpn.com.

281.    Plaintiffs' agent sent 12 Notices to Sharktech concerning infringement of movies such as *Kill Chain*, *Hitman's Bodyguard*, *The Outpost*, *The Hitman's Wife's Bodyguard*, and *London Has Fallen* between February and March of this year at IP

20-023W

address 70.39.108.195.  Upon information and belief, Sharktech forwarded each of the Notices to dmca@privateinternetaccess.com and john@privateinternetaccess.com.

282.    During this same period the PIA end user at IP address 70.39.108.195 shared multiple copies of these Works.  For example, the end user was confirmed by MEU sharing copies of *The Hitman's Wife's Bodyguard* 21 times and *The Outpost* 14 times just between February and March of this year.

283.    The host provider Choopa allocated to Defendant PIA IP addresses including 108.61.13.43; 108.61.13.44; 108.61.13.45 and 108.61.13.46 from 8/3/2012.

284.    Between May 7, 2018 to the present, Plaintiffs' agent sent Choopa 247 Notices concerning infringement of Status Update; The Hitman's Bodyguard; Day of the Dead; 211; Once Upon a Time in Venice; I Feel Pretty; The Mechanic: Resurrection; Criminal; and Automata at these IP addresses that, upon information and belief, Choopa forwarded to Defendant PIA.

285.    The host provider allocated to Defendant PIA IP addresses including 173.239.232.23 and 173.239.232.101.

286.    Plaintiffs' agent sent hundreds of Notices to the host provider that, upon information and belief, forwarded the Notices to Defendant PIA.

287.    In 2019, Defendant PIA and/or its end user distributed copies of *The Brass Teapot* and *Lost Child* from IP addresses 173.239.232.89, 173.239.232.101 and 173.239.232.23 even after Plaintiffs' agent had sent hundreds of notices to the host provider concerning this IP address.

288.    Defendants failed to terminate the accounts of their end users associated

20-023W

with these IP addresses or take any meaningful action in response to these Notices.

289.    Defendants failed to even forward the Notices to their end users.

290.    Plaintiff Venice PI, LLC served a subpoena on Defendant PIA in Civil Action No. 19-cv-169 in the District of Hawaii concerning infringing activity at IP address 91.207.175.82.

*291.*    Plaintiff Millennium Funding, Inc. served a subpoena on Defendant PIA in Civil Action No. 20-cv-3170-PAB-NRN in the District of Colorado concerning infringing activity at IP addresses 193.37.252.19 and 194.59.251.68.

292.    Defendant PIA failed to terminate the accounts of their end users associated with these IP addresses in the subpoena or take any meaningful action in response to these subpoenas.

293.    In the contrary, PIA warned its end users that Plaintiffs' counsel had received log information from the notorious YTS piracy website.

294.    Defendants could have taken simple measures to stop their end users from continuing to reproduce and/or distribute Plaintiffs' works but did not.

295.    For example, Defendants could have temporarily "null-routed" the IP addresses to disable the link to the infringing activity and stop further piracy of Plaintiffs' works.

296.    For example, Defendants could have temporarily suspended the end users' account to stop further piracy of Plaintiffs' works.

297.    For example, Defendants could have blocked certain ports such as ports 6881-6889 that are used for BitTorrent.

20-023W

298.    If Defendants had even forwarded the Notices to their end users, the end user would likely have ceased the conduct.  *See* Decl. of Robert O'Brien at ¶13 ("I would have immediately ceased…had I received any of these notices earlier or had my service been temporarily terminated."); Decl. of Tayah Durnan at ¶5("I would have immediately stopped…had I received any warning or notices…")

299.    Defendants continued to provide service to their end users despite knowledge that their end users were using the service to engage and facilitate massive piracy of copyright protected Works including the Plaintiffs'.

300.    Each of Defendants purposefully failed to do anything about its end users' flagrant piracy including failing to even forward the Notices on to its end users because it was motivated to continue receiving payments from its end users and was concerned that its end users would cancel their service if it forwarded the notices to its end users.

### H. Defendants control the conduct of their end users.

301.    Each of Defendants can terminate the accounts of its' end users at any time.

302.    Upon information and belief, Defendants promptly terminates end user accounts when said end users failed to pay for the service.

303.    Upon information and belief, each of Defendants blocks specific traffic it considers abusive.

### I. Defendants do not have a safe harbor from liability.

304.    As part of the DMCA, Congress created a safe harbor that limits the liability of a service provider for copyright infringement when their involvement is limited to, among other things, "transmitting, routing, or providing connections for, material through

20-023W

a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(a). To benefit from this safe harbor, however, an ISP must demonstrate that it "has adopted and reasonably implemented...a policy that provides for the termination in appropriate circumstances of subscribers...who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

305.   Defendants do not have a policy of terminating repeat infringers.

306.   Plaintiffs' agents have sent thousands of Notices to host providers such as Sharktech and Leaseweb concerning infringements at IP addresses the host providers reassigned to Defendants.

307.   Despite these host providers forwarding the Notices to Defendants, each of Defendants failed to terminate the accounts and/or take any meaningful actions against its end users in response to these Notices consistent with a reasonably implemented policy for termination of subscribers and account holders of the service provider's system or network who are repeat infringers necessary to support a safe harbor from liability ("policy").

308.   In many cases, Defendants were untruthful to the host providers when the host provider required a follow up response to the Notices.

309.   For example, when Leaseweb required ExpressVPN to respond to a Notice Plaintiffs' agent sent to Leaseweb on July 16, 2021 concerning piracy of "The Hitman's Bodyguard" at IP Address: 154.6.19.11 and Port: 56194 at Timestamp: 2021-07-15 14:34:33, Defendant ExpressVPN replied that "The mentioned content has been removed".  However, the IP address 154.6.19.11 continues to be the source of substantial infringing activity, including piracy of *The Hitman's Wife's Bodyguard*.

20-023W

310.    Congress created a safe harbor that limits the liability of a service provider for copyright infringement "…by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider" does not have the requisite knowledge, "…responds expeditiously to remove or disable access to, the material…" and has the appropriate designated agent for receiving notices.  17 U.S.C. § 512(c)(1), (2).

311.    Defendants and/or their end users use IP addresses of Defendants as links to access infringing copies of Plaintiffs' Works at Defendants' servers.

312.    The thousands of Notices Plaintiffs' agent sent to Defendants' host providers concerning infringements included information such as the IP addresses that were forwarded to Defendants could have been used by Defendants to disable access to the infringing material and/or activity.

313.    Defendants failed to respond and expeditiously remove or disable access to the material and/or activity in response to the thousands of Notices Plaintiffs' agent sent to their host providers such as Sharktech.

314.    Defendant ExpressVPN has failed to designate and register an agent with the Copyright Office as provided by 17 U.S.C. § 512(c)(2).

315.    Defendants' conduct renders them ineligible for safe harbor immunity from copyright liability under the DMCA.

***J. The copyright infringements arise from Defendants' advertisements.***

316.    Defendants advertises that their services can be used to do whatever their end users wish since there are no logs.

65

317.   Defendants' end users are motivated to become customers from Defendants' advertisements.

318.   Defendants' end users are motivated to become customers from the knowledge of Defendants' practice of deleting logs, ignoring notices of infringements or failing to take any meaningful action.

319.   The ability and availability for Defendants' end users to distribute and stream copyright protected Works including Plaintiffs from servers and IP addresses controlled by Defendants while concealing their identity is a draw for end users and at least one of their motivations to become customers of Defendant.

320.   Defendants directly profits from their end users streaming and distribution of Plaintiffs' copyright protected Works without authorization.

**K. Defendant PIA breached a settlement agreement with Plaintiffs.**

321.   On or about Sept. 1, 2021, Plaintiffs, other rightsholders and Defendant PIA entered into a settlement agreement ("Agreement") to resolve copyright claims in this action and other claims.  *See* Exhibit "6".

322.   Plaintiffs' counsel, counsel for Kape (Dr. Venetia Argyropoulou) and counsel for PIA negotiated the Agreement.

323.   Counsel for PIA had authority to bind PIA.

324.   Dr. Argyropoulou had authority to bind PIA.

325.   The Agreement provided for PIA to make a payment to Plaintiffs and non-parties by Sept. 21, 2021.

326.   In the Agreement PIA acknowledges that the Agreement "…does not give

20-023W

PIA any license to distribute for commercial uses or for any other purposes whatsoever, the Works owned by Owners."

327.    The Agreement provides for being "governed by and construed in accordance with the laws of the State of Hawaii…"

328.    One of the rightsholders in the Agreement is a Hawaii limited liability company.

329.    On Sept. 1, 2021, the general counsel for PIA sent an email to Plaintiffs' counsel stating, "We are sending the approved version of the final settlement agreement after [general counsel of Kape Dr.] Venetia [Argyropoulou] sent her feedback and I made a couple of small revisions."

330.    That same day, Plaintiffs' counsel replied with a revised version that merely changed "Voltage Pictures, Inc. to LLC" and changed payment due date from 8/15/2021 to 9/21/2021.  Plaintiffs' counsel emphasized that "It is very important that the payment arrive before end of 9/30/2021."

331.    That same day, general counsel for PIA stated that he was revising to make the signing party Moran Laufer (the CFO of PIA and Kape) rather than himself and sending over for his signature.

332.    That same day, Plaintiffs' counsel replied to the general counsel for PIA "This is fine".

333.    The general counsel for PIA never stated an intention not to be bound by the Agreement absent an executed writing.

334.    The Agreement is a valid, binding and enforceable contract.

20-023W

335.    Plaintiffs' counsel also represents Plaintiffs in Civil Action 21-cv-643 in the E. District of Virginia. In preparing a First Amended Complaint in the Virginia action to name further Defendants, Plaintiffs' counsel for the first time became aware that an intended Defendant ZenGuard is also a subsidiary of Kape.  Plaintiffs' counsel promptly notified general counsel for PIA of its intentions in the Virginia action in the spirit of good faith.

336.    Despite Plaintiffs and PIA agreeing to the fully enforceable Agreement, on Sept. 10, 2021 the general counsel for PIA sent a new proposed agreement to also release ZenGuard that replaced the name PIA with "Kape Technologies Plc (":Kape" which such term shall also include all of KAPE TECHNOLOGIES PLC current and prospective subsidiaries)", increased the total amount to be paid to settle claims for ZenGuard, and provided that Moran Laufer would be the signing party on behalf of Kape.

337.    On Sept. 11, 2021 (Saturday) at 9:39 AM Hawaii Time, Dr. Argyropoulou suddenly emailed Plaintiffs' counsel and demanded that he sign the new proposed agreement on behalf of the Plaintiffs by the next day within less than 14 hours (less than 9 hours when taking into account time zone of some of the Plaintiffs).

338.    Plaintiffs' counsel pointed out in reply that because it was Saturday morning (and afternoon in the mainland), it would be impossible to get in touch with his clients within less than 14 hours.

339.    Dr. Argyropoulou threateningly replied that "…we fully intend to take all necessary legal measures to protect our brand names, if a settlement is not reached now."

20-023W

340.   Plaintiffs' counsel further pointed out in reply that the "current and prospective subsidiaries" language was vague and could potentially release a Defendant in other outstanding lawsuits if Kape purchased that Defendant.

341.   Dr. Argyropoulou replied that she is "willing to limit this to prospective subsidiaries not based in the US".

342.   Plaintiffs' counsel then pointed out to Dr. Argyropoulou that "Many of the foreign VPN providers have also agreed to be subject to jurisdiction in the US just like ZenGuard."

343.   Less than two days later (Sept. 13, 2021), the news site CNet reported that Kape was purchasing ExpressVPN for $936 million dollars. https://www.cnet.com/tech/services-and-software/kape-technologies-buys-expressvpn-as-part-of-a-936-million-deal/ [last accessed on 11/5/2021].

344.   At the time Dr. Argyropoulou demanded that Plaintiffs' counsel sign the new proposed agreement, Defendant ExpressVPN was also a Defendant in the Virginia action.

345.   Upon information and belief, Dr. Argyropoulou was involved with Kape's purchase of ExpressVPN.  Accordingly, Dr. Argyropoulou knew that Kape was in the process of purchasing Defendant ExpressVPN when she demanded that Plaintiffs' counsel sign the new proposed agreement within less than 14 hours.

346.   PIA, through its agent Dr. Argyropoulou, breached the Agreement by attempting to deceive Plaintiffs' counsel into signing the new proposed agreement on behalf of Plaintiffs in which she had snuck in a full release for Defendant ExpressVPN

under the false pretenses of settling the PIA and ZenGuard matters.

347.   PIA, through its agent Dr. Argyropoulou, breached the Agreement by attempting to strongarm Plaintiffs' counsel to sign the new proposed agreement on behalf of Plaintiffs within less than 14 hours before its parent and alter ego Kape publicly released that it was purchasing ExpressVPN.

348.   Upon information and belief, ExpressVPN induced PIA to breach the Agreement and/or conspired with PIA and its alter ego Kape to deceive Plaintiffs into inadvertently releasing ExpressVPN from the Virginia Action by attempting to insert the vague language into the new agreement and pressuring Plaintiffs' counsel to sign the new agreement in less than 14 hours.

349.   PIA purposefully and maliciously breached the Agreement to attempt to release its alter ego Kape's "prospective subsidiary not based in the US" Defendant ExpressVPN by attempting to sneak in vague language in a proposed new agreement and coerce Plaintiffs' counsel to sign the proposed new agreement on behalf of his clients by threatening him and giving him a ridiculous deadline of less than 14 hours on a Saturday.

350.   PIA breached the covenant of good faith and fair dealing implied in the Agreement.

351.   PIA acted wantonly, oppressively, or with such malice as implies a spirit of mischief or criminal indifference to its civil obligations.

352.   PIA misconduct is willful and with conscious indifference to consequences.

353.   Plaintiffs relied upon this Agreement to their detriment.

20-023W

354.   Plaintiffs sent PIA a 10-day notice to cure pursuant to ¶23 of the settlement agreement on 11/1/2021.  PIA did not cure its breach.

355.   Plaintiffs have substantially complied with the Agreement.

356.   To the extent Plaintiffs have not complied with the Agreement, their non-compliance is excused.

357.   PIA breached the Agreement by continuing to distribute, reproduce and/or publicly perform copies of Plaintiffs' Works in violation of U.S. Copyright law.

358.   Plaintiffs relied upon the contract to their detriment for Defendant PIA to cease distributing, reproducing and/or publicly performing copies of Plaintiffs' Works in violation of U.S. Copyright law.

359.   PIA breached the Agreement by failing to pay Plaintiffs the agreed upon amount.

360.   PIA's obligation to make the agreed upon payment was not excused or relieved.

361.   PIA's breaches of the agreement were substantial failures to perform that are material.

362.   Plaintiffs have suffered damages as result of PIA's breach of contract.

363.   For example, PIA did not make the payment by 9/30/2021 despite Plaintiffs' counsel emphasizing the importance of this date.

364.   For example, PIA has directly infringed many of Plaintiffs' Works multiple times since breaching the contract.

## VII. FIRST CLAIM FOR RELIEF
### (Direct Copyright Infringement)

71

365.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

366.    Plaintiffs are the registered copyright owners of the Works, each of which contains an original work of authorship.

367.    Defendants actively promote their VPN service for piracy and encourage their customers ("end users") to use their VPN service for piracy.

368.    Defendants and their end users use their VPN service for piracy.

369.    Defendants transmit, route, or provide connections for transmitting copies of Plaintiffs' Works through a network under their control including servers provided by Sharktech in Denver, CO.

370.    Defendants distributed at least a piece of the copyright protected Works to others.

371.    Defendants make copies of said Works on said network when transmitting, routing, or providing connections for transmitting copies of Plaintiffs' Works through said network.

372.    Defendants encourage their end users to use the network to distribute and reproduce copies of Plaintiffs' Works.

373.    Defendants encourage their end users outside of the United States to access and use their servers and IP addresses in the United States to violate geographical restrictions of authorized platforms and publicly perform and/or distribute copies of the Plaintiffs' Works outside of the United States.

374.    Plaintiffs did not authorize, permit, or provide consent to Defendants to

20-023W

copy, reproduce, distribute, publicly perform, or display their Works.

375.    As a result of the foregoing, Defendants violated the Plaintiffs' exclusive rights to reproduce the Works in copies, in violation of 17 U.S.C. §§ 106(1) and 501.

376.    As a result of the foregoing, Defendants violated the Plaintiffs' exclusive rights to distribute copies of the Works in copies, in violation of 17 U.S.C. §§ 106(3) and 501.

377.    As a result of the foregoing, Defendants violated the Plaintiffs' exclusive rights to publicly perform (stream) copies of the Works in copies, in violation of 17 U.S.C. §§ 106(3) and 501.

378.    Defendants encourage their end users outside of the United States to use their VPN service to access and use servers and IP addresses in the United States to publicly perform and/or distribute copies of the Plaintiffs' Works to the end users outside of the United States.

379.    As a result of the foregoing, Defendants imported, without the authority of Plaintiffs, copies of the Works that have been acquired outside the United States in violation of 17 U.S.C. §602(a)(1).

380.    As a result of the foregoing, Defendants imported into the United States, without the authority of Plaintiffs, pirated copies of the Works in violation of 17 U.S.C. §602(a)(2).

381.    As a result of the foregoing, Defendants exported from the United States, without the authority of Plaintiffs, pirated copies of the Works in violation of 17 U.S.C. §602(a)(2).

20-023W

382.   Defendants' violations of 17 U.S.C. §602(a) violate Plaintiffs' exclusive right to distribute copies of the Works in violation of 17 U.S.C. §§ 106(3) and 501.

383.   Defendants' infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

384.   Defendants interfere with standard technical measures used by copyright holders to identify or protect copyright works by purposefully deleting their end users' log information. *See* 17 U.S.C. § 512(i)(1)(B).

385.   The Plaintiffs have suffered damages that were proximately caused by each of the Defendants copyright infringements including, but not limited to lost sales, price erosion, and a diminution of the value of its copyrights.

## VIII. SECOND CLAIM FOR RELIEF
### (Contributory Copyright Infringement based upon material contribution)

386.   Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

387.   Each of Defendants knowingly supplies the services such as IP addresses and server access to their end users despite actual and/or constructive knowledge that its end users use the machinery to infringe Plaintiffs' exclusive rights.

388.   Defendants and their paid affiliates promote their service for the purpose of infringing copyright protected Works including Plaintiffs.

389.   Through its activities, Defendants knowingly and intentionally took steps that are substantially certain to result in direct infringements of Plaintiffs' Copyrighted Works, and that have resulted in such direct infringements in violation of Plaintiffs' copyrights.

74

20-023W

390.    Defendants' host providers such as LogicWeb, Sharktech, Choopa, M247 and Leaseweb sent them thousands of Notices providing them with specific knowledge of their end users' ongoing infringements of Plaintiffs' Works.

391.    Despite Defendants' knowledge that their end users were using their service to engage in widescale copyright infringements, Defendants failed to take simple measures or any reasonable steps to minimize the infringing capabilities of their service.

392.    Despite having the ability to do so, each of Defendants refuses to even null-route the IP addresses of their end users where specific infringing activity has been identified and informed.

393.    Despite having the ability to do so, each of Defendants refuses to save logs of the IP addresses of their end users where specific infringing activity has been identified and informed.

394.    Despite having the ability to do so, each of Defendants refuses to block notorious piracy websites such as The Pirate Bay, YTS, RARBG and 1337 that their end use to infringe Plaintiffs' Works as promoted by Defendants.

395.    Defendants are liable as a contributory copyright infringers for the infringing acts of their end users.   Defendants have actual and constructive knowledge of the infringing activity of their end users.   Defendants knowingly caused and otherwise materially contributed to these unauthorized distributions of Plaintiffs' Works.

396.    Defendants' infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

397.    By engaging in the contributory infringement alleged in this Second

20-023W

Amended Complaint, Defendants deprived not only the producers of the Works from income that could have been derived when the respective film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy.   Defendants' misconduct therefore offends public policy

## IX. THIRD CLAIM FOR RELIEF
### (Vicarious Infringement)

398.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

399.    Defendants are vicariously liable for the infringing acts of their end users' infringements including but not limited to their end users' direct infringements of Plaintiffs' exclusive right to distribute and reproduce copies of their Works.

400.    Each of Defendants have the right and ability to supervise and control the infringing activities that occur through the use of its service, and at all relevant times has derived a direct financial benefit from the infringement of Plaintiffs' copyrights.

401.    Defendants have refused to take any meaningful action to prevent the widespread infringement by their end users despite having actual knowledge.  Indeed, the ability of end users to use Defendants' service to distribute copies of Plaintiffs' Works with knowledge that all log records of their activities will be deleted acts as a powerful draw for users of Defendants' service.

402.    Defendants' end users are also motivated to become end users of Defendants due to their knowledge that they can use piracy apps such as Popcorn Time

20-023W

and ShowBox to pirate Plaintiffs' Works without any consequence because of Defendants' policy of ignoring notices of infringement and deleting logs.

403. Defendants' end users are also motivated to become end users of Defendants due to their knowledge that they can use Defendants' service to access legal platforms such as Netflix from unauthorized regions and stream or distribute Plaintiffs' Works to these unauthorized regions.

404. Defendants are therefore vicariously liable for the unauthorized distribution of Plaintiffs' Works.

## X. FOURTH CLAIM FOR RELIEF
### (Contributory Copyright Infringement based upon intentional inducement)

405. Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

406. Defendants intentionally induced the infringement of Plaintiffs' exclusive rights under the Copyright Act, including infringement of Plaintiffs' exclusive rights to reproduce, publicly perform, and distribute copies of their Works.

407. As instructed and encouraged by Defendants, their end users purchase and install the VPN service to conceal their identities while engaging in movie piracy.

408. As instructed and encouraged by Defendants, their end users install piracy applications such as Popcorn Time to use on their devices while assigned IP addresses by the Defendants' VPN services to conceal their identities while pirating Plaintiffs' Works.

409. As instructed and encouraged by Defendants, their end users access servers in the United States from locations outside of the United States that are not authorized by legal platforms to stream, distribute or reproduce Plaintiffs' Works and

stream, distribute or reproduce Plaintiffs' Works.

410.   As instructed and encouraged by Defendants, their end users access servers in the United States from locations outside of the United States to use BitTorrent to export copies of Plaintiffs' Works to locations outside of the United States in violation of Plaintiffs' exclusive rights to distribute their Works.

411.   Defendants' end users use piracy applications to connect to sources that publicly perform and/or distribute copies of Plaintiffs' Works while anonymously connected to the Internet by Defendants' VPN services.

412.   Defendants' end users connect to notorious piracy websites such as YTS to download torrent files to reproduce and distribute copies of Plaintiffs' Works while anonymously connected to the Internet by Defendants' VPN service exactly as promoted and encouraged to do by Defendants.

413.   Defendants induce direct infringements of Plaintiffs' Works by encouraging the end users to use movie piracy applications such as Popcorn Time and ShowBox and to access websites such as YTS that facilitate, enable, and create direct links between their customers and infringing sources, and by actively inducing, encouraging, and promoting their VPN services as a means to "safely" use movie piracy applications for blatant copyright infringement by assuring customers that their identification information will be concealed.

414.   Defendants induce direct infringements of Plaintiffs' Works by encouraging their end users to use their VPN service to access legal platforms such as Netflix to publicly perform or distribute copies of Plaintiffs' Works to unauthorized regions.

78

20-023W

415.    Defendants' intentional inducement of the infringement of Plaintiffs' rights in their Copyrighted Works constitutes a separate and distinct act of infringement.

## XI. FIFTH CLAIM FOR RELIEF
### (Secondary Liability for DMCA Violations)

416.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

417.    Defendants encourage their end users to access torrent files for copying copyright protected Works from notorious movie piracy websites such as The Pirate Bay, Torrentgalaxy, 1337x, RARBG and YTS.

418.    Defendants' end users registered for accounts with piracy websites such as YTS and RARBG.

419.    Defendants' end users knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the Plaintiffs' copyright protected Works, distributed copyright management information ("CMI") that included false wording such as "TGx", "RARBG", "FGT" and "YTS" in violation of 17 U.S.C. § 1202(a)(2).

420.    Defendants' end users, without the authority of Plaintiffs, or the law, distributed removed or altered CMI knowing that the CMI had been removed or altered to include the wording "TGx", "RARBG", "FGT" or "YTS" without the authority of Plaintiffs and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of Plaintiffs' copyright protected Works in violation of 17 U.S.C. § 1202(b)(2).

421.    Defendants' end users, without the authority of Plaintiffs, or the law, distributed Plaintiffs' Copyright protected Works knowing that the CMI had been removed

or altered to include the wording "TGx", RARBG", "FGT" or "YTS", and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of the copyright protected Works in violation of 17 U.S.C. § 1202(b)(3).

422.    Particularly, Defendants' end users knew that the CMI in the file names of the pieces had been altered to include the wording "TGx", "RARBG", "FGT" or "YTS".

423.    Particularly, Defendants' end users distributed the file names that included CMI that had been altered to include the wording "TGx", "RARBG", "FGT" or "YTS".

424.    Defendants' end users knew that the wording "TGx", "RARBG", "FGT" or "YTS" originated from notorious movie piracy websites which Defendants themselves promoted to them and to which the end users have registered accounts.

425.    Defendants' end users' acts constitute violations under the Digital Millennium Copyright Act, 17 U.S.C. § 1202.

426.    Defendants are secondarily liable for the DMCA violations of their end users.

427.    Defendants have actual and constructive knowledge of their end users' DMCA violations.

428.    Defendants knowingly caused and otherwise materially contributed to these DMCA violations.

429.    Defendants are vicariously liable for the DMCA violations of their end users.

430.    Defendants have the right and ability to supervise and control the DMCA violations that occur through the use of their service, and at all relevant times has derived a direct financial benefit from the DMCA violations complained of herein. Defendants have

20-023W

refused to take any meaningful action to prevent the widespread DMCA violations by their end users. Indeed, the ability of Defendants' end users to distribute torrent files from torrent websites such as YTS and the Pirate Bay that Defendants and their affiliates themselves promote and obtain file copies of the Works with altered CMI and distribute said copies while concealing their activities acts as a powerful draw for Defendants' end users. Defendants are therefore vicariously liable for the DMCA violations.

431.   Plaintiffs are entitled to an injunction to prevent Defendants from continuing to contribute to violations of 17 U.S.C. § 1202.

432.   Plaintiffs are entitled to recover from Defendants the actual damages suffered by Plaintiffs and any profits Defendants have obtained as a result of its wrongful acts that are not taken into account in computing the actual damages. Plaintiffs are currently unable to ascertain the full extent of the profits Defendants have realized by their violations of 17 U.S.C. § 1202.

433.   Plaintiffs are entitled to elect to recover from Defendants statutory damages for its violations of 17 U.S.C. § 1202.

434.    Plaintiffs are further entitled to costs and reasonable attorneys' fees.

## XII. SIXTH CLAIM FOR RELIEF
### (Breach of Contract against PIA only)

435.   Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

436.   On or about Sept. 1, 2021, Plaintiffs, other rightsholders and Defendant PIA entered into a settlement agreement ("Agreement") to resolve the copyright claims and other claims.

20-023W

437.   The Agreement is a valid, binding and enforceable contract.

438.   Plaintiffs substantially complied with their part of the contract.

439.   Plaintiffs are excused from performance of their part of the contract that was not performed.

440.   Plaintiffs relied upon this contract to their detriment.

441.   PIA breached the Agreement by continuing to distribute, reproduce and/or publicly perform copies of Plaintiffs' Works in violation of U.S. Copyright law.

442.   PIA breached the Agreement by failing to pay Plaintiffs the agreed upon amount.

443.   PIA's obligation to make the agreed upon payment was not excused or relieved.

444.   PIA's obligation to not distribute, reproduce and/or publicly perform copies of Plaintiffs' Works in violation of U.S. Copyright law was not excused or relieved.

445.   PIA's breaches of the Agreement were substantial failures to perform that are material.

446.   Plaintiffs have been damaged as result of PIA's breach of contract in an amount to be proven at trial and is entitled to injunctive relief to prevent any further breaches and damages.

447.

Plaintiffs are also entitled to attorneys' fees arising from PIA's breach of contract and interest of 10 percent a year as provided in §478-2 of the Hawaii Revised Statutes.

**PRAYER FOR RELIEF**

20-023W

WHEREFORE, the Plaintiffs respectfully request that this Court:

(A) enter permanent injunctions enjoining Defendants from infringing and contributing to infringements of the Plaintiffs' copyrighted Works and contributing to DMCA violations;

(B) enter permanent injunctions ordering Defendants to stop interfering with standard technical measures by deleting end user log information;

(C) order Defendants to adopt a policy that provides for the prompt suspension of end users for which it receives more than three unique notices of infringements of copyright protected Works and/or DMCA violations unless within 72 hours unless said end users makes a counter notification;

(D) order Defendants to adopt a policy of storing logs of end user access for at least two years to comply with the legal requirement not to interfere with standard technical measures used by copyright holders to identify or protect copyright works;

(E) order Defendants to block end users from accessing notorious piracy websites of foreign origin including those listed in the annual trade report of Notorious Foreign Markets published by the United States Government such as (a) YTS; (b) Piratebay; (c) Rarbg; (d) 1337x; and (e) Popcorntime on networks under their control to prevent further pirating of Plaintiffs' Works;

(F) enter an order pursuant to 17 U.S.C. §512(j) and/or 28 U.S.C §1651(a) that any service provider subject to US jurisdiction providing service for Defendants including but not limited to Leaseweb, Choopa and Sharktech which Defendants use to infringe Plaintiffs' Works immediately cease said service upon notice;

20-023W

(G) award the Plaintiffs their actual damages from the copyright infringements and Defendants' profits in such amount as may be found; alternatively, at Plaintiffs' election, for statutory damages pursuant to 17 U.S.C. § 504(a) and (c);

(H) award the Plaintiffs actual damages from Defendants' contribution to DMCA violations and Defendants' profits in such amount as may be found; or, in the alternative, at Plaintiffs' election, for statutory damages per DMCA violation pursuant to 17 U.S.C. § 1203(c) for violations of 17 U.S.C. § 1202;

(I) award the Plaintiffs actual and punitive damages pursuant to Hawaii law for Defendant PIA's willful breach of the settlement agreement with malice aforethought;

(J) award the Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505 and/or 17 U.S.C. § 1203(b)(5);

(K) award the Plaintiffs their reasonable attorneys' fees and costs against Defendant PIA pursuant to Hawaii law for PIA's breach of the settlement agreement;

(L) grant the Plaintiffs any and all other and further relief that this Court deems just and proper.

The Plaintiffs hereby demand a trial by jury on all issues properly triable by jury.

DATED: Kailua-Kona, Hawaii, Nov. 18, 2021.

/s/ Kerry S. Culpepper
Kerry S. Culpepper
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone:    (808) 464-4047
Facsimile:    (202) 204-5181
E-Mail:        kculpepper@culpepperip.com
Attorney for Plaintiffs

20-023W

20-023W

## CERTIFICATE OF SERVICE

I hereby certify that on the date below I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

A. John Peter Mancini     jmancini@mayerbrown.com,

4680105420@filings.docketbird.com, ajpmancini@aol.com,

jmarsala@mayerbrown.com

Paul Matthew Fakler     pfakler@mayerbrown.com,

7018781420@filings.docketbird.com, jmarsala@mayerbrown.com

DATED: Kailua-Kona, Hawaii, November 18, 2021.

CULPEPPER IP, LLLC

/s/ Kerry S. Culpepper
Kerry S. Culpepper
Attorney for Plaintiffs

20-023W