**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. <u>1:21-cv-01261-RM-SKC</u>

Millennium Funding, Inc. *et al*,

      Plaintiffs,

v.

Private Internet Access, Inc., *et al.*,

      Defendants.

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE
[DOC. #71]**

---

Plaintiffs oppose Defendant Private Internet Access, Inc.'s untimely Rule 12(f) Motion to Strike highly relevant allegations from the Second Amended Complaint ("SAC") [Doc. #59].

## I.    INTRODUCTION

Plaintiffs allege that Defendants Private Internet Access, Inc. ("PIA"), EXPRESS VPN INTERNATIONAL LTD (a BVI Limited Company) and EXPRESS VPN INTERNATIONAL LTD (an Isle of Man Limited Company), (both ExpressVPN entities collectively referred to as "ExpressVPN")(PIA and ExpressVPN collectively, "Defendants") promote their Virtual Private Network ("VPN") services as an essential tool for individuals who wish to pirate content by emphasizing that they provide their end users "anonymous" usage by, for example, deleting end users' log access records so that their identities cannot be disclosed to copyright owners.  *See* SAC at ¶2

20-022D

Plaintiffs further allege that Defendants' end users have become so emboldened by Defendant's promises that their identities will never be disclosed that they use Defendants' VPN services to engage in widespread movie piracy, harassment, illegal hacking and murder. Defendants use widely publicized tragic incidents of crimes committed by their users as opportunities to boast about how their "no-logging" policy hindered law enforcement from identifying the perpetrators who used their service.  *See* Id. at ¶¶2-5, 77.

In a meet and confer, PIA asserted its intention to move to dismiss the direct copyright infringement and secondary liability for copyright infringement and DMCA violations claims in the First Amended Complaint for purportedly failing to sufficiently allege "…any particular volitional act by PIA that proximately caused the copying or distribution of the specific movies at issue in the case", that PIA "encourage, promote, or otherwise induce infringing conduct specifically" or "had actual knowledge that the filenames had been altered."  Exhibit "1".  PIA also asserted it intention to move to sever due to purported lack of support for joinder.  Accordingly, Plaintiffs added many of the factual allegations at issue in the SAC to show Defendants' relationship with Kape Technologies ("Kape"), that Defendants promote piracy and maintain lawless business practices in accordance with their belief that the so-called freedom of the Internet is above laws of the United States and other nations, and that Defendants themselves use the VPN services to engage in the same activity as their end users.  *See* Id. at ¶¶86, 90, 130 (PIA's Caleb Chen states, "The Internet is its own jurisdiction.").  Accordingly, the factual allegations in the SAC which Defendant PIA seeks to strike such as statements by its

20-023W

own employees – *on PIA's own website* – advocating use of the VPN service for piracy and boasting how law enforcement was unable to identify its end users thanks to its no log policy are highly relevant to Plaintiffs' case.  Now PIA seeks to strike these relevant factual allegations even though many of them rebut arguments Defendant made in its earlier filed Motion to Dismiss [Doc. #70].  Instead of arguing that these allegations are patently untrue, PIA argues that statements of its employees supporting Plaintiffs' allegations that PIA engages in same conduct as its end users – evidence that is clearly admissible per, for example, Rules 401 and 406 *Federal Rules of Civil Procedure* – are too scandalous to be in the SAC.  Defendant PIA also falsely asserts that the SAC includes factual allegations of "anonymous online message board posts full of hate speech" and "allegations of posting racist messages" when it does not.  Mot. at pgs. 2 and 8.  PIA's Motion should be denied because it is exactly the type of dilatory motion to strike that Courts disfavor.

## II.    LEGAL STANDARD

Rule 12(f) of the Federal Rules of Civil Procedure provides that a court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Motions to strike are disfavored and will only be granted under the rarest of circumstances. *See Sierra Club v. Tri-State Generation & Transmission Ass'n*, 173 F.R.D. 275, 285 (D. Colo. 1997). Therefore, the moving party's "burden of proof is a heavy one." *Sierra Club v. Young Life Campaign, Inc.*, 176 F. Supp. 2d 1070, 1086 (D. Colo. 2001)  A pleading may be "scandalous" when it contains allegations that "degrade [the opposing party's] moral character, contain

20-023W

repulsive language, or detract from the dignity of the court." *Sierra Club*, 173 F.R.D. at 285.  Further, "[e]ven where the challenged allegations fall within the categories set forth in the rule, a party must usually make a showing of prejudice before the court will grant a motion to strike." *Id.*  Moreover, regardless of whether the moving party has met his burden to prove that allegations contained in a pleading violate Rule 12(f), discretion remains with the Court to grant or deny the motion. *See* Fed.R.Civ.P. 12(f) (denoting only that allegations which are subject to Rule 12(f) "may" be stricken).

## III.    ARGUMENT

### A.    *Defendant PIA has not satisfied the heavy burden necessary to show the allegations should be stricken.*

Plaintiffs allege that Defendant PIA is liable for: *inter alia* direct copyright infringement (count 1); contributory copyright infringement based upon material contribution (count 2); vicarious infringement (count 3); contributory copyright infringement based upon intentional inducement (count 4); secondary liability for DMCA violations (count 5) and breach of contract (count 6).  *See* SAC at ¶¶ 365-447.

A defendant is vicariously liable for copyright infringement "when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement." *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 930 n.9. (2005).  In *Warner Bros. Records, Inc. v. Charter Communs., Inc.,* 454 F. Supp. 3d 1069, 1077 (D. Colo. 2019), this Court stated that for pleading vicarious infringement, "[P]laintiffs must only allege that the ability to download their infringing content served as a draw, not necessarily the only draw to

4

20-023W

subscribers."

For contributory copyright infringement based upon intentional inducement, Plaintiffs must allege that Defendants distributed a product or service "with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement."  *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936-37, 125 S. Ct. 2764, 2780 (2005).

The allegations Defendant PIA seeks to have stricken are not "wholly unrelated to the substance of the complaint".  *Glaser v. Jordan*, No. 09-cv-01758-REB-MJW, 2010 U.S. Dist. LEXIS 39349, at *6 (D. Colo. Mar. 30, 2010).  Rather, the allegations support Plaintiffs' allegation that Defendants PIA and ExpressVPN use news of widely published criminal incidents of their end users to publicly boast to the piracy community that thanks to their business practice of deleting logs they had no evidence to provide law enforcement for gaining credibility ("street cred") with the piracy community.  These allegations in the SAC are examples of "clear expression or other affirmative steps taken to foster infringement" required for intentional inducement by *Grokster* and that "the ability to download their infringing content served as a draw" to Defendants' end users as required for vicarious infringement by this Court in *Warner*.

Defendant PIA argues in its Motion to Dismiss that one of the requisite elements for establishing DMCA violations is knowledge of the false or altered copyright management information ("CMI"). *See* Motion to Dismiss [Doc. #70] at pg. 11. Accordingly, the allegations in the SAC of PIA's employees' involvement in piracy such as PIA's Head of Privacy Rick Falkvinge's involvement with the operation of the Pirate

20-023W

Bay and PIA's Caleb Chen article on PIA's website encouraging use of a VPN while pirating from the YTS piracy website are clearly relevant for establishing that PIA had knowledge that files with the YTS title were false or altered and that PIA knew that the false or altered CMI would promote infringement.   These allegations also rebut Defendants' argument that PIA did not have "knowledge that CMI was altered".  Id. at pg. 14.   PIA clearly had knowledge that YTS was false or altered CMI because *PIA warned its end users to be sure to use a VPN while pirating from the YTS website*.  To be clear, Plaintiffs do not agree with PIA's argument that secondary liability for DMCA violations requires the same double scienter for the secondary actor as required for the primary actor.  Nonetheless, the relevance of these allegations is further shown by the fact that they rebut PIA's own arguments.

The allegations are also relevant to disproving the affirmative defense Defendants will likely assert that they have "adopted and reasonably implemented" a "policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers" and "does not interfere with standard technical measures". 17 U.S.C. § 512(i).  Particularly, evidence that Defendants failed to terminate accounts of end users who committed criminal acts such as sharing child pornography will demonstrate that any written policy on Defendants' websites is merely a sham that they have not reasonably implemented.

Further, Plaintiffs allege that Defendants interfere with standard technical measures by deleting their and their end users log records.  *See* SAC at ¶251. Defendants will undoubtedly attempt to argue that their policy of deleting log records is a reasonable

20-023W

policy for protecting the privacy of their end users.  *See, e.g.,* Motion to Dismiss [Doc. #70] at pg. 15 (Defendant PIA argues that "data-snooping would be completely at odds with the very data privacy protection that VPNs were created to afford").  Plaintiffs' allegations in the SAC rebut any arguments that this policy is reasonable by pointing out the unreasonable results of this policy – namely, Defendants' end users become so confident that they can get away with anything thanks to Defendants' business practice of deleting logs that they use it to pirate Plaintiffs' Works, make false bomb threats, hack, and share child pornography.  And Defendants then turn around and boast about it.

Nor do the allegations "improperly and excessively impugn[s] [Defendant's] moral character" without factual basis.  *Skadegaard v. Farrell*, 578 F. Supp. 1209, 1221 (D.N.J. 1984). Rather, not only are the allegations complained of true, but some such as paragraphs 89-90 are screenshots from *Defendants' very own websites*.  Defendant PIA (and ExpressVPN) cannot plausibly argue that including a screenshot of something it published (and still publishes) on its websites in a complaint impugns its moral character or demeans this Court.   Assuming *arguendo* that the allegations are redundant, immaterial, impertinent, or scandalous matter, PIA has failed to articulate any specific prejudice it suffers by these allegations in an affidavit besides conclusively stating once that "these allegations serve only to prejudice the Court." Mot. at pg. 10.

**1.     Paragraph 4 – allegations that Defendant PIA's employees advocate use of the VPN service for piracy is relevant to Plaintiffs' allegations of direct infringement.**

Defendant PIA wishes to strike Plaintiffs' allegations that "employees of Defendant PIA explicitly advocate use of its service for piracy – one is even a member of "The Pirate

20-023W

Party" – and participate in the operation of the notorious website The Pirate Bay" at paragraph 4.   However, this allegation supports Plaintiffs' allegation that "Upon information and belief, PIA engages in the same conduct as its end users" on paragraph 90 and is thus liable for direct copyright infringement.   PIA cannot deny this allegation since it prominently publishes on its website that Mr. Falkvinge is its "Head of Privacy" and includes this information about his founding of the Pirate Party in his biography.  *See* SAC at ¶90 (screenshot from PIA's website introducing Rick Falkvinge).  This allegation provides circumstantial evidence supporting Plaintiffs' allegation that PIA engages in the same conduct as its users (copyright infringement) and rebuts arguments Defendant PIA spends pages making in its Motion to Dismiss [Doc. #70] that Plaintiffs have failed to allege volitional conduct of direct infringement on behalf of Defendant PIA.  To be clear, Plaintiffs do not agree with Defendant PIA's overly stringent interpretation of the volitional requirement to the extent there even is one after *ABC, Inc. v. Aereo, Inc.*, 573 U.S. 431, 134 S. Ct. 2498 (2014).   Nonetheless, Mr. Falkvinge's open advocacy for criminal activities such as hosting the website The Pirate Bay is relevant as circumstantial evidence to support Plaintiffs' assertion that certain direct infringements were done by Defendant PIA (via its employees).

2.      **Paragraph 48 – prior trade names used by and activity of non-party Kape Technologies are highly relevant to the claims against PIA.**

Defendant PIA does not argue that the allegation that Kape changed its name in 2018 to dissociate itself with its prior business of distributing malware in paragraph 48 of the SAC is untrue.   Rather, PIA argues that this allegation is "not even directed at PIA or

8

any party to this proceeding – have no bearing on any of the causes of action and are completely immaterial and impertinent."  Mot. at pg. 16. However, Plaintiffs allege that Kape owns PIA, Kape and PIA are mere alter egos, and that Kape directs all the legal decisions for PIA.  *See* SAC at ¶¶47, 49-57.  Thus, this allegation is clearly directed at PIA.  Plaintiffs further alleges that Kape is the owner of websites that publish articles promoting Defendants' VPN services for piracy – specifically for use of piracy apps such as Showbox which Kape itself warns "may have **malware or other viruses** installed."  "Is Showbox   Safe?   It   Is,   But   Only   If   You   Do   This",   Oct.   19,   2021, https://www.vpnmentor.com/blog/is-showbox-safe-it-is-but-only-if-you-do-this/       [last accessed on 12/27/2021] (website cited in ¶220 of SAC); *see* SAC at ¶¶60, 217, 220, 224-225, 227.  PIA's parent company's and alter ego's history of distributing malware and its founder's tax evasion are consistent with Plaintiffs' allegations that Kape promotes Defendants PIA's and ExpressVPN's VPN services for piracy in paragraphs 216-222 and 224-227 by encouraging end users to install malware infected piracy apps, and that PIA maintains lawless business practices because it places the so-called freedom of the Internet above laws of the United States and other nations.

**3.    Paragraphs 77-83 – the allegation that Defendant PIA's end users are emboldened by its no-log promises is relevant evidence.**

Defendant PIA seeks to strike Plaintiffs' allegation on paragraph 77 that "Emboldened by Defendants' promises that their identities cannot be disclosed, Defendants' end users use the VPN services not only to engage in widespread movie piracy, but other outrageous criminal conduct such as sharing child pornography,

20-023W

harassment, illegal hacking and murder." Mot. at pg. 8. Here, PIA also complains about phantom allegations concerning posting racist messages not in the SAC. Id. However, the allegation on paragraph 77 concerning Defendants' no log policy supports Plaintiffs' allegations of intentional inducement by alleging clear expression or other affirmative steps taken to foster infringement and of vicarious infringement by showing that the no log policy is a powerful draw to end users that wish to use Defendants' VPN services for illegal acts such as piracy.

PIA argues that allegations of murder have nothing to do with VPN technology at all even though co-Defendant ExpressVPN bragged that Turkish law enforcement was unable to find the identity of an assassin that used ExpressVPN's VPN service to cover his/her tracks even through the servers were seized. *See* SAC at ¶¶82-83. Far from being irrelevant, PIA and ExpressVPN understand that by telling the piracy community that law enforcement was unable to uncover the identities of the perpetrators of well published extreme crimes such as murder from them thanks to their business practice of deleting logs they can get street cred with the piracy community. Thus, Defendants publish these incidents on the news website *TorrentFreak* which describes itself as "[A] publication dedicated to bringing the latest news about copyright, privacy, and everything related to filesharing". *About TorrentFreak*, https://torrentfreak.com/about/ [last accessed on Dec. 23, 2021]; *see* SAC at ¶83 (ExpressVPN uses the assassination of the Russian Ambassador to boast about its service to TorrentFreak).

Defendant PIA also wishes to strike paragraphs 78-80 which give examples of PIA end users using the VPN service for criminal acts and paragraph 81 which alleges that

20-023W

PIA once again "boasted that it had no logs to disclose to law enforcement concerning these serious crimes of Ross M. Colby and Preston McWaters."  For example, PIA publicly boasted to *TorrentFreak* that thanks to its business practice of deleting logs it had no evidence to provide law enforcement concerning the serious crimes of Colby and McWaters to gain street cred with the piracy community. *See e.g.,* Ernesto, *Private Internet Access' "No-Logging" Claims Proven True Again in Court*, June 6, 2018, https://torrentfreak.com/private-internet-access-no-logging-claims-proven-true-again-in-court-180606/ (Article by sponsor of PIA discussing PIA involvement with criminal case of Ross M. Colby and stating that "this is the second time that Private Internet Access's "no-logging" policy has been tested in court… PIA has now passed twice with flying colors."); *VPN Provider's No-Logging Claims Tested in FBI Case*, Mar. 12, 2016, https://torrentfreak.com/vpn-providers-no-logging-claims-tested-in-fbi-case-160312/ (PIA chairman Andrew Lee quoted as saying "Our company was subpoenaed by the FBI for user activity logs relating to this matter…This report makes it clear that PIA does not log user activity and we continue to stand by our commitment to our users.")  Further, Defendant PIA's head of privacy Rick Falkvinge published an article on PIA's website on Oct. 11, 2016 boasting that PIA was not able to assist law enforcement's attempt to find the identification of a person who made fake bomb threats and that if forced to change its policies by the government it would follow another company's precedent and choose to "shut down operations instead of selling out its users".  Rick Falkvinge, *Why PIA doesn't fly a warrant canary: it's solving the wrong problem*, Oct. 11, 2016, https://www.privateinternetaccess.com/blog/why-pia-doesnt-fly-a-warrant-canary-its-

20-023W

solving-the-wrong-problem/ [last accessed on 12/26/2021] (attached as Exhibit "2").

Defendant PIA argues that these allegations are "a statement of unnecessary particulars" and that "Plaintiffs in no way tie either the acts by these two VPN users or PIA's statements…to any infringement…"  Mot. at pgs. 8-9.  However, these allegations are not like the "fifty paragraphs detailing each of the twenty-three lawsuits" in *Webster v. Nations Recovery Ctr., Inc.*, Civil Action No. 09-cv-01685-WYD-MEH, 2009 U.S. Dist. LEXIS 89458, at *8 (D. Colo. Sep. 15, 2009).  Rather, Plaintiffs' factual allegations of Defendant PIA's boasts to the piracy community and on its own website that the FBI was unable to get the identity of persons who made multiple bomb threats and engaged in criminal hacking using PIA's VPN service thanks to PIA's well publicized policy of deleting logs supports Plaintiffs' allegation that PIA has emboldened its end users to the point where they know they can get away with anything.  As discussed above, PIA knows exactly what message it is conveying to the piracy community when it informs them (via *TorrentFreak*) and on its website that the FBI could not even get the identity of the PIA end users who used its service to make bomb threats and hack into another company.  Moreover, PIA has failed to even assert that it is prejudiced by these allegations.

**4.    Paragraph 84 – the allegation that Defendant ExpressVPN's end user used the VPN service to share child pornography is relevant evidence.**

Defendant PIA also argues that allegations that ExpressVPN user Frank Beyer used ExpressVPN's VPN service to download child pornography are "scandalous" and "casts "a cruelly derogatory light" on PIA by attempting to (falsely) associate PIA with an individual who committed horrific acts."  Mot. at pg. 12.  However, the SAC does not allege

12

20-023W

that Frank Beyer is an *end user of PIA*.   Again, these factual allegations buttress Plaintiffs'

point that Defendants' end users are so emboldened by Defendants' promotions that their

identity will never be revealed that they even use the VPN services for sharing child

pornography, thereby showing how unreasonable their business practices are.   Moreover,

Plaintiffs also allege that Frank Beyer copied the Work *Angel Has Fallen* in the next

paragraph.  Evidence that Frank Beyer was convicted of using BitTorrent while logged

into his ExpressVPN service to share child pornography is relevant because it would

support Plaintiffs' allegation that Frank Beyer also used BitTorrent to share *Angel Has*

*Fallen*.  To the extent that PIA is concerned that this allegation pertaining to ExpressVPN

may be imputed to it, this is a premature stage to demand the entire allegation be stricken.

Rather, this concern should be best dealt with by motions in limine prior to trial.

**5.      Paragraphs 86-89 – The *admitted* hacking crimes of an employee of ExpressVPN and ExpressVPN's affirmation of its support for him is highly relevant.**

Defendant PIA argues that ExpressVPN's statement supporting Mr. Gericke after

he admitted to hacking in violation of US law has "nothing whatsoever to with copyright

infringement".  Mot. at pg. 17.  However, the allegation that ExpressVPN would not only

continue to employ as its chief information officer an individual that plead guilty to a

serious crime of hacking into the devices of US residents on behalf of a foreign

government but *publicly endorse him*, buttresses Plaintiffs' assertion that ExpressVPN

end users are "Emboldened by Defendants' promises that they engage in…illegal

hacking..." and that "…ExpressVPN engages in the same conduct as its end users."  SAC

at ¶¶5, 86.  Defendant ExpressVPN knows exactly what type of message it is promoting

20-023W

when it boasts to everyone that its chief information officer is an admitted hacker – the network of ExpressVPN is a law-free zone above the laws of the US and open for piracy. Moreover, this allegation will rebut the assertion ExpressVPN will undoubtedly make of lack of volitional conduct for direct infringement because it supports Plaintiffs' allegation that ExpressVPN's employees engage in the same conduct as its end users and directly infringe the Works.

PIA argues that "nothing in the Department of Justice announcement cited by Plaintiffs mentions the use of a VPN at all, let alone by Mr. Gericke specifically…"  Mot. at pg. 18.  Here PIA is playing word games.  The Factual Statement, which Mr. Gericke did "admit … under oath that the facts and descriptions … are true and accurate" makes clear that from January of 2016 Mr. Gericke was a supervisor in the criminal venture, and that the ventures' activities included deployment of *anonymizing software and servers* and made extensive use of *anonymization services* and *proxy servers* located in the United States and elsewhere to prevent detection and mask their true origin of CIO.  *See* https://www.justice.gov/opa/press-release/file/1432611/download [last accessed on Dec. 23, 2021] at pg. 2 at ¶2 (Mr. Gericke agrees that the Factual Statement is accurate) and pgs. 22-48 at ¶27 (in January of 2016 Mr. Gericke "…became a supervisor in U.A.E. CO CIO Operations…"), ¶28 ("t]he CNE services conducted by CIO…involved…the acquisition, development, and deployment of customized systems and infrastructure to support CNE activities, including *anonymizing software*, servers, and hardware systems"), ¶39 ("Throughout the Period, CIO employees whose activities were supervised by and/or known to the Defendants, carried out these CNE operations through

20-023W

the use of, among other things, *anonymization services* located in the United States and elsewhere…"),  ¶40 ("throughout the Period, CIO employees, whose activities were supervised by and/or known to the Defendants, purchased…CIO infrastructure…by obtaining *anonymized servers* on the Internet to avoid attribution", ¶49 ("CIO employees with Defendants' support, direction and/or supervision…created a graphic operator interface that they referred to as "Karmageddon"…utilized a U.S. company's *anonymization services* and other *proxy servers* to prevent detection and mask the true origin of CIO intrusions…"), and ¶56 ("…utilized a U.S. company's anonymization services and other proxy servers to prevent detection").  Anonymization services and proxy servers are tools provided by VPN services such as PIA.  *See* PIA Support Portal, https://www.privateinternetaccess.com/helpdesk/kb/articles/do-you-offer-a-socks5-proxy ("PIA describes its SOCKS5 proxy")(attached as Exhibit "3").  Once again, to the extent that PIA is concerned that this allegation pertaining to ExpressVPN may be imputed to it, this is a premature stage to demand the entire allegation be stricken.  Rather, this concern should be best dealt with by a motion in limine prior to trial.

**6.     Paragraphs 90-92 and 95-96 – Defendant PIA's own publications on its website in support of piracy are not scandalous.**

Defendant PIA asserts that the allegations in paragraphs 90-92 that PIA boldly promotes on its website that its head of "privacy" is Rick Falkvinge the founder of the "Pirate Party", that Mr. Falkvinge unabashedly argues for abolition of Intellectual Property rights and laws against child pornography and knowingly assisted in the operation of the notorious piracy website The Pirate Bay are "irrelevant" and "scandalous".  Mot. at pgs.

20-023W

14-15.   However, it is not plausible to argue that a screenshot from Defendant PIA's own website is "scandalous".   Assuming *arguendo* that Mr. Falkvinge's involvement with the Pirate Party is not connected with his employment with PIA, PIA still felt the need to point out that he was the founder of the Pirate Party in his biography on PIA's website.   PIA knows exactly what type of message it is promoting when it tells everyone on its website that the founder of The Pirate Party and facilitator of the notorious piracy website The Pirate Bay is its head of "privacy" – privacy is just a codeword for piracy.   SAC at ¶4.

Defendant PIA's assertion that quotations of statements of Mr. Falkvinge in the SAC were made "in his personal capacity years before he worked with PIA" are improperly outside of the pleadings and should not be considered on a motion to strike.   Mot. at pgs. 13-14.   Nonetheless, PIA's assertion is contradicted by published documents on its own website.   Notably, the same year (2013) Mr. Falkvinge was publishing articles on PIA's website   (*see, e.g.* Falkvinge, "Why Do We Need Privacy, Anyway?", https://www.privateinternetaccess.com/blog/why-do-we-need-privacy-anyway/   [last accessed on 12/26/2021] (attached as Exhibit "4")) he was continuing to vigorously argue for legalization of child pornography (*see* Falkvinge, "Three Reasons Possession Of Child Porn   Must   Be   Re-Legalized   In   The   Coming   Decade", http://falkvinge.net/2012/09/07/three-reasons-child-porn-must-be-re-legalized-in-the-coming-decade/ [last accessed on 12/27/2021] ((partial screenshot at Decl. of Culpepper at ¶7)) and identifying himself as leader of the Swedish Pirate Party when he gave a quote defending an apparent move by the operators of the website The Pirate Bay to host it on servers in North Korea.   *See* Marshal Honorof, *Pirate Bay Bootleg Site Moves to North*

20-023W

*Korea*, Mar. 4, 2013, https://www.nbcnews.com/id/wbna51042239 [last accessed on 12/26/2021] ("North Korea may have the one government on this planet which takes pride in asking Hollywood and United States interests to take a hike in the most public way imaginable.") (attached as Exhibit "5").

Plaintiffs' factual allegation supported by screenshots and published articles that PIA's official head of "privacy" was the founder of the Pirate Party and wishes to abolish intellectual property laws and *openly* assisted with the operation of the notorious piracy website The Pirate Bay supports Plaintiffs' allegation that PIA engages in the same conduct as its end users and is thus liable for direct copyright infringement and is an example of culpable expression supporting secondary liability.  Further, these allegations rebut arguments Defendant PIA spends pages making in its Motion to Dismiss [Doc. #70] that Plaintiffs have failed to allege volitional conduct on behalf of Defendant PIA.  Plaintiffs reiterate that they do not agree with PIA's overly stringent requirement of the volitional requirement.   Nonetheless, Mr. Falkvinge's open advocacy for criminal activities is relevant as circumstantial evidence to support Plaintiffs' assertion that certain direct infringements were conducted by Defendant PIA (via its employees).  However, Plaintiffs are willing to voluntarily strike paragraph 91 (Mr. Falkvinge's push for legalization of child pornography) provided that such action does not constitute waiver of Plaintiffs' right to seek discovery on this subject and bring up evidence related to Mr. Falkvinge's efforts on this topic in trial in support of their claims.

Defendant PIA also asks this Court to strike paragraphs 95-96 where Plaintiffs allege that PIA's employee Caleb Chen publishes articles on the PIA website advocating

20-023W

use of the PIA VPN service for piracy.  *See* Mot. at pg. 6 (heading II refers to paragraphs "95-96").   Caleb Chen published articles on PIA's website advocating use of the PIA VPN service for piracy such as the article entitled "Popular torrenting site YTS provides IP address logs to copyright lawyers to extort you with" to warn PIA's end users not to use the YTS website without using a VPN.   SAC at ¶¶95-96.  Importantly, PIA published this article *after* it had been served with a subpoena for identification of one of their end users that used YTS to pirate one of Plaintiffs' Works.  *See* Id. at ¶119.  Defendant PIA does not include any arguments supporting this request.   Paragraph 95-96 clearly support Plaintiffs claims that Defendant PIA (via its employees) engages in the same conduct as its end users and is thus directly liable for copyright infringement of its employees and secondarily liable for copyright infringement and DMCA violations of its end users. Accordingly, paragraphs 95-96 should not be stricken.

**B.     *Defendant PIA's Motion to Strike is Untimely.***

Defendant PIA was served with the SAC on Nov. 18, 2021. *See* SAC at pg. 86 (Certificate of Service).  The Parties stipulated to an extension for "an additional twenty-one (21) days, up to and including December 23, 2021, for PIA to answer or otherwise respond to Plaintiffs' Second Amended Complaint and for an additional twenty-one (21) days for Plaintiffs to respond to PIA's answer or response."   Joint Stipulation [Doc. #64] at pgs. 2-3.  PIA filed its response (Motion to Dismiss) [Doc. #70] to the SAC per this stipulation on Dec. 23, 2021.  The same day, but *afterwards*, PIA filed the present Motion to Strike [Doc. #71].

Rule 12(f) provides that a motion to strike may be made "either *before* responding

20-023W

to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." Fed. R. Civ. P. 12(f).  PIA failed to comply with either time limit provided by Rule 12(f) since its Motion to Strike was filed *after* its response and more than 21 days after being served with the SAC.  Moreover, PIA's delay by 21 days to file this Motion to Strike undercuts its arguments that the allegations are scandalous or demeaning to this Court.  Accordingly, the Motion to Strike should be denied for its untimeliness.

## IV.     CONCLUSION

Defendant PIA should not be permitted to bury relevant evidence of its open advocacy for use of its VPN services for piracy and lack of any enforcement of its policies by falsely painting allegations concerning screenshots of PIA's boasts as "scandalous". Rather, PIA's motion to strike should be denied and any possible prejudice should be addressed by a motion in limine.

DATED: Kailua-Kona, Hawaii, January 13, 2022.

/s/ Kerry S. Culpepper
Kerry S. Culpepper
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone:   (808) 464-4047
Facsimile:    (202) 204-5181
E-Mail:        kculpepper@culpepperip.com
Attorney for Plaintiffs

20-023W

## CERTIFICATE OF SERVICE

I hereby certify that on the date below I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

A. John Peter Mancini     jmancini@mayerbrown.com,

4680105420@filings.docketbird.com, ajpmancini@aol.com,

jmarsala@mayerbrown.com

Paul Matthew Fakler     pfakler@mayerbrown.com,

7018781420@filings.docketbird.com, jmarsala@mayerbrown.com

DATED: Kailua-Kona, Hawaii, Jan. 13, 2022.

CULPEPPER IP, LLLC

/s/ Kerry S. Culpepper
Kerry S. Culpepper
Attorney for Plaintiffs

20-023W