## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-01261-RM-SKC

Millennium Funding, Inc. *et al*,

      Plaintiffs,

v.

Private Internet Access, Inc. *et al.*,

      Defendants.

---

## DEFENDANT PRIVATE INTERNET ACCESS, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS

---

## INTRODUCTION

As Defendant Private Internet Access ("PIA") demonstrated in it Motion to Dismiss ("Motion"), Plaintiffs' Second Amended Complaint ("SAC") is devoid of any specific factual allegations that could plausibly support the counts upon which PIA moved. In most places, Plaintiffs make only conclusory allegations without *any* supporting factual underpinnings. Where facts are alleged at all with respect to Plaintiffs' copyright infringement and DMCA claims, they relate primarily to the actions of VPN end users, or to irrelevant conduct entirely unrelated to copyright infringement, and do not support the claims against PIA. With respect to Plaintiffs' breach of contract claim, Plaintiffs fail to even try to address the precedent cited by PIA and their own allegations and negotiation correspondence that undermine that claim. Instead, they advance spurious legal theories about choice of law and the statute of frauds that are unsupported by any precedent. PIA's motion should be granted in its entirety.

## ARGUMENT

### I.      Plaintiffs Fail to State a Claim for Direct Copyright Infringement

#### A.      Plaintiffs Have Not Pled the Requisite Volitional Acts

In its Motion, PIA established that – especially for claims against operators of automated systems allegedly used by third parties to commit infringement – a volitional act by that system's operator is required to viably plead direct infringement. Mot. at 5-7. PIA also established that Plaintiffs have failed to plead, and cannot plausibly plead, any such volitional act by PIA. Mot. at 7-10. In response, Plaintiffs largely fail to address the arguments and precedent actually advanced by PIA. Instead, they attempt to distract the Court with claims regarding arguments PIA supposedly failed to make. They also try to argue that various allegations regarding the conduct of PIA's users somehow also can support direct liability for PIA. Opp. at 14-20. None of these arguments are availing. Any allegations Plaintiffs point to as support for their direct infringement claims actually relate to acts initiated by users and fail to allege any plausible volitional infringing acts by PIA.

Plaintiffs' claim that PIA failed to address direct infringement of the public performance right or the "non-BitTorrent" distribution right is incorrect. *See* Opp. at 14-15. PIA moved to dismiss on ***all*** claims of direct infringement, seeking to strike that entire count of the SAC on the grounds that any specific allegations of direct infringement were directed at user conduct only, and failed to establish *any* volitional act by PIA. *See, e.g.,* Mot. at 6-7. There was no reason for PIA to separately analyze each of the exclusive rights allegedly violated, because this fatal defect applies equally to all varieties of direct infringement that Plaintiffs attempt to allege.

Plaintiffs further argue that their allegation that PIA's VPN service allows its end users to access Netflix content in violation of geographic restrictions is sufficient to plead direct

infringement. Opp. at 14. But the paragraph of the SAC cited by Plaintiffs to support this argument only alleges that PIA's service generally allows *users* to access Netflix. SAC ¶ 127. This does not allege a volitional act by PIA that directly causes any infringement.[1] Indeed, Plaintiffs do not even allege any specific example of any PIA user – much less PIA itself – actually streaming one of Plaintiff's movies from outside the United States.

Plaintiffs' argument that PIA directly infringes the separate right to distribute by exporting works from the United States in violation of 17 U.S.C. § 602(a)(2) (Opp. at 15) fails for the same reason: these claims are based entirely on the alleged "importation" and "exporting" conduct by PIA's end users. Plaintiffs do not allege ***any*** volitional conduct specifically by PIA.

Plaintiffs' other attempts to argue that they have sufficiently pled direct liability fare no better. They point to a handful of conclusory allegations which assert, without further detail, that PIA itself directly infringes their works. Opp. at 15-17. Plaintiffs also attempt to argue that generalized statements by alleged PIA employees regarding piracy and torrenting somehow show that PIA itself has committed acts of infringement. *Id.* at 16. But nowhere—in the SAC or here—do Plaintiffs allege a single specific instance in which they claim PIA itself infringed one of Plaintiffs' copyrighted works other than by automatically responding to user prompts.

Lastly, Plaintiffs argue that PIA directly infringes when it "acts on behalf of its end users." Opp. at 17-20. Collapsing the standards for direct and secondary liability, Plaintiffs protest that the volitional conduct requirement should not be applied here, first arguing that the

---

[1] Nor is does it support a claim of direct infringement against the user. Such conduct may be a violation of the user's service agreement with Netflix, but that does not render the performance infringing. Breach of contract is not the same thing as copyright infringement. Moreover, even if copyright were implicated, a U.S. consumer's access to a fully-paid Netflix subscription while traveling abroad would clearly be fair use. *See Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 447- 455 (1984) (holding that VCR user's use to record television programming without a license for time-shifting purposes would be a non-infringing use).

10th Circuit has not explicitly adopted that requirement for a claim for direct infringement, and next that the Supreme Court's decision in *ABC, Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014) overruled the volitional conduct requirement. Opp. at 17-18. Both arguments are unavailing.

While the 10th Circuit has not yet had occasion to rule on the question of volitional conduct, every circuit court to address the question has upheld the requirement. *See, e.g.*, *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019); *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666-67 (9th Cir. 2017); *BWP Media USA, Inc. v. T&S Software Assocs.*, 852 F.3d 436, 442-44 (5th Cir. 2017); *Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 387 (3d Cir. 2016); *Cartoon Network LP v. CSC Holdings, Inc*., 536 F.3d 121, 131-32 (2d Cir. 2008); *CoStar Grp., Inc. v. LoopNet, Inc*., 373 F.3d 544, 550-51 (4th Cir. 2004).

*Aereo* did not change that requirement. In fact, *Aereo*'s holding does not address the question of volitional conduct at all. *See BWP Media USA Inc. v. Polyvore, Inc*., 922 F.3d 42, 48 (2d Cir. 2019) (Walker, J., concurring) (noting that "[t]he Supreme Court reversed on grounds unrelated to whether Aereo's conduct was volitional. . . The majority did not discuss the issue of volitional conduct."). Indeed, every circuit court to address the issue since has ***upheld*** that requirement, including in decisions expressly rejecting the argument that *Aereo* eliminated the volitional act requirement. *See VHT*, 918 F.3d 723 at 731; *Giganews*, 847 F.3d 657 at 666-67; *BWP Media*, 852 F.3d 436 at 442-44; *Leonard* 834 F.3d 376 at, 387. *See also, EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 96 (2d Cir. 2016), quoting *Cartoon Network*, 536 F.3d at 131. ("[V]olitional conduct is an important element of direct liability.").

*Aereo* also addressed an entirely distinct factual scenario, one in which the defendant's streaming service used antennas to intercept copyrighted television broadcasts, transcoded and

copied those broadcasts onto its servers, and then streamed those broadcasts to its subscribers. *See Aereo*, 573 U.S. at 431. But PIA is not actively intercepting and retransmitting broadcasts of Plaintiffs' movies, nor is it a streaming service at all. It merely provides users the ability to encrypt all of their internet traffic—including their activities on sites that offer streaming or downloads.

Plaintiffs' reliance on *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904 (D.C. Cir. 2018) is misplaced. As the quoted passage in Plaintiffs' own brief states, the D.C. Circuit expressly *declined* to rule on the volitional conduct requirement because it did not need to do so. Opp. at 18 quoting *Spanski*, 883 F.3d at 912. *Spanski* is also factually inapposite. There, the defendant not only transmitted television programming on an on-demand basis; it selected the programming available on its service, further removing it from the universe of cases addressing the liability of a content-neutral, automated system. *See Spanski.* 883 F.3d 904 at 911.

**B.      Plaintiffs Have Not Plausibly Pled Fixation by PIA**

PIA also established that Plaintiffs have not plausibly pled any fixation of actionable copies by PIA. Mot. at 7, 10-11. In their Opposition, Plaintiffs seek to distract from the fatal flaws in their pleadings by advancing faulty procedural arguments and nonsensical theorizing as to how PIA's systems *might* work. Opp. at 19-20. These arguments fail.

First, Plaintiffs argue that PIA's Motion improperly relies upon information outside of the pleadings. Opp. at 19. Not so. PIA's Motion is based on the wording of Plaintiffs' own SAC, and on information from PIA's website – which is referenced and relied upon throughout the SAC, and thus properly considered on a motion to dismiss. *See* Mot. at 9, n. 1, citing *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

Next, Plaintiffs seek to create the illusion of a fact dispute and ask this court to permit them to engage in a fishing expedition to plug the holes in their allegations. Opp. at 19-20. This is clearly improper. The pleading standard "'does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.'" *Jensen v. Am.'s Wholesale Lender*, 425 F. App'x 761, 764 (10th Cir. 2011), quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79. To the contrary, "the case law is clear that judges are trusted to prevent discovery from becoming 'fishing expeditions or an undirected rummaging for evidence of some unknown wrongdoing.'" *Chang v. Vail Resorts, Inc.*, 2016 WL 590375, at *4 (D. Colo. Feb. 12, 2016), report and recommendation adopted, 2016 WL 1039912 (D. Colo. Mar. 15, 2016) (Dismissing claims). *See also Rodriguez v. Quality Loan Serv. Corp.*, 2010 WL 1644695, at *2 (D. Ariz. Apr. 22, 2010), aff'd, 472 F. App'x 642 (9th Cir. 2012) (Granting motion to dismiss and holding that "[d]espite a lack of discovery, however, plaintiff must plead enough facts to state a claim to relief that is plausible on its face. . . She cannot use discovery to conduct a fishing expedition in hope that some fact supporting an allegation will be uncovered. Even with an opportunity to amend her complaint, plaintiff has failed to allege any facts that would support [her] claim.") (internal quotations omitted).

## II.    Plaintiffs Fail to Plausibly Allege DMCA Violations

In its Motion, PIA established that Plaintiffs have failed to plead a viable claim for secondary liability for violations of Section 1202 of the DMCA, because they have failed to plausibly allege that PIA had the knowledge or intent necessary under the "double scienter" requirement of that statute. Mot. at 11-16. PIA explained the policy rationale identified by Congress in enacting the intent requirement of Section 1202, and cited case law reinforcing the

importance of the double-scienter requirement. *See* Mot. at 12-13. And PIA showed that Plaintiffs failed to plausibly allege either alteration or intent by PIA end users or that PIA had any actual knowledge of alteration or any scienter regarding the effect of such alteration on possible future infringement. *Id.* at 14-15.

In their Opposition, Plaintiffs do not even try to reconcile their position with the policy rationale underpinning Section 1202's scienter requirement: that the statute requires intent because it should not be applied to those who act without specific culpable intent. *See* Mot. at 12. Nor do they address the well-reasoned precedent in *Brittney Gobble Photography, LLC v. Sinclair Broadcast Group, Inc.*, 2021 WL 5359671, at *27 (D. Md. Nov. 17, 2021)*, Sid Avery & Associates, Inc. v. Pixels.com, LLC* 479 F. Supp. 2d 859, 871 (C.D. Cal. 2020), or *Stevens v. Corelogic, Inc.*, 899 F.3d 666 (9th Cir. 2018). (Mot at 13-14) – all noting the requirement to establish scienter to prevail on a Section 1202 claim. Instead, Plaintiffs focus on whether vicarious liability for a Section 1202 claim could ever be cognizable. Opp. at 20. But Plaintiffs' cited cases applying the common law framework for vicarious copyright infringement liability (a strict liability tort) to secondary liability claims under Section 1202 (a statute with a clear scienter element) should not persuade the Court to recognize such claim under these alleged facts, and certainly do not support Plaintiffs' attempt to bypass the statute's scienter requirement entirely.

First, Plaintiffs' reliance on the Sixth Circuit's ruling, *Gordon v. Nextel Commc'ns*, 345 F.3d 922 (6th Cir. 2003), is unavailing. Opp. at 20-21. As a preliminary matter, PIA respectfully suggests that the Court should not follow *Gordon*'s ruling that secondary liability even exists for Section 1202 claims. Notably, the court in *Gordon* did not consider the arguments and legislative

history cited by PIA. Moreover, the only precedent cited by that court for the supposed existence of secondary liability for DMCA claims were cases addressing secondary liability for copyright infringement claims. *Gordon*, 345 F.3d at 925-26. As PIA demonstrated in its Motion, these cases cannot support secondary liability for DMCA violations. Section 1202 claims are fundamentally distinct from infringement claims and have no scienter requirement at all. Mot. at 15. In any event, *Gordon* expressly notes the requirement of *actual* knowledge of CMI alteration by the person accused of direct liability—something Plaintiffs simply cannot plausibly plead that PIA's users have. *Gordon*, 345 F.3d at 926.

Next, Plaintiffs cite a series of cases where, either on default judgment or when the opponent otherwise failed to address or dispute the issue, a court accepted the plaintiff's un-challenged assertion that the framework for vicarious liability applied to violations of Section 1202. *See* Opp. at 20-23. But these cases serve to show only that Plaintiffs' view of the law survives when it is unchallenged. Indeed, the court in *Koenig v. Dowdy*, 2017 WL 4322815 (E.D.N.C. Sept. 28, 2017) ***specifically noted*** that it accepted the plaintiff's assertion that a party can be held vicariously liable under Section 1202 only because the defendants did not challenge, and thus had conceded, that assertion. *See id.* at *8. And like *Gordon*, none of these decisions address, much less rebut, the arguments PIA has made demonstrating that Section 1202 does not include any provision for secondary liability.

Plaintiffs nowhere convincingly demonstrate that they have plausibly alleged the actual knowledge and intent required under Section 1202, either for PIA or its users. Seeking to get around this failure, Plaintiffs again seek permission to proceed to discovery. Instead of providing any basis for their conclusory allegations of PIA's "knowledge," allegations undercut by

Plaintiffs' own description in the SAC of how a VPN functions, Plaintiffs submit a confusing description of how they suspect PIA's service might work before conceding that they actually have no idea if PIA's servers function in the way they have described. Plaintiffs then ask this Court to let them proceed to discovery to "investigate the configuration of PIA's servers." Opp. at 23. But, as established *supra* p. 6, Plaintiffs without a plausibly pled claim cannot use a discovery for "'fishing expeditions or an undirected rummaging for evidence of some unknown wrongdoing.'" *Chang*, 2016 WL 590375, at *4.

Finally, Plaintiffs claim that they have adequately pled CMI alteration *by PIA's end users*, arguing that additions to file names by those end users must result in secondary liability for PIA. Opp. at 23-25.[2] As a preliminary matter, Plaintiffs have failed to rebut PIA's point that the mere addition of a few characters to the end of a filename, which leaves the title of the movie fully intact, could possibly constitute the removal or alteration of CMI. Moreover, Plaintiffs do not explain how those conclusory allegations satisfy the DMCA's double scienter requirement even as to end users, because the SAC fails to allege—even on the part of PIA users—"a more specific application than the universal possibility of encouraging infringement; specific allegations as to how identifiable infringements 'will' be affected are necessary" or any "evidence from which one can infer that future infringement is likely . . . to occur as a result of the removal or alteration of CMI." *Stevens*, 899 F.3d at 674–75. *See also* Mot. at 12-13. Thus, Plaintiffs have failed to plead the necessary scienter for both PIA and its end users.

---

[2] While *Energy Intelligence Group, Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261, 277 (5th Cir. 2020) found that a file name may be CMI, that case is clearly distinguishable because there the defendant completely overwrote the file names, whereas here the most Plaintiffs allege is that unspecified "seeding" users – who may not even be PIA users – added a string of characters at the end of otherwise unaltered and complete file names. *See id.* at 264.

**III.     Plaintiffs' Contract Claims are Fatally Deficient**

Moving to Plaintiffs' claims for breach of contract, PIA showed that, as a threshold matter, Plaintiffs did not attach a "true and correct" copy of the draft exchanged between the parties, and instead manipulated the draft to omit copious redlined edits and comments prior to submitting it to the Court. Mot. at 16-17 and Ex. 2. In response, Plaintiffs argue that a version of a document that omits active tracked changes that were visible by default when the document was opened is nonetheless an accurate copy of the document. Opp. at 7. This argument is nonsensical. Plaintiffs next attempt to excuse their manipulation of the documents by claiming that they omitted the tracked changes to preserve the confidentiality of the settlement discussions. As explained in the Declaration of Paul Fakler, this claim is contrary to the facts of the parties' negotiations and Plaintiffs' filings. *See* Fakler Decl. ¶¶ 6-9. Moreover, the argument makes no sense because Plaintiffs redacted various sections of the document and could have redacted the redlines if they truly were concerned about confidentiality.

As to the substance of Plaintiffs' contract claims, PIA established that those claims must be dismissed because no final agreement was ever reached between the parties or signed, and because the supposed "agreement" Plaintiffs seek to enforce would be barred by Hawaii's statute of frauds. Mot. at 17-22. In support, PIA cited on-point case law regarding the enforceability of non-final settlement agreements, and the fact that an email from counsel does not satisfy the statute of frauds. PIA showed that—even after the date Plaintiffs argue the agreement was finalized—the parties continued to negotiate its terms, showing that no final agreement had been reached. *Id*. In response, Plaintiffs fail to address the ample precedent cited by PIA and instead offer a stream of diversionary arguments, none of which are actually supported by any applicable

precedent. Each of these arguments is unavailing.

Plaintiffs' threshold argument—that Colorado law, rather than the governing Hawaii law set forth in the draft agreement, governs—fails completely. Opp. at 8. In support of this argument, Plaintiffs cite only one case: *Carlson v. Borlya*, 490 P.2d 700 (Colo. App. 1971). But in *Carlson*, there was no choice of law provision in the contract. Therefore, using Colorado's default choice of law principles, the court applied Colorado law because the alleged contract was made at a series of in-person meetings occurring in Colorado, and a supplemental agreement was executed in Colorado shortly thereafter. *Carlson*, 490 P.2d at 702. Thus, *Carlson* fails to support Plaintiffs' request that the Court override the agreement's express choice of law provision.

In fact, it is well established that under Colorado's choice of law principles and precedent, the Court must apply Hawaii law to Plaintiffs' contract claim. Federal courts sitting in diversity jurisdiction apply the choice of law rules of their forum states. *Zhou v. Sec. Life of Denver Ins. Co.*, 506 F. Supp. 3d 1119, 1124-25 (D. Colo. 2020). But that does not mean they must also apply the substantive contract law of that state, as Plaintiffs assert. In analyzing choice of law:

> Colorado follows the Restatement (Second) of Conflict of Laws (1971) for contract actions. . . When analyzing what law to apply to a contract claim, the Restatement first directs the court to consider any choice-of-law provision in the contract. Restatement § 187. Colorado courts, consistent with the Restatement . . . apply the law chosen by the parties unless there is no reasonable basis for their choice or unless applying the chosen state's law would be contrary to the fundamental policy of the state whose law would otherwise govern."

*Id*. at 1125 (internal quotations and citations omitted).

Under these principles, the choice of law provision in the purported settlement agreement must be given first consideration. The very draft agreement Plaintiffs seek to enforce

specifies that Hawaii law is to govern. *See* ECF 66 at p. 7, ¶ 21. Plaintiffs nowhere address this irreconcilable fact, nor provide any reason why that choice of law provision would not be enforceable.

But even if Colorado law were applied, Plaintiffs are out of luck. Under Colorado law, Plaintiffs' contract claims would still be barred by the statute of frauds, which provides that "[e]very agreement that by the terms is not to be performed within one year after the making thereof" is void "unless such agreement or some note or memorandum thereof is in writing and subscribed by the party charged therewith." *See* COLO. REV. STAT. § 38-10-112(1).

Plaintiffs attempt to evade their statute of frauds problem by ignoring it, seeming to argue that under Colorado law no signature is ever required unless Plaintiffs specifically knew that PIA intended to be bound only by written instrument. Opp. at 8-9. This argument is meritless. First, it ignores the fact that, as noted above, the Colorado statute of limitations applies to the agreement, without any additional condition that the parties expressly state their intent to require a signed writing. But Plaintiffs' argument fails irrespective of the statute of limitations. As PIA noted in its Motion, "the very email exchange Plaintiffs seek to rely on clearly shows that PIA's General Counsel did not expect there to be a final settlement until after he circulated a clean final execution copy, which he would not do until after various open terms were finally agreed." Mot. at 18-19. Plaintiffs are simply incorrect when they argue (Opp. at 8-9) that PIA failed to address the factors set forth in *City & County of Denver v. Adolph Coors Co.*, 813 F. Supp. 1476 (D. Colo. 1993).[3] PIA established in its Motion that the parties never came to a completed

---

[3] Desperately trying to create a question of fact about the parties' intention to be bound, Plaintiffs argue that they must be allowed an evidentiary hearing, and that the issue of contract formation must proceed to trial. Opp. at 12. This argument fails as well. There is no dispute as to the language used in the SAC—only a dispute regarding the

agreement, which Plaintiffs' counsel himself acknowledged in a later email to PIA, and the parties continued to negotiate settlement terms for weeks after the date of the email exchange upon which Plaintiffs seek to rely. Mot. at 19-20.

Plaintiffs' next argument, that the ten-year covenant not to sue—which unambiguously triggers the statute of frauds under either Hawaii or Colorado law—can be severed from the remainder of the draft settlement agreement, is also meritless. *See* Opp. at 12. Plaintiffs cite *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794 (9th Cir. 1991), but *Texaco* does not support Plaintiffs' position at all. In that case, applying California law, the court actually held that a provision in a settlement agreement was unenforceable and therefore the entire agreement was barred by the statue of frauds. The court noted that "a promise coming within the statute of frauds may be excised—and the remainder of the contract enforced—where the promise is clearly ancillary to the contract as a whole." *See id.* at 801. But it found that this exception did not apply, because the promise in question was an important feature of the settlement as a whole, and not ancillary. *Id.* Here, the covenant not to sue is similarly central to the proposed settlement and provides much of the consideration that PIA would have received under the agreement had it been finalized. Just like in *Texaco*, the provision cannot be severed and the agreement in its entirety violates the statute of frauds.

Plaintiffs' argument that the social nicety of ending an email transmitting a draft settlement with "Best, John" satisfies the writing requirement of the statute of frauds is also fatally flawed. *See* Opp. at 13. Under either Colorado or Hawaii law, a cover email is not a "signature" for the purposes of the statute of frauds. *See Buckles Mgmt., LLC v. InvestorDigs,*

---

legal import of the allegations. Plaintiffs should not be allowed to concoct a phony fact issue to avoid the dismissal of their deficient pleading.

*LLC*, 728 F. Supp. 2d 1145, 1151 (D. Colo. 2010) ("as a matter of law, the purported electronic signature on the email in this case is not valid or enforceable in that [it] does not constitute a writing subscribed by the party charged therewith.'") (internal quotation marks omitted); *Parish Farms, Inc. v. Dialysis Newco, Inc.*, 2015 WL 12670501, at *3-4 (D. Haw. Oct. 30, 2015) (Under Hawaii's statute of frauds, an email is not a writing signed by the party to be charged).

Lastly, Plaintiffs ask the Court simply to ignore the statute of frauds based upon their suggestion that Hawaiian courts have created a blanket exception to the statute for "in-court settlement agreements." Opp. at 13. Plaintiffs do not cite a single case supporting this claim. The cases they do cite completely fail to support their argument. In *Nelson v. Boone*, 890 P.2d 313 (Haw. 1995), the settlement agreement the plaintiff sued upon was in writing and signed by a party's attorney. *Id.* at 317. Only the agreement proving the attorney's authority to sign on behalf of the client was not in writing. *Id.* at 319. Again, here there was **no settlement agreement executed** by PIA or its agents. *Wakefield v. Bardellini*, 476 P.3d 773 (Haw. Ct. App. 2020) did not even involve a settlement agreement. The court merely held that the appellant had waived any statute of frauds defense applicable to a real property agreement by failing to raise it before the trial court. *Id.*

## IV.   The SAC Provides Insufficient Notice of the Specific Allegations Against PIA

In its Motion, PIA established that the use of "Defendants" to collectively refer to multiple parties, lumped together in allegations levied throughout the SAC warrants dismissal. Mot. at 4-5. In response, Plaintiffs identify a handful of paragraphs in the SAC that identify PIA by name. Opp. at 5-6. But the SAC contains nearly 400 numbered paragraphs, the bulk of which do not differentiate between the "Defendants" accused. That a small fraction of those allegations

specify PIA does not remedy the fact that, as a whole, the SAC fails to provide PIA sufficient notice of the exact allegations directed towards it.

PIA also demonstrated that Plaintiffs' use of a shotgun pleading in the counts of the SAC is improper. Mot at 4-5.[4] In response, Plaintiffs misleadingly point to the sole count that pertains only to PIA (breach of contract) as a supposed illustration that the SAC is not a shotgun pleading. Next, citing *Southwell v. Allstate Property & Casualty Co.,* Plaintiffs argue that the shotgun pleading is of no import, because all claims allegedly have largely the same factual underpinning. Opp. at 6. But in *Southwell*, the claims pled all arose out of the same automobile accident. 2020 WL 4287194, at *1 (D. Colo. July 27, 2020) . Here, the factual underpinnings of the SAC are wide-ranging. There is no single occurrence giving rise to Plaintiffs' allegations against all Defendants; the only factual similarity is that the defendants operate in the same industry.

DATED: February 15, 2022.

Respectfully submitted,

*s/A. John P. Mancini*
A. John P. Mancini
Paul Fakler
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone: 212-506-2441
Email: jmancini@mayerbrown.com
        pfakler@mayerbrown.com
*Attorneys for Defendant Private Internet Access, Inc.*

---

[4] Plaintiffs are incorrect in their assertion that PIA failed to meet and confer regarding these deficiencies. As set forth in the Declaration of Paul Fakler, counsel for PIA identified these deficiencies during the meet and confer process that was initiated after the filing of the FAC; those deficiencies remained in the subsequently filed SAC and the parties discussed all of the issues upon which PIA moves prior to the filing of the Motion. Fakler Decl. ¶¶ 4-5; 10-11.

**CERTIFICATE OF SERVICE**

I hereby certify that, on the date below, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which will send notification of such filing to the following

email addresses:

Kerry Steven Culpepper
CULPEPPER IP, LLLC
75-170 Hualalai Road
Suite B204
Kailua Kona, HI 96740
Telephone: 808-464-4047
Fax: 202-204-5181
Email: kculpepper@culpepperip.com


*Attorney for Plaintiffs*

DATED: New York, New York, February 15, 2022


                                        MAYER BROWN LLP

                                        *s/ A. John P. Mancini*_____
                                        A. John P. Mancini
                                        1221 Avenue of the Americas
                                        New York, NY 10020-1001
                                        Telephone: 212-506-2441