**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 21-cv-01261-NYW-SKC

MILLENNIUM FUNDING, INC.,
VOLTAGE HOLDINGS, LLC,
LHF PRODUCTIONS, INC.,
OUTPOST PRODUCTIONS, INC.,
AFTER II MOVIE, LLC,
MILLENNIUM MEDIA, INC.,
WONDER ONE, LLC,
HITMAN TWO PRODUCTIONS, INC.,
MILLENNIUM IP, INC.,
I AM WRATH PRODUCTIONS, INC.,
KILLING LINK DISTRIBUTION, LLC,
VENICE PI, LLC,
RAMBO V PRODUCTIONS, INC.,
MON, LLC,
NIKOLA PRODUCTIONS, INC.,
BODYGUARD PRODUCTIONS, INC.,
YAR PRODUCTIONS, INC.,
DALLAS BUYERS CLUB, LLC,
SF FILM, LLC,
SCREEN MEDIA VENTURES, LLC,
SPEED KILLS PRODUCTIONS, INC.,
LAUNDRY FILMS, INC.,
CINELOU FILMS, LLC,
BADHOUSE STUDIOS, LLC,
HANNIBAL CLASSICS INC., and
JUSTICE EVERYWHERE PRODUCTONS LLC,

      Plaintiffs,

v.

PRIVATE INTERNET ACCESS, INC.,

      Defendant.

---

## ORDER ON MOTION TO DISMISS AND MOTION TO STRIKE

---

This matter comes before the Court on Defendant Private Internet Access, Inc.'s Motion to

Dismiss (the "Motion to Dismiss") [Doc. 70] and Defendant Private Internet Access, Inc.'s Motion to Strike (the "Motion to Strike") [Doc. 71].[1]  Upon review of the Motions and the related briefing, the applicable case law, and the entire docket, the Motion to Strike is **GRANTED in part** and **DENIED in part** and the Motion to Dismiss is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

The Court draws the following facts from the Second Amended Complaint and Jury Demand (the "Second Amended Complaint") [Doc. 59] and presumes they are true for purposes of the pending Motions.  Plaintiffs are 26 entities who own the copyrights to various motion pictures (the "Works"), which are currently offered for sale in commerce.  [Doc. 59 at ¶¶ 28, 112, 114].  Defendant Private Internet Access, Inc. ("Defendant" or "PIA") is owned by and/or is the alter ego of non-party Kape Technologies, Inc. ("Kape"), [*id.* at ¶¶ 47, 49], which owns virtual private network ("VPN") services.  [*Id.* at ¶ 58].  According to Plaintiffs, "[a] VPN is a type of Internet Service that provides access to the Internet." [*Id.* at ¶ 74].  A conventional internet service provider ("ISP") "will assign its end user an IP address and log the end user['s] access to the Internet while using the assigned IP address"; in comparison, "many VPN providers provide their end users 'anonymous' usage by, for example, deleting end users' log access records, assigning their end users IP addresses that are simultaneously shared among many users, and/or encrypting traffic." [*Id.*].

Plaintiffs allege generally that PIA, through its VPN services, either directly engages in and/or induces or contributes to third parties' infringement of Plaintiffs' copyrights.  First, Plaintiffs allege that PIA "advertise[s] [its] VPN service for allowing [its] end users to bypass regional restrictions of streaming platforms to stream copies of . . . Plaintiffs' Works from locations

---

[1] This case was reassigned to the undersigned on August 4, 2022.  *See* [Doc. 85].

Plaintiffs have not authorized the platform to stream the Works," [*id.* at ¶ 123], and encourages its users to do so, thereby violating Plaintiffs' copyrights.  [*Id.* at ¶¶ 373, 377].

Second, Plaintiffs allege that PIA and its users "use BitTorrent and BitTorrent Client applications . . . to infringe Plaintiffs' exclusive rights of reproduction and distribution" of the Works.  [*Id.* at ¶ 131].  BitTorrent is a peer-to-peer file-sharing "protocol," or—according to Plaintiffs—a "set of computer rules."  [*Id.* at ¶ 137].  BitTorrent protocol allows users to "join a 'swarm' of host computers to download and upload from each other simultaneously" which reduces the load on the source computer and facilitates the distribution of large files. [*Id.* at ¶ 138]. Plaintiffs allege that "BitTorrent is overwhelmingly used for piracy."  [*Id.* at ¶ 141].

Plaintiffs describe the torrenting process as follows:  an individual seeking to upload a copyrighted Work to the internet may "rip"—i.e., create a copy of—a movie "from either Blu-ray or legal streaming services" and create a "'torrent' descriptor file" for the Work.  [*Id.* at ¶¶ 142-43].  The original user can then upload the torrent to a "torrent site," such as "YTS" or "RARBG,"[2] which indexes torrent files that are currently available for copying and distribution.  [*Id.* at ¶¶ 152, 169].  Then, users can access torrent sites to upload and download materials, including Plaintiffs' copyrighted Works.  [*Id.* at ¶¶ 155, 169].

Plaintiffs further allege that downloaders of torrent files are also uploaders of the file.  More specifically, torrent files are divided into identically sized groups known as "pieces."  [*Id.* at ¶ 145]. The BitTorrent protocol causes the original user's computer "to send different pieces of the computer file, here the copyrighted Work, to . . . peers seeking to download the computer file." [*Id.* at ¶ 170].  Once a peer user receives a piece of the computer file, it starts transmitting that

---

[2] Plaintiffs do not provide any additional identifying information as to these websites, but state that they are known as "reliable" torrent websites or "piracy" websites.  [Doc. 59 at ¶¶ 224, 269].

piece to other peer users; the users "work together in what is called a 'swarm.'" [*Id.* at ¶¶ 171-72]. Once a peer user has downloaded the full file, the BitTorrent Client reassembles the pieces and the downloading user can view the movie. [*Id.* at ¶ 176]. That user continues to distribute the torrent file—here, Plaintiffs' copyrighted Works. [*Id.*]. Plaintiffs allege that PIA's users have accessed torrent websites to upload and download Plaintiffs' Works by using "IP addresses provided by [PIA], which [PIA] received from host providers such as Sharktech in Denver," which IP addresses "then become[] a link to the infringing copies of Plaintiffs' Works. [*Id.* at ¶¶ 155-56]; *see also* [*id.* at ¶¶ 157-163 (Plaintiffs citing specific examples of PIA users allegedly downloading torrent files of Plaintiffs' Works).

Plaintiffs allege that PIA's end users use PIA's VPN services "exactly as explained and encouraged" by PIA, that is, "to infringe copyright protected content while logged [in to] the VPN service so they can conceal their illicit activities." [*Id.* at ¶ 246]. End users thus purchase the VPN services "to infringe copyright protected content," including Plaintiffs' Works," while using [PIA's] VPN service." [*Id.* at ¶ 248]. Moreover, Plaintiffs allege that although PIA has the capability to log their users' access to the VPN services, PIA "interfere[s] with standard technical measures used by copyright holders to identify or protect copyright works by purposefully delet[ing] [PIA's] and [PIA's] end users' logged information." [*Id.* at ¶¶ 249, 251]. Plaintiffs assert that PIA does so to "use [its] service as a means to pirate copyright protected Works anonymously." [*Id.* at ¶ 250].

Plaintiffs also raise allegations that the Works are altered in some respects. According to Plaintiffs, a legitimate file copy of a Work "includes copyright management information ('CMI') indicating the title" of the Work. [*Id.* at ¶ 254]. However, the original user of the infringing file will add wording or letters—such as "TGx," "FGT," or "YTS"—to the file titles "to 'brand' the

quality of piracy files he or she released and [to] attract further traffic to his or her website.'"  [*Id.* at ¶¶ 144, 255].  For example, the original seeder of infringing file copies of *Angel Has Fallen* added "YTS" to the file titles, and the initial seeder of the infringing file copies of *The Outpost* added "TGx" to the file titles.  [*Id.* at ¶¶ 256-57].  "YTS" and "TGx" are not included in the file name of legitimate copies of Plaintiffs' Works.  [*Id.* at ¶ 258].  Plaintiffs allege that PIA's end users knew that TGx or YTS are not the authors or licensed distributors of Plaintiffs' Works and knew that the "CMI that included TGx [and] YTS . . . in the file names was false" and was altered without Plaintiffs' permission, and thus PIA's end users "induced, enabled, and facilitated further infringements of the Work."  [*Id.* at ¶¶ 260-61, 264, 268].  Plaintiffs allege that PIA knew that its users were infringing Plaintiffs' Works and distributing copies of the Works with altered CMI, but PIA failed to terminate the accounts of the end users alleged to have engaged in this conduct and did not take any other meaningful action after receiving notice.  [*Id.* at ¶¶ 274, 278, 281, 286, 288].  According to Plaintiff, PIA "could have taken simple measures to stop [its] end users from continuing to reproduce and/or distribute Plaintiffs' works but did not."  [*Id.* at ¶ 294].  For example, PIA could have terminated its users' accounts.  [*Id.* at ¶ 301].  Instead, PIA "continued to provide service to [its] end users despite knowledge that [its] end users were using the service to engage and facilitate massive piracy of copyright protected Works[,] including the Plaintiffs'." [*Id.* at ¶ 299].

Aside from allegations of copyright infringement, Plaintiffs also allege that PIA breached a settlement agreement with Plaintiffs.  Specifically, Plaintiffs assert that on or around September 1, 2021, Plaintiffs and PIA entered into a settlement agreement "to resolve copyright claims in this action and other claims."  [*Id.* at ¶ 321].  The agreement was negotiated by Plaintiffs' counsel, counsel for Kape, and counsel for PIA; both counsel for Kape and counsel for PIA had authority

to bind PIA.  [*Id.* at ¶¶ 322-24].  PIA's counsel sent an email to Plaintiffs' counsel on September 1 stating: "We are sending the approved version of the final settlement agreement after [Kape's counsel] sent her feedback and I made a couple of small revisions."  [*Id.* at ¶ 329].  Plaintiffs' counsel replied "with a revision that merely changed 'Voltage Pictures, Inc.['] to [']LLC' and changed [the] payment due date from 8/15/2021 to 9/21/2021."  [*Id.* at ¶ 330].  That same day, PIA's counsel stated that "he was revising [the agreement] to make the signing party Moran Laufer (the CFO of PIA and Kape) rather than himself and sending over for his signature."  [*Id.* at ¶ 331].  Plaintiffs' counsel replied:  "This is fine."  [*Id.* at ¶ 332].  Plaintiffs take the position that this exchange created a valid, binding, and enforceable contract.  *See* [*id.* at ¶ 334].

Thereafter, Plaintiffs' counsel prepared to amend Plaintiffs' pleading in a separate lawsuit to name an entity named ZenGuard as a defendant in that matter; after learning that ZenGuard "is also a subsidiary of Kape," Plaintiffs' counsel notified PIA's general counsel of his intent to amend.  [*Id.* at ¶ 335].  PIA's counsel then sent Plaintiffs' counsel a new proposed agreement on September 10, 2021 that purported to also release ZenGuard from liability and replaced PIA in the agreement with Kape.  [*Id.* at ¶ 336].  Kape's counsel then emailed Plaintiffs' counsel at 9:39 AM on September 11, 2021 and "demanded that he sign the new proposed agreement on behalf of the Plaintiffs by the next day within less than 14 hours."  [*Id.* at ¶ 337].  On September 13, 2021, it was reported that Kape was set to purchase ExpressVPN.  [*Id.* at ¶ 343].

Plaintiffs allege that PIA breached the agreement by (1) "attempting to deceive Plaintiffs' counsel into signing the new proposed agreement on behalf of Plaintiffs in which she had snuck in a full release for Defendant ExpressVPN under the false pretenses of settling the PIA and ZenGuard matters" and (2) "attempting to strongarm Plaintiffs' counsel to sign the new proposed agreement on behalf of Plaintiffs within less than 14 hours before its parent and alter ego Kape

publicly released that it was purchasing ExpressVPN." [*Id.* at ¶ 347]. Furthermore, they allege that PIA has breached the agreement by continuing to distribute, reproduce, or publicly perform copies of Plaintiffs' Works and failing to pay Plaintiffs the agreed-upon amount. [*Id.* at ¶¶ 357, 359].

Plaintiffs initiated this case on May 7, 2021, originally naming Sharktech, Inc. and Tim Mouhieddine Timrawi as defendants. [Doc. 1]. After these defendants moved to dismiss or transfer the case, *see* [Doc. 17], Plaintiffs filed a First Amended Complaint on August 1, 2021, naming Sharktech, Inc., PIA, and Does 1 – 5 as defendants. [Doc. 27]. Plaintiffs then filed the operative Second Amended Complaint on November 18, 2021 with PIA's consent. *See* [Doc. 59]; *see also* [Doc. 54].[3] In addition to PIA, the Second Amended Complaint also named Express VPN International LTD (a BVI Limited Company) and Express VPN International LTD (an Isle of Man Limited Company) (collectively, "ExpressVPN") as Defendants. [Doc. 59 at 1]. ExpressVPN was voluntarily dismissed from this case on March 12, 2022. [Doc. 82].

The Second Amended Complaint asserts the following claims for relief: (1) direct copyright infringement (Claim One); (2) contributory copyright infringement "based upon material contribution" (Claim Two); (3) vicarious copyright infringement (Claim Three); (4) contributory copyright infringement "based upon intentional inducement" (Claim Four); (5) a claim for violations of the Digital Millennium Copyright Act ("DMCA") (Claim Five); and (6) breach of contract (Claim Six). *See* [Doc. 59 at ¶¶ 365–447].

PIA filed the Motion to Dismiss on December 23, 2021, seeking dismissal of the Second Amended Complaint in its entirety. [Doc. 70 at 1]. While PIA states that the operative pleading

---

[3] Plaintiffs voluntarily dismissed Sharktech as a party on October 5, 2021, *see* [Doc. 46], and thus, only PIA, as the then-sole Defendant in this case, needed to consent to Plaintiffs' amendment of pleadings under Rule 15(a)(2).

"fails . . . to allege facts sufficient to plausibly satisfy the pleading standards applicable to any of the claims directed at PIA," [*id.*], PIA only raises specific arguments as to Claims One, Five, and Six.  [*Id.* at 2].  That same day, PIA filed the Motion to Strike.  [Doc. 71].  Both Motions are fully briefed and ripe for disposition.  *See* [Doc. 79; Doc. 81; Doc. 77; Doc. 78].

## LEGAL STANDARDS

### I.   Motion to Strike

Rule 12(f) of the Federal Rules of Civil Procedure permits a district court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "The purpose of Rule 12(f) is to save the time and money that would be spent litigating issues that will not affect the outcome of the case."  *United States v. Smuggler-Durant Mining Corp.*, 823 F. Supp. 873, 875 (D. Colo. 1993); *see also Resol. Tr. Corp. v. Schonacher*, 844 F. Supp. 689, 691 (D. Kan. 1994) (explaining that the "purpose of the rule is to minimize delay, prejudice, and confusion by narrowing the issues for discovery and trial").  Motions to strike, however, are generally disfavored.  *See United States v. Shell Oil Co.*, 605 F. Supp. 1064, 1085 (D. Colo. 1985); *see also Sierra Club v. Tri-State Generation & Transmission Ass'n, Inc.*, 173 F.R.D. 275, 285 (D. Colo. 1997) (describing Rule 12(f) motions as a "generally-disfavored, drastic remedy").  For this reason, "[e]ven where the challenged allegations fall within the categories set forth in the rule, a party must usually make a showing of prejudice before the court will grant a motion to strike."  *Sierra Club v. Young Life Campaign, Inc.*, 176 F. Supp. 2d 1070, 1085 (D. Colo. 2001).  But "regardless of whether the moving party has met its burden to prove that allegations contained in a pleading violate Rule 12(f), discretion remains with the Court to grant or deny the motion."  *Haskett v. Flanders*, No. 13-cv-03392-RBJ-KLM, 2014 WL 6675263, at *3 (D. Colo. Nov. 24,

2014); *see also* Fed. R. Civ. P. 12(f)(1) (a court may *sua sponte* strike improper matters in pleadings).

## II.   Motion to Dismiss

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  A plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible.").  The Court must ultimately "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

## I.   Motion to Strike

Because the Motion to Dismiss tests the sufficiency of the allegations in the Second Amended Complaint, the Court first resolves the Motion to Strike, so as to determine which allegations are properly before the Court.  In its Motion to Strike, PIA moves the Court to strike

17 Paragraphs in the Second Amended Complaint,[4] primarily asserting that the allegations contained therein are impertinent, immaterial, or scandalous under Rule 12(f).  [Doc. 71 at 2]. Plaintiffs disagree that their allegations are improper under Rule 12.  [Doc. 77 at 4].  Moreover, they contend that the Motion to Strike should be denied as untimely.  [*Id.* at 18-19].

### A.    Timeliness of the Motion

The Court first addresses Plaintiffs' argument that the Motion to Strike was untimely filed. Rule 12 permits the filing of a motion to strike "either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading."  Fed. R. Civ. P. 12(f).  According to Plaintiffs, the Motion to Strike is untimely because it was filed *after* PIA's Motion to Dismiss.  [Doc. 77 at 19].  PIA notes that the Motion to Strike was filed immediately after the Motion to Dismiss and contends that "courts . . . have found that where a Rule 12(f) motion is filed within minutes after a response to the pleading, that contemporaneous motion can be deemed filed first and filed timely."  [Doc. 78 at 14].

The Court, which has a strong preference for deciding matters on the merits over procedural technicalities, agrees with PIA.  The Motions were each filed on December 23, 2021, only seven minutes apart.  *See* [Doc. 70; Doc. 71].  In other words, the Motions "were essentially simultaneous."  *Nkemakolam v. St. John's Mil. Sch.*, 876 F. Supp. 2d 1240, 1246 (D. Kan. 2012). As noted by Defendant, courts have rejected the argument raised here by Plaintiffs where a motion to strike was filed just minutes after the moving party filed its response to a pleading.  *See id.* (seven minutes); *Kaufman v. Cent. RV, Inc.*, No. 21-2007-SAC-ADM, 2021 WL 809293, at *2 (D.

---

[4] In its Motion to Strike, PIA asserted that Paragraphs 95 and 96 in the Second Amended Complaint should be stricken.  [Doc. 71 at 6].  In its Reply, PIA states that the inclusion of these Paragraphs was a typographical error and represents that it does not move to strike these Paragraphs.  [Doc. 78 at 3 n.3].  Accordingly, the Court does not consider Paragraphs 95 and 96 in its analysis.

Kan. Mar. 3, 2021) (four minutes).  And, in any event, Rule 12(f) permits the Court to strike redundant, immaterial, impertinent, or scandalous allegations *sua sponte*.  Fed. R. Civ. P. 12(f)(1). For these reasons, the Court will not deny the Motion on untimeliness grounds and instead turns to the merits of the Parties' substantive arguments.

###### B.      Whether Plaintiffs' Allegations Should be Stricken

In all, PIA seeks to strike 17 Paragraphs, or portions thereof, in the Second Amended Complaint.   The challenged Paragraphs can be distilled into four general categories: (1) allegations of conduct by PIA's and former defendant ExpressVPN's users and the VPN servicers' alleged related statements; (2) allegations of PIA employees' conduct or personal views; (3) allegations of ExpressVPN employees' conduct; and (4) allegations related to non-party Kape Technologies.  The Court addresses each category of allegations below.

###### 1.      Bad Acts of Users and the VPN Servicers' Alleged Related Statements

First, PIA seeks to strike Plaintiffs' allegations enumerating the alleged bad acts of VPN users, as well as the VPN servicers' alleged related statements, which PIA asserts are irrelevant to this case and prejudicially inflammatory.  [Doc. 71 at 7].  Plaintiffs allege in their Second Amended Complaint that, "[e]mboldened by Defendants' promises that their identities cannot be disclosed, [PIA's and ExpressVPN's] end users use the VPN services not only to engage in widespread movie piracy, but other outrageous criminal conduct such as sharing child pornography, harassment, illegal hacking and murder."  [Doc. 59 at ¶ 77].  Plaintiffs go on to allege the following bad acts of PIA users:

> 78.  On June 6, 2018, Ross M. Colby was convicted of two felonies for using PIA VPN service to hack into the computer systems of the company Embarcadero.
>
> 79.  The same PIA IP addresses that were used to access Mr. Colby's personal email and Facebook accounts [were] used for the illegal hacking. Upon information and belief, Mr. Colby was a PIA end user.

80.  Between December 2015 and March 2016, Preston McWaters used PIA's VPN service to make false bomb threats to schools and stalk a former female co-worker under a fake email address and Twitter accounts he created under the name of her boyfriend. When a search warrant was executed on Mr. McWater's [sic] home, a mobile phone including the PIA mobile app was found. Upon information and belief, Mr. McWaters was a PIA end user.

[*Id.* at ¶¶ 78-80].  Plaintiffs further allege that "PIA boasted that it had no logs to disclose to law enforcement concerning these serious crimes of Ross M. Colby and Preston McWaters."  [*Id.* at ¶ 81].

In addition, Plaintiffs raise the following allegations with respect to users of ExpressVPN, a former defendant in this case:

82.  An unknown ExpressVPN end user used the VPN services to hide details concerning the assassination of the Russian Ambassador to Turkey, Andrei Karlov in 2017. . . .

83.  ExpressVPN used this tragic incident to tout its VPN service by bragging that law enforcement could not find information to locate the murder suspects even though their server was seized. . . .

84.  ExpressVPN end user Frank Beyer admitted to using the VPN service in connection with the disgusting act of downloading sexual videos of prepubescent children. . . .

[*Id.* at ¶¶ 82-84].

**PIA Users' Conduct and PIA's Related Statements**.  PIA argues that Paragraphs 77-81 should be stricken because there is no connection between the conduct of its users, or PIA's alleged related statements, to the alleged infringement of Plaintiffs' copyrights or the alleged breach of contract.  [Doc. 71 at 9-10].  PIA argues that because the alleged hacking, stalking, and bomb threats "are completely unrelated to any of [Plaintiffs'] causes of action," these allegations "would only serve to prejudice the Court against PIA, and VPN providers generally."  [*Id.* at 10].

Plaintiffs maintain that the allegations are pertinent to the substance of this matter, asserting

that Paragraph 77 "supports Plaintiffs' allegations of intentional inducement by alleging clear expression or other affirmative steps taken to foster infringement and of vicarious infringement by showing that [PIA's] no log policy is a powerful draw to end users that wish to use [PIA's] services for illegal acts such as piracy." [Doc. 77 at 10].  They raise a similar argument with respect to Paragraph 81.  *See* [*id.* at 12 (arguing that Paragraph 81 "supports Plaintiffs' allegation that PIA has emboldened its end users to the point where they know they can get away with anything")].  Plaintiffs do not raise any specific arguments explaining why Paragraphs 78, 79, or 80 are relevant to their copyright claims.  *See* [*id.* at 10-11 (Plaintiffs acknowledging that "PIA also wishes to strike paragraphs 78-80 which give examples of PIA end users using the VPN service for criminal acts" but not raising any argument as to why the allegations should not be stricken)].

The Court agrees with PIA that Paragraphs 77, 78, 79, 80, and 81 are improper under Rule 12(f).  Allegations that are "so unrelated to [the] plaintiff's claims as to be unworthy of any consideration" may be stricken.  *Holderness v. Birner Dental Mgmt. Servs. Inc.*, No. 12-cv-01391-WJM-MJW, 2013 WL 618162, at *1 (D. Colo. Feb. 19, 2013) (quotation omitted); *see also Begay v. Pub. Serv. Co. of N.M.*, 710 F. Supp. 2d 1161, 1185 (D.N.M. 2010) ("To be impertinent or immaterial, the allegations must have no possible bearing on the controversy.").  The fact that PIA users—who have no apparent connection to this case—allegedly used PIA's VPN services to hack, stalk, or make threats does not make it more or less probable that PIA engaged in copyright infringement of Plaintiffs' Works or breached a settlement agreement with Plaintiffs.  *See Masters v. Allstate Prop. & Cas. Ins. Co.*, No. 20-cv-01213-DDD-NYW, 2020 WL 9424371, at *3 (D. Colo. July 7, 2020), *report and recommendation adopted*, 2020 WL 9424265 (D. Colo. Aug. 21, 2020) (striking allegations that were not probative to the specific claims or defenses in the action).  Moreover, Plaintiffs' attempt to connect PIA to, or place blame on PIA for, a user stalking a co-

worker and making false bomb threats to schools can certainly be deemed "scandalous," i.e., "improperly cast[ing] a derogatory light on someone." *Sundance Servs., Inc. v. Roach*, No. CV 10-110 JP/CEG, 2011 WL 13285462, at *2 (D.N.M. June 2, 2011). "[T]he Court has little difficulty concluding that the challenged paragraphs contain gratuitously impugning allegations which are not remotely relevant to this action." *Holderness*, 2013 WL 618162, at *2.

Furthermore, although Plaintiffs maintain that Paragraphs 77 and 81 are pertinent to their contributory or vicarious copyright infringement claims, they cite no case law in support of this assertion. *See* [Doc. 77 at 9-12]. "To state a claim of contributory copyright infringement, a plaintiff must allege that the defendant 'with knowledge of the infringing activity' induced, caused, or materially contributed to the infringing conduct of another." *Viesti Assocs., Inc. v. Pearson Educ., Inc.*, No. 12-cv-02240-PAB-DW, 2013 WL 4052024, at *7 (D. Colo. Aug. 12, 2013) (quoting *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 750 (S.D.N.Y. 2012)). A contributory copyright infringement claim requires a causal link between the defendant's alleged inducement and the third party's alleged infringement. *Id.* On the other hand, a vicarious copyright infringement claim requires allegations that (1) a third party infringed the plaintiff's copyright; (2) the defendant had the ability to control or supervise the third party's infringing activities; (3) the defendant failed to stop the infringement; and (4) the defendant had a direct financial interest in the infringing activity. *Id.* at *8.

Again, allegations that PIA's users engaged in criminal behavior do not bear on the present controversy and serve only to place PIA in a negative light. *Sundance Servs.*, 2011 WL 13285462, at *2; *Holderness*, 2013 WL 618162, at *2. And allegations that PIA "boasted" that it did not keep records of events unrelated to PIA's alleged infringement are simply not relevant to the crux of Plaintiffs' claim: whether PIA knowingly induced, specifically, its users' copyright infringement

14

of Plaintiffs' Works, or whether PIA was able to and failed to stop, specifically, its users' copyright infringement of Plaintiffs' Works. *Viesti Assocs.*, 2013 WL 4052024, at *7-8. Because the allegations in Paragraphs 77, 78, 79, 80, and 81 have no bearing on the merits of this case, they are not necessary or pertinent to the instant matter. *Sundance Servs.*, 2011 WL 13285462, at *2. And because the impertinent allegations would serve only to gratuitously impugn PIA for alleged conduct completely unrelated to the instant case, the Court finds good cause to strike these challenged Paragraphs. The Motion to Strike is thus **GRANTED** with respect to Paragraphs 77, 78, 79, 80, and 81.

   ***ExpressVPN Users' Conduct and ExpressVPN's Related Statements***. Next, PIA argues that Paragraphs 82 and 83—related to the assassination of Andrei Karlov—are improper under Rule 12(f) because they "have nothing to do with copyright infringement or copyright management information" and are unconnected to any alleged harm to Plaintiffs in this case. [Doc. 71 at 10-11]. While these allegations relate to former defendant ExpressVPN, PIA asserts that "Plaintiffs . . . seek to use the specter of this horrific act to taint . . . PIA . . . with a killing committed by an individual who is a stranger to this case." [*Id.*]. Plaintiffs counter that these Paragraphs are "[f]ar from . . . irrelevant," but fail to accompany this statement with an explanatory argument; rather, Plaintiffs merely assert that "PIA and ExpressVPN understand that by telling the piracy community that law enforcement was unable to uncover [from them] the identities of the perpetrators of well published extreme crimes such as murder . . . thanks to their business practice of deleting logs they can get street cred with the piracy community." [Doc. 77 at 10]. Plaintiffs draw no connection between PIA's purported intent to gain "street cred with the piracy community" and Plaintiffs' substantive copyright claims and do not otherwise explain how PIA's "street cred" is relevant or pertinent to the claims or defenses in this matter. *See* [*id.*].

15

Copyright infringement is a strict-liability cause of action; a defendant may be held liable for the tort even absent an intent to infringe. *UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.*, 446 F. Supp. 2d 1164, 1172 (E.D. Cal. 2006). As such, the Court is unpersuaded that PIA's purported intent to gain "street cred with the piracy community" is relevant to Plaintiffs' claims here. Moreover, while these allegations are asserted with respect to a former party, the Court does not find this distinction material, given Plaintiffs' repeated use of the collective "Defendants" in the Second Amended Complaint and Plaintiffs' allegations that closely tie PIA and ExpressVPN together. *See, e.g.*, [Doc. 59 at ¶¶ 72-73, 75, 77]. At bottom, it is clear that references to a political assassination and Plaintiffs' repeated attempts to connect that assassination with VPN services could "improperly cast[] a derogatory light" on PIA. *Sundance Servs.*, 2011 WL 13285462, at *2; *cf. Holderness*, 2013 WL 618162, at *2 ("It is easy to see how Defendant's reputation could be harmed by allegations of allowing unlicensed dentists to practice and then falsely billing for those procedures, as well as the alleged misuse of narcotics authorization.").

Similarly, the allegation that an ExpressVPN user used VPN services to engage in criminal activity, *see* [Doc. 59 at ¶ 84], is improper under Rule 12(f). Plaintiffs defend this Paragraph by arguing that it "buttress[es] Plaintiffs' point that Defendants' end users are . . . emboldened by Defendant's promotions that their identity will never be revealed" which "show[s] how unreasonable [PIA's and ExpressVPN's] business practices are." [Doc. 77 at 13]. But Plaintiffs' claims are not for "unreasonable . . . business practices"; they are copyright claims. *See generally* [Doc. 59]. Moreover, the Court is not persuaded that this allegation "is relevant because it would support Plaintiffs' allegation that [the user] also used BitTorrent to share *Angel Has Fallen*." [Doc. 77 at 13]. Plaintiffs allege that this user "used the ExpressVPN service to share copies of copyright protected Works including *Angel Has Fallen*," [Doc. 59 at ¶ 85], but have since voluntarily

dismissed all of their claims against ExpressVPN.  *See* [Doc. 82].  Accordingly, Plaintiffs identify

no reason why this allegation is relevant to Plaintiffs' current claims against PIA.

Paragraph 84 "contains scandalous matter that is unrelated to Plaintiffs['] claims and is

prejudicial to Defendant[]."  *Bernath v. Extreme Seal Experience, LLC*, No. 2:16-cv-185, 2016

WL 11671369, at *3 (E.D. Va. July 12, 2016) (granting motion to strike similar allegations to

those in this case).   Given the lack of *any* relevancy between the instant matter and these

Paragraphs, and due to the scandalous nature of the challenged allegations, the Motion to Strike is

**GRANTED** with respect to Paragraphs 82, 83, and 84.

### 2.      Allegations Regarding the Personal Views or Acts of PIA Employees

Next, PIA requests that the Court strike Paragraphs 4, 90, 91, and 92, which relate to PIA

employees.  [Doc. 71 at 12].  The Amended Complaint alleges as follows:

> 4. As discussed below, although Defendant PIA attempts to use the codeword
> "privacy", employees of Defendant PIA explicitly advocate use of its service for
> piracy – one is even a member of "The Pirate Party" – and participate in the
> operation of the notorious website The Pirate Bay. Even worse, after Defendant
> PIA was served with a subpoena for identification of one its end users that accessed
> pirated content from the website YTS using its VPN service, Defendant PIA issued
> a warning to its end users that Plaintiffs' counsel was "extorting" YTS users.
>
> . . .
>
> 90. Upon information and belief, PIA engages in the same conduct as its end users.
> PIA proudly employs as its head of "Privacy" Rick Falkvinge, the founder of the
> first "Pirate Party" whose aim is to abolish intellectual property laws.
>
> 91. As head of the "Pirate Party", Rick Falkvinge has pushed for legalization of
> possession of child pornography.
>
> 92. Rick Falkvinge and his Pirate Party begin hosting the notorious piracy website
> "The Pirate Bay" in 2010 after an injunction was obtained by several movie studios
> against the previous host provider. . . .

[Doc. 59 at ¶¶ 4, 90-92].

***Paragraph 91***.  Defendant moves to strike Paragraph 91 on the basis that it is "completely

17

irrelevant to copyright infringement or copyright management information . . . and can serve only to smear PIA with the specter of a scandalous topic." [Doc. 71 at 15].  In response, Plaintiffs first state that they are "willing to voluntary strike paragraph 91 . . . provided that such action does not constitute waiver of Plaintiffs' right to seek discovery on this subject and bring up evidence related to Mr. Falkvinge's efforts on this topic in trial in support of their claims." [Doc. 77 at 17].  The Court cannot and does not pass on any issues related to Plaintiffs' "right to seek discovery on this subject" or to present evidence on this topic at trial, given that Plaintiffs' apparent request is premature, unsupported by legal authority, and not procedurally proper.  *See* D.C.COLO.LCivR 7.1(d) (a motion cannot be made in a response brief).  However, insofar as Plaintiffs agree to voluntarily strike Paragraph 91, the Motion to Strike is **GRANTED**.

*Allegations Related to Rick Falkvinge*.  Next, PIA argues that Paragraph 4 "add[s] unnecessary particulars to [Plaintiffs'] initial allegations regarding PIA, seeking to poison the Court's view of PIA" and that Paragraphs 90 and 92 "elaborate on these irrelevant and inflammatory allegations." [Doc. 71 at 13].  According to PIA, these allegations "improperly attempt to impute Mr. Falkvinge's personal views and political affiliations on his employer, PIA, despite the fact that those views were expressed by Mr. Falkvinge in a role entirely separate from his employment at a time long before he had any association with PIA." [*Id.* at 14].  In response, Plaintiffs assert that Defendant's arguments involve matters "improperly outside of the pleadings and [which] should not be considered on a motion to strike." [Doc. 77 at 16].  Plaintiffs then direct the Court to matters outside of the pleadings to suggest that "PIA's assertion is contradicted by published documents on its own website." [*Id.*].  Plaintiffs ultimately argue that the fact that Mr. Falkvinge founded the Pirate Party, "wishes to abolish intellectual property laws," and "assisted with the operation of the notorious piracy website The Pirate Bay supports Plaintiffs' allegation

that PIA engages in the same conduct as its end users and is thus liable for direct copyright infringement and is an example of culpable expression supporting secondary liability." [*Id.* at 17]. Plaintiffs cite no case law in support of their arguments. [*Id.* at 16-17].

The Court cannot make factual findings when ruling on a motion to strike, and where, as here, the Parties' arguments rely "upon facts outside of the pleadings, [the issue] is more properly the subject of a motion for summary judgment than a motion to strike." *N. Nat. Gas Co. v. L.D. Drilling, Inc.*, No. 6:08-cv-01405-JTM, 2017 WL 1048365, at *2 (D. Kan. Mar. 20, 2017). Accordingly, the Court considers only the matters contained in the Second Amended Complaint in addressing Defendant's request to strike. While the Court acknowledges PIA's position that the personal views of its employee are not relevant to the case, the Court concludes that PIA has not sufficiently demonstrated that these allegations are so "inflammatory" that they would serve to "poison the Court's view of PIA." [Doc. 71 at 13]. More specifically, allegations that an employee of PIA founded an apparent political party and participated in the operation of a piracy website are not so scandalous so as to "improperly cast[] a derogatory light on" PIA. *Sundance Servs.*, 2011 WL 13285462, at *2. In their Second Amended Complaint, Plaintiffs allege that PIA engages in direct copyright infringement, *see* [Doc. 59 at ¶ 90], and Plaintiffs suggest that Mr. Falkvinge's "open advocacy" for purported piracy "is relevant as circumstantial evidence to support Plaintiffs' assertion that certain direct infringements were conducted by Defendant PIA (via its employees)." [Doc. 77 at 17]. The Court does not pass on the strength or relevancy of this purported evidence, but is mindful that "[a]ny doubt about whether the challenged material is redundant, immaterial, impertinent, or scandalous should be resolved in favor of the non-moving party." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1382 (3d ed. 2019). At this juncture, the Court declines to strike these Paragraphs. PIA may challenge the strength or relevancy of any

associated evidence via an appropriate motion or at trial.  The Motion to Strike is thus **DENIED**

with respect to Paragraphs 4, 90, and 92.

### 3.        Allegations Related to ExpressVPN Employees' Conduct

In their Second Amended Complaint, Plaintiffs raise a number of allegations concerning

ExpressVPN's Chief Information Officer Daniel Gericke.  Specifically, they assert:

> 86.  Upon information and belief, ExpressVPN engages in the same conduct as its
> end users.  ExpressVPN proudly employs as its chief information officer Daniel
> Gericke, an individual that has admitted to using VPN services to hack into devices
> of American residents on the behalf of a foreign government.

> 87.  On Sept. 7, 2021, Mr. Gericke entering into a deferred prosecution agreement
> ("DPA") requiring him to make a payment of $335,000 to resolve a Department of
> Justice investigation regarding violations of U.S. export control, computer fraud
> and access device fraud laws.

> 88.  In the DPA, Mr. Gericke admitted to: (1) knowingly and willfully conspiring,
> in violation of Title 18, United States Code, Section 371, to violate the Arms Export
> Control Act ("AECA") and the International Traffic in Arms Regulations
> ("ITAR"); and (2) knowingly conspiring, in violation of Title 18, United States
> Code, Section 371, to commit access device fraud, and computer fraud and abuse,
> in violation of Title 18 United States Code, Sections 1029 and 1030.

> 89.  Despite admitting to using a VPN to hack into the device of Americans on
> behalf of a foreign government, on Sept. 27, 2021 ExpressVPN released an official
> statement stating that "…Daniel fits into our mission as a company, past, present,
> and future."

[Doc. 59 at ¶¶ 86-89].  PIA contends that these allegations have "nothing whatsoever to do with

copyright infringement" or the breach of contract claim, [Doc. 71 at 17], and should be stricken as

immaterial, impertinent, and scandalous.   [*Id.* at 18].  Plaintiffs disagree, arguing that these

allegations support their assertion that ExpressVPN's users are "[e]mboldened" by ExpressVPN's

promises of privacy and are relevant to "Plaintiffs' allegation that ExpressVPN's employees

engage in the same conduct as its end users and directly infringe the Works."  [Doc. 77 at 13-14].

But as explained above, ExpressVPN is no longer a defendant in this case, and any alleged

conduct of ExpressVPN has no obvious bearing on the remaining claims in this case.  Indeed, Plaintiffs' arguments as to relevancy pertain solely to ExpressVPN, not PIA.  [*Id.* at 13-15].  The Court agrees that the criminal conduct of a non-party to this case is not pertinent to the instant matter, and "allegations that are immaterial, impertinent, or scandalous which only serve to confuse and inflame public opinion may be stricken under Rule 12(f)."  *Masters*, 2020 WL 9424371, at *3.  Finding these allegations improper under Rule 12(f), the Court will **GRANT** the Motion to Strike with respect to Paragraphs 86, 87, 88, and 89.

### 4.    Prior Trade Names Used by and Alleged Conduct of Kape Technologies

Finally, PIA requests that the Court strike Paragraph 48 of the Second Amended Complaint.  [Doc. 71 at 16].  Paragraph 48 states:  "[Non-party] Kape [Technologies PC] was previously known as Crossrider until it changed its name change in 2018 to disassociate from its prior business of distributing malware that infects users' devices to effectively hijack a browser session and insert advertisements when a partnered website is visited. . . ."  [Doc. 59 at ¶ 48].  PIA asserts that these allegations, "which are not even directed at PIA or any party to this proceeding[,] have no bearing on any of the causes of action and are completely immaterial and impertinent." [Doc. 71 at 16].  According to PIA, these "irrelevant allegations just falsely paint Kape—and, by association, PIA—as unethical," which will only serve to prejudice PIA.  [*Id.*].  Plaintiffs respond that the prior trade names used by Kape, as well as its purported conduct, are "highly relevant" to Plaintiffs' claims against PIA because (1) Plaintiffs allege that Kape owns PIA and that Kape and PIA are alter egos of the other; and (2) Kape's "history of distributing malware and its founder's tax evasion are consistent with Plaintiffs' allegations that Kape promotes [PIA's] services for piracy . . . by encouraging end users to install malware infected piracy apps, and that PIA maintains lawless business practices because it places the so-called freedom of the Internet above laws of the

United States and other nations." [Doc. 77 at 9].

Again, Plaintiffs do not meaningfully connect Paragraph 48 to any substantive portions of its claims. Kape's alleged "business of distributing malware" plainly has no connection to whether PIA engaged in copyright infringement of Plaintiffs' Works. *See McPherson v. Bachus & Schanker, LLC*, No. 10-cv-01768-CMA-KMT, 2011 WL 2415003, at *2 (D. Colo. June 10, 2011) (striking allegations of "assault or abuse of employees" or "questionable business practice" as irrelevant and scandalous where they were not relevant to the plaintiffs' FLTSA claims and unnecessarily cast the defendants in a poor light); *Holderness*, 2013 WL 618162, at *2 (striking allegations of the defendant's "unethical practices" where they had no connection to the plaintiff's age discrimination claim).

However, PIA does not explain why the reference to Kape's former use of the trade name "Crossrider" is in and of itself prejudicial or irrelevant to this case. *See* [Doc. 71]. Accordingly, the Motion to Strike will be **GRANTED in part** and **DENIED in part** with respect to Paragraph 48. Paragraph 48 is **STRICKEN** to the extent it alleges that Kape's 2018 name change was to "disassociate from its prior business of distributing malware that infects users' devices to effectively hijack a browser session and insert advertisements when a partnered website is visited." Having resolved the Motion to Strike, the Court turns to the Motion to Dismiss.

## II.   Motion to Dismiss

In the Motion to Dismiss, PIA first moves to dismiss the Second Amended Complaint in its entirety on the basis that the pleading often refers to the collective "Defendants" and employs "shotgun pleading" throughout. [Doc. 70 at 4-5]. Then, PIA argues that Plaintiffs fail to state a claim for direct copyright infringement, [*id.* at 5], vicarious liability for violations of the Digital

Millennium Copyright Act ("DMCA"), [*id.* at 11], or breach of contract, [*id.* at 16], and contends that each of these claims must be dismissed under Rule 12(b)(6), [*id.* at 1].

### A.    Collective Allegations and Shotgun Pleadings

PIA first argues that the entirety of Plaintiffs' Second Amended Complaint should be dismissed because the pleading "refers to 'Defendants' collectively, without specifying what acts by which defendant could provide factual underpinnings for the broad assertions pled." [*Id.* at 4]. PIA suggests that Plaintiffs' use of collective allegations is "rendered even more confusing by their use of 'shotgun pleading' in the [Second Amended Complaint]'s six counts, each of which re-alleges and incorporates by reference all previous paragraphs." [*Id.* at 4-5]. PIA contends that "many of the allegations in the [Second Amended Complaint] [are] insufficient to place PIA on notice of the specific claims against it." [*Id.* at 2].

A shotgun pleading is one in which "a party pleads several counts or causes of action, each of which incorporates by reference the entirety of its predecessors." *Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1242-43 (D. Colo. 2014). However, PIA cites no authority suggesting that shotgun allegations are an appropriate basis to dismiss a pleading. While "technically, it is inappropriate for a plaintiff to incorporate by reference all prior allegations into each of their claims, in this Court's experience, it is a practice that is almost universally employed by the attorneys who practice before this Court." *Swenson v. All. Moving & Storage LLC*, No. 21-cv-01968-CMA-STV, 2022 WL 1508506, at *6 (D. Colo. Apr. 26, 2022), *report and recommendation adopted*, 2022 WL 1500778 (D. Colo. May 12, 2022). This sort of technical violation does not warrant dismissal of a complaint "where, despite the overbroad incorporation of preceding allegations, the defendant is provided fair notice of the factual and legal basis for

each claim." *Id.* Here, the Court is satisfied that Plaintiffs' claims contain sufficient detail to put PIA on notice of the claims against it.

That the Second Amended Complaint often generally references a collective "Defendants" does not change this conclusion. The Second Amended Complaint contains numerous allegations setting out the wrongful conduct of PIA and its users specifically. *See, e.g.*, [Doc. 59 at ¶¶ 90, 124-25, 157-63, 252, 287, 292-93]. Moreover, the Court notes that the Second Amended Complaint names, in essence, only two Defendants,[5] and many of the allegations clearly refer to and apply equally to both PIA and ExpressVPN. *See, e.g.*, [*id.* at ¶¶ 70, 123, 131, 173, 193-94]; *see also Oliver v. Meow Wolf, Inc.*, No. CV 20-237 KK/SCY, 2020 WL 6939875, at *21 (D.N.M. Nov. 25, 2020) ("By referring to 'Defendants' collectively, Plaintiff plainly means to include both of the identified Defendants, i.e., Defendant MWI and Defendant Kadlubek, in the allegations supporting her copyright infringement and VARA claims."). The case cited by PIA in support of its argument is thus readily distinguishable from this matter. *See Jacobs v. Credit Suisse First Bos.*, No. 11-cv-00042-CMA-KLM, 2011 WL 4537007, at *2 (D. Colo. Sept. 30, 2011) (granting motion to dismiss where the complaint largely contained collective references to the 17 defendants and only mentioned the moving defendant in a singular factual averment). And to the extent that PIA is left with uncertainty with respect to specific allegations, the Amended Complaint provides sufficient notice and background for PIA to use to develop the factual record during discovery. Accordingly, the Court does not find dismissal warranted on this basis and instead turns to the Parties' substantive arguments.

---

[5] Plaintiffs allege that former defendants "ExpressVPN (BVI) and ExpressVPN (Isle of Man) are mere alter egos of each other" and are, accordingly, referenced "collectively as ExpressVPN." [Doc. 59 at ¶ 65].

**B.      Direct Copyright Infringement**

Next, PIA argues that Plaintiffs fail to state a claim for direct copyright infringement, which the Court construes as directed only toward Plaintiffs' Claim One.  [Doc. 70 at 5].  First, PIA contends that Plaintiffs must allege that the alleged copyright infringement was caused by a volitional act of PIA and that Plaintiffs have failed to do so.  [*Id.* at 7].  Second, it asserts that Plaintiffs have not plausibly alleged that Defendant "fixed" any copies of Plaintiffs' movies, which Defendant also contends is required to state a claim of infringement.  [*Id.* at 10].

**1.      Volitional Conduct**

According to PIA, "volitional conduct by the defendant is a required element" of a direct copyright infringement claim, and "every [C]ircuit court in which this issue has been addressed" has concluded the same.  [*Id.* at 5].  PIA maintains that Plaintiffs have failed to allege this requisite volitional conduct because the alleged infringement forming the basis of Plaintiff's claims is "initiated and completed by third-party end users, using third-party BitTorrent software and technology—not by PIA."  [*Id.* at 8].  In response, Plaintiffs note that the Tenth Circuit has not yet spoken on whether volitional conduct is a requisite element of this claim and argue that Supreme Court precedent "clearly sets forth there is no volitional requirement" to state a copyright-infringement claim.  [Doc. 79 at 17 (citing *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014))].  In any event, Plaintiffs assert that if volitional conduct is required, they have sufficiently alleged such conduct through their allegations of "unblocking."  [*Id.* at 15].

***Elements of a Direct Infringement Claim***.  "To state a claim for copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original."  *Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1299 (10th Cir. 2014) (quotation omitted).  The second element requires the Court to "consider two distinct

issues":  first, whether "as a factual matter, the defendant copied [the] plaintiff's work," and second, "whether the elements copied by the defendant are protected by copyright."  *Paycom Payroll, LLC v. Richison*, 758 F.3d 1198, 1204 (10th Cir. 2014) (quotations omitted).  PIA argues that "[t]o establish the second prong . . ., Plaintiffs must establish that the alleged direct infringement was proximately caused by PIA's volitional act."  [Doc. 70 at 5].

The Second, Fourth, Fifth, and Ninth Circuits have held that to succeed on a direct copyright infringement claim, the plaintiff must show "volitional conduct" by the defendant.  *See, e.g.*, *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008); *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550-51 (4th Cir. 2004); *BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 443-44 (5th Cir. 2017); *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017).  But "'volition' in this context does not really mean an 'act of willing or choosing' or an 'act of deciding.'"  *Giganews*, 847 F.3d at 666.  Indeed, copyright infringement is a strict liability tort.  *See* 3 Patry on Copyright § 9:5.  Rather, the volitional-conduct requirement "stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts."  *Giganews*, 847 F.3d at 666 (quotation omitted).  "As its name suggests, *direct* liability must be premised on conduct that can reasonably be described as the *direct* cause of the infringement."  *Id.* (quotation omitted and emphasis in original).  As explained by the Fourth Circuit, to establish direct liability for copyright infringement, "something more must be shown than mere ownership of a machine used by others to make illegal copies.  There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner."  *CoStar Grp.*, 373 F.3d at 550.

The Court is persuaded by this weight of authority and predicts that the Tenth Circuit would follow the other Circuit courts holding that causation is a requisite element of a copyright infringement claim, and to survive the Motion to Dismiss, Plaintiffs must adequately plead "volition conduct" by PIA, given the Circuit's acknowledgment that <u>direct</u> infringement necessarily requires that "<u>the defendant</u> copied [the] plaintiff's work." *Richison*, 758 F.3d at 1204 (emphasis added); *cf. CoStar Grp.*, 373 F.3d at 551 ("To conclude that these persons are copyright infringers simply because they are involved in the ownership, operation, or maintenance of a transmission facility that automatically records material—copyrighted or not—would miss the thrust of the protections afforded by the Copyright Act."). It thus stands to reason that to state— and eventually succeed on—a claim for direct copyright infringement, there must be some causal nexus between the named defendant and the alleged direct infringement.

The Court respectfully disagrees with Plaintiffs' contention that *Aereo* dictates differently. In *Aereo*, the Supreme Court considered whether Aereo "performed publicly" in violation of the Copyright Act. *See Aereo*, 573 U.S. at 435-36.[6] Aereo's services permitted its subscribers to watch broadcast television over the internet while the programs were being broadcast over the air, and its system was described as follows:

> First, when a subscriber wants to watch a show that is currently being broadcast, he visits Aereo's website and selects, from a list of the local programming, the show he wishes to see. Second, one of Aereo's servers selects an antenna, which it dedicates to the use of that subscriber (and that subscriber alone) for the duration of the selected show. . . . Third, rather than directly send the data to the subscriber, a server saves the data in a subscriber-specific folder on Aereo's hard drive. In other words, Aereo's system creates a subscriber-specific copy—that is, a

---

[6] Under the Act, to "perform" means, within the context of any audiovisual work, "to show its images in any sequence or to make the sounds accompanying it audible." 17 U.S.C. § 101. To perform publicly means "to transmit or otherwise communicate a performance . . . of the [copyrighted] work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times." *Id.*

"personal" copy—of the subscriber's program of choice.  Fourth, once several seconds of programming have been saved, Aereo's server begins to stream the saved copy of the show to the subscriber over the Internet.

*Id.* at 436-37.

The Supreme Court noted that while the Act "does not clearly indicate when an entity 'perform[s]'" versus when the entity "merely supplies equipment that allows others to do so," *id.* at 438-39, when the Act is read "in light of its purpose," Aereo "performed" under the Copyright Act.  *Id.* at 439.[7]  In so doing, the Court looked to the legislative history of the Copyright Act, and specifically, to the Act's 1976 amendments, which were intended to capture community antenna television ("CATV") providers—i.e., carriers of television programs—within the scope of the Act. *Id.* at 440-42.  Specifically, the Copyright Act was amended to include that to "'perform' an audiovisual work means 'to show its images in any sequence or to make the sounds accompanying it audible.'"  *Id.* at 441 (quoting 17 U.S.C. § 101).  "Under this new language, *both* the broadcaster *and* the viewer of a television program 'perform,' because they both show the program's images and make audible the program's sounds."  *Id.* (emphasis in original).  Moreover, the Act was amended to clarify that an entity performs publicly when it "transmit[s]" a performance to the public, *id.* (citing 17 U.S.C. § 101), which, according to the Supreme Court, "ma[de] clear that an entity that acts like a CATV system itself performs, even if when doing so, it simply enhances

---

[7] In their Response, Plaintiffs quote from *Aereo* as follows: "The Supreme Court concluded that 'when Aereo merely supplies equipment that allows others [to transmit copyright works,] the Act is unmistakable: An entity that engaged in activities like Aereo's performs." [Doc. 79 at 17-18 (quoting *Aereo*, 573 U.S. at 438-39) (alterations in original)].  This is an inaccurate recitation of the language—both in form and meaning—in *Aereo*.  The Supreme Court actually stated: "Considered alone, the language of the Act does not clearly indicate when an entity 'perform[s]' (or transmit[s]') and when it merely supplies equipment that allows others to do so.  But when read in light of its purpose, the Act is unmistakable:  An entity that engages in activities like Aereo's performs."  *Aereo*, 573 U.S. at 438-39 (alterations in original).  Thus, the actual wording in the *Aereo* opinion differs meaningfully from what Plaintiffs have included in their brief, and the actual language from *Aereo* does not support Plaintiffs' position.

viewers' ability to receive broadcast television signals." *Id.* at 442.  Given Aereo's "overwhelming

likeness" to cable companies, the Supreme Court concluded that Aereo—by selling a service that

allowed users to watch television programs and used its own equipment to do so—was "not simply

an equipment provider.  Rather, Aereo, and not just its subscribers, 'perform[s]' (or 'transmit[s]')."

*Id.*

Stated another way, the *Aereo* decision did not adopt or reject a volitional-conduct

requirement.  *See Giganews*, 847 F.3d at 668.  Indeed, courts across the country have rejected

Plaintiffs' argument here.  *See, e.g.*, *id.* at 667; *BWP Media*, 852 F.3d at 442 (agreeing that "the

volitional-conduct requirement is consistent with the *Aereo* majority opinion") (alteration marks

omitted); *Fox Broad. Co. v. DISH Network LLC*, No. CV 12-4529 DMG (SHX), 2015 WL

13655436, at *11 (C.D. Cal. Jan. 12, 2015) ("The *Aereo* majority's analysis can be reconciled with

the volitional-conduct requirement for direct infringement."); *see also BWP Media USA Inc. v.

Polyvore, Inc.*, 922 F.3d 42, 49 (2d Cir. 2019) (Walker, Jr., J., concurring).[8]

Turning to the Parties' Rule 12(b)(6) arguments, Defendant argues that Plaintiffs fail to

allege specific facts establishing volitional conduct on its part, instead asserting only "sweeping,

conclusory allegations of direct infringement by PIA . . ., merely repeating in one form or another

that [PIA] 'distribute[s]' or 'reproduce[s]' Plaintiffs' motion pictures from a certain IP address."

---

[8] Similarly, the Court is unpersuaded by Plaintiffs' reliance on *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 912 (D.C. Cir. 2018).  *See* [Doc. 79 at 18].  Plaintiffs' argument that the D.C. Circuit in *Spanski* "rejected" the logic of the volitional-conduct requirement is inaccurate, as the D.C. Circuit expressly declined to rule whether the volitional-conduct requirement exists for copyright infringement claims: "Our court has yet to decide whether to read such a volitional conduct or proximate cause requirement into the Copyright Act, and we need not do so today."  *Spanski*, 883 F.3d at 912.  Instead, the court concluded that the defendant, which as in *Aereo* used its own equipment to permit users to watch copyrighted television programs by transmitting content at the users' request, participated in "infringement under *Aereo*'s binding authority."  *Id.*

[Doc. 70 at 8].  PIA argues that Plaintiffs' allegations demonstrate only that PIA provides the "technical infrastructure through which transmissions selected by end users are sent"—not that PIA has any role in the content that is transmitted or has any volition in the process—and that the only specific allegations of infringement are directed to end users, not PIA.  [*Id.* at 8-10].  In response, Plaintiffs argue that "[t]o the extent 'volitional conduct' is required, [this requirement] is satisfied by Plaintiffs' allegation of PIA's 'unblocking.'"  [Doc. 79 at 15].[9]

   ***"Unblocking" Allegations***.  Plaintiffs do not direct the Court to any specific allegations in their Second Amended Complaint that they assert sufficiently allege PIA's volitional conduct.  *See* [*id.*].  The allegations of "unblocking" in the Second Amended Complaint are related to two types of alleged conduct:  streaming Works and downloading Works.  With respect to streaming, Plaintiffs allege that PIA "advertise[s] [its] VPN service for allowing [its] end users to bypass regional restrictions of streaming platforms to stream copies of copyright protected content[,] including Plaintiffs' Works from locations Plaintiffs have not authorized the platform to stream the Works."  [Doc. 59 at ¶ 123]; *see also* [*id.* at ¶¶ 124-25 (Plaintiffs alleging that PIA "advertises its VPN service for allowing [its] end users to 'unblock Netflix USA'" and states on its website that its VPN service "Puts An End To Geo-Restrictions On Your Favorite Content.")].

---

[9] Plaintiffs also argue that "PIA does not even argue that Plaintiffs failed to plead that it infringes their public performance and (non-BitTorrent) distribution rights" and that Defendant's arguments are limited to challenging Plaintiffs' file-sharing theory of infringement.  [Doc. 79 at 14].  Plaintiffs assert that file-sharing infringements "are not the only direct infringements pled," and Defendant has thus waived any argument related to infringement of Plaintiffs' right of public performance or other distribution rights.  [*Id.* at 14-15]; *see also* 17 U.S.C. § 106(1), (3), (6) (copyright infringement includes reproduction of copyrighted work, distribution of copyrighted work, or public performance of copyrighted work).  The Court is not persuaded by Plaintiffs' suggestion that Defendant's challenge is somehow limited to a theory of infringement based on "file-sharing transmissions."  *See* [Doc. 79 at 14].  Defendant plainly argues that Plaintiffs fail to state a claim of direct copyright infringement, *see* [Doc. 70 at 5], which necessarily encompasses all theories of infringement.  While the Court does not pass on the strength or detail of any of Defendant's arguments, the Court does not find them to be waived.

Furthermore, PIA "stated in a Reddit forum that it was working on a project to unblock Netflix," [*id.* at ¶ 126], and in 2019, PIA "announced that it had secured a means for its end users to access Netflix from its 'U.S., U.K. and Canada servers.'" [*Id.* at ¶ 127]. Finally, Plaintiffs assert that PIA "encourage[s] [its] end users outside of the United States to access and use their servers and IP addresses in the United States to violate geographical restrictions of unauthorized platforms and publicly perform and/or distribute copies of the plaintiffs' Works outside of the United States." [*Id.* at ¶ 373].

PIA argues that these allegations only assert that "PIA's service generally allows users to access Netflix," but do not "allege a volitional act by PIA that directly causes any infringement" because "Plaintiffs do not even allege any specific example of any PIA user—much less PIA itself—actually streaming one of Plaintiff[s'] movies from outside the United States." [Doc. 81 at 3 (emphasis omitted)]. The Court respectfully agrees. At best, Plaintiffs' allegations suggest that PIA advertises or represents that its users *can* "unblock" Netflix to circumvent the streaming service's geographic restrictions, [Doc. 59 at ¶¶ 123-30], and encourages its users to do so. [*Id.* at ¶ 373]. But Plaintiffs cite no authority demonstrating that, by encouraging or advertising its services, PIA has effectively engaged in "volitional conduct" in the copyright context, and the Court cannot conclude that these allegations are sufficient. *See Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1308 (S.D. Fla. 2011) (no allegations of volitional conduct where the complaint alleged that the defendant's website "*allow[ed]* users to upload and download copyrighted material" and "*encourage[d]* the massive infringement" but did not allege that the defendants "took direct, volitional steps to violate the plaintiffs'" rights) (emphasis added). "[T]he key to understanding the so-called 'volitional conduct' requirement is to equate it with the requirement of causation, not [the defendant's] intent." *Perfect 10, Inc. v. Giganews, Inc.*, No.

CV11–07098 AHM (SHx), 2013 WL 2109963, at *6 (C.D. Cal. 2013).  Here, the Second Amended Complaint does not contain any specific factual allegations establishing specific volitional conduct on the part of PIA that is directly linked to any specific infringement, *see generally* [Doc. 59], and thus, there are insufficient facts to state a claim of direct infringement against PIA on this theory: "*direct* liability must be premised on conduct that can reasonably be described as the *direct* cause of the infringement."  *Giganews*, 847 F.3d at 666 (quotation omitted).

In addition, Plaintiffs suggest there have been unauthorized downloads of their Works, arguing that "when PIA and its end users access PIA servers in the United States to download copies of Plaintiffs' Works from unauthorized regions outside of the United States using streaming platforms 'unblocked' by PIA, PIA directly infringes Plaintiffs' distribution rights."  [Doc. 79 at 15 (citing Doc. 59 at ¶¶ 379-85)].  Even assuming direct copyright infringement could be premised on such a theory, the Paragraphs cited by Plaintiffs do not set out facts supporting Plaintiffs' theory of relief; rather, they contain legal conclusions not entitled to the presumption of truth at this stage. *See, e.g.*, [Doc. 59 at ¶ 379 ("[PIA] imported, without the authority of Plaintiffs, copies of the Works that have been acquired outside the United States in violation of 17 U.S.C. § 602(a)(1).")]; *see also Iqbal*, 556 U.S. at 679.  It is not the Court's duty to comb through Plaintiffs' 447-Paragraph pleading to find facts supporting Plaintiffs' theory of relief.  *Barcikowski v. Sun Microsystems, Inc.*, 420 F. Supp. 2d 1163, 1179 (D. Colo. 2006); *cf. S.E.C. v. Thomas*, 965 F.2d 825, 827 (10th Cir. 1992).

Nevertheless, the Court notes that Plaintiffs allege in their pleading that two of PIA's Australian users downloaded and distributed copies of Plaintiffs' Works.  [Doc. 59 at ¶¶ 200, 203].  Plaintiffs appear to conclude that, based on these users' downloads and distribution of the Works, PIA *itself* has "exported a copy of the Work . . . and also imported a copy of the Work."  [*Id.*].  But

these allegations are unsupported by facts demonstrating that PIA engaged in any volitional conduct with respect to any "importing" or "exporting" of Plaintiffs' Works; rather, they suggest volitional conduct only on the part of PIA's users. *See, e.g.*, [*id.* at ¶ 200 ("Defendant PIA exported a copy of the Work to Australia *when [a user] downloaded a copy of the Work* and also imported a copy of the Work to United States from Australia *when [the user] distributed a copy of the Work*.") (emphasis added)]; *see also* [*id.* at ¶ 74 (Plaintiffs alleging that a VPN simply "provides access to the Internet.").  Plaintiffs direct the Court to no allegations in the Second Amended Complaint establishing that PIA's users' alleged distribution or downloading of the Works necessarily constitutes volitional conduct of PIA.  *See* [Doc. 79].  And even where Plaintiffs generally set forth the process by which BitTorrent users download and/or distribute Works, there are no allegations demonstrating that through this process, PIA too necessarily "imports" or "exports" the Work.  *See* [Doc. 59 at ¶¶ 142-76].[10]  It is Plaintiffs' burden to support or explain their theory of relief, and the Court cannot conclude that they have done so here.

   ***Allegations of PIA's Direct Distribution***.  In the alternative, Plaintiffs argue that they have sufficiently alleged direct infringement by PIA because they allege that "PIA engages in the same conduct as its end users and is thus liable for direct copyright infringement."  [Doc. 79 at 16; Doc. 59 at ¶ 90].  For example, Plaintiffs direct the Court to allegations that "Defendants and/or Defendants' end users distributed copies of the Plaintiffs' copyrighted Works identified by the Unique Hash Number."  [Doc. 59 at ¶ 185]; *see also* [*id.* at ¶¶ 186, 193-94].  Moreover, Plaintiffs

---

[10] At best, Plaintiffs allege that PIA's users "upload and download Plaintiffs' copyrighted work from IP addresses provided by [PIA]," and the "IP address used by the end users then becomes a link to the infringing copies of Plaintiffs' Works."  [Doc. 59 at ¶¶ 155-56].  But Plaintiffs do not explain, in the Second Amended Complaint nor their Response, how the provision of an IP address—which Plaintiffs allege permits the user anonymous internet usage, *see* [*id.* at ¶ 74]— constitutes the importation or exportation Plaintiffs' Works by PIA constituting direct infringement.  *See* [Doc. 59; Doc. 79].

state that the Second Amended Complaint provides "examples of open advocacy for piracy by PIA's employees such as Caleb Chen and Rick Falkvinge." [Doc. 79 at 16]; *see also* [Doc. 59 at ¶¶ 90-96 (alleging, for example, that Mr. Falkvinge founded a group "whose aim is to abolish intellectual property laws" and "began hosting [a] notorious piracy website . . . in 2010")].[11]

The Court is respectfully unpersuaded by Plaintiffs' argument. As a preliminary matter, the statement that PIA "engages in the same conduct as its end users" is nothing more than a "naked assertion[] devoid of further factual enhancement." *Jemaneh v. Univ. of Wyo.*, 82 F. Supp. 3d 1281, 1300 (D. Colo.), *aff'd*, 622 F. App'x 765 (10th Cir. 2015). Plaintiffs' allegations that PIA "and/or [its] end users" distributed copies of copyrighted works or that PIA "and [its] end users participated in a swarm . . . uploaded and downloading . . . Plaintiffs' Works," *see* [Doc. 59 at ¶¶ 173, 186], similarly lack the factual support necessary to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. More specifically, Plaintiffs have directed the Court to no factual allegations supporting Plaintiffs' suggestion that PIA *itself* has distributed, uploaded, or downloaded copyrighted Works. *See* [Doc. 79]; *Barcikowski*, 420 F. Supp. 2d at 1179. And finally, allegations related to PIA employees' purported "advocacy for piracy" does not suffice to allege any actual volitional conduct by PIA. Accordingly, the Court

---

[11] In their Response, Plaintiffs attempt to allege new facts in support of their claim. For example, Plaintiffs assert that "Mr. Falkvinge admits that he uses a VPN . . . while in Sweden to fake as if he is in the United States and access content from Pandora in violation of geographic restrictions." [Doc. 79 at 16]. This allegation is nowhere in the Second Amended Complaint, which Plaintiffs appear to acknowledge, suggesting that "Exhibit 2 can be considered in opposition to PIA's [Motion to Dismiss] without converting [the Motion] to a motion for summary judgment because it is merely a printout of the complete article referred to in paragraph 93 of the [Second Amended Complaint]." [*Id.* at 16 n.4]. Plaintiffs cite no authority in support of this argument. Because there are no references to Mr. Falkvinge's alleged uses of VPNs in the Second Amended Complaint, and because it is well-established that a plaintiff cannot amend its pleading by asserting new facts in response to a motion to dismiss, the Court declines to consider these new allegations here. *See, e.g.*, *Abdulina v. Eberl's Temp. Servs., Inc.*, 79 F. Supp. 3d 1201, 1206 (D. Colo. 2015).

cannot conclude that Plaintiffs have stated a claim for direct infringement against PIA.[12]   The Motion to Dismiss is therefore **GRANTED** with respect to Claim One, and Claim One is **DISMISSED without prejudice** under Rule 12(b)(6).[13]

### C.   The Digital Millennium Copyright Act

Plaintiffs' Claim Five asserts a claim for "[s]econdary [l]iability for DMCA [v]iolations." [Doc. 59 at 79].  Plaintiffs allege that PIA's end users have violated the DMCA, 17 U.S.C. § 1202, [*id.* at ¶ 425], and that PIA should be held secondarily liable for the DMCA violations of its end users.  [*Id.* at ¶ 426].

Section 1202(a) of the DMCA prohibits a person from "knowingly and with the intent to induce, enable, facilitate, or conceal infringement . . . distribut[ing] or import[ing] for distribution copyright management information that is false."  17 U.S.C. § 1202(a)(2).  Similarly, section 1202(b) states that

No person shall, without the authority of the copyright owner or the law—

. . .

(2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

(3) distribute, import for distribution, or publicly perform works [or] copies of works . . . knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,

knowing . . . that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

---

[12] As a result, the Court does not address Defendant's fixation argument.  *See* [Doc. 70 at 10].

[13] "[D]ismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile."  *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190 (10th Cir. 2014) (internal quotation marks omitted).  Futility of amendment is not an issue presently before the Court; thus, the Court dismisses Claim One without prejudice.

17 U.S.C. § 1202(b)(2)-(3).  Copyright management information, or "CMI," is defined in the DMCA in pertinent part as "[t]he title and other information identifying the work, including the information set forth on a notice of copyright," that is "conveyed in connection with copies or phonorecords of a work or performances or displays of a work." 17 U.S.C. § 1202(c)(1).  Plaintiffs assert that PIA 's end users—and, vicariously, PIA—have violated each of sections (a)(2), (b)(2), and (b)(3).  [Doc. 59 at ¶¶ 419-21, 426].

PIA challenges the sufficiency of Claim Five on three grounds.  First, PIA asserts that sections 1202(a) and 1202(b) each contain a "double scienter" requirement that requires the plaintiff to allege not only knowledge on the part of the defendant, but intentional conduct, as well. [Do. 70 at 11-12].  PIA argues that Plaintiffs "provide no specific factual allegations that could plausibly support these [scienter] elements" as to PIA.  [*Id.* at 13].  In the alternative, PIA argues that the Second Amended Complaint's allegations demonstrate that "the CMI was not actually even altered or deleted," and thus, an essential element of a claim under the CMI is missing from Plaintiffs' allegations.  [*Id.* at 14].  Finally, PIA suggests that vicarious liability is not applicable to claims arising under § 1202.  [*Id.* at 15].  The Court addresses each of these arguments below.

### 1.  Vicarious Liability Under § 1202

Because Defendant's third argument requires a threshold inquiry into the legal viability of Claim Five, the Court addresses this argument first.  PIA argues that § 1202 "does not provide for secondary liability of any type," arguing that "common law secondary liability principles applied to strict liability copyright infringement claims do not apply to the distinct statutory § 1202 claims."  [*Id.* at 15].  Specifically, PIA notes that, unlike copyright infringement, which is a strict-liability tort, § 1202 "requires both knowledge and intent, both as to alteration or distribution, and as to the fostering or inducement of future infringement in order for liability to apply."  [*Id.*].  It

follows, according to PIA, that holding a defendant vicariously liable for a § 1202 violation of a third party would "impose a lower scienter threshold for a secondary liability claim than exists for a direct liability claim under § 1202," which Defendant asserts would be inconsistent with the legislative intent of § 1202. [*Id.* at 15-16]. PIA does not cite any case law wherein a court ruled that a defendant could not be held vicariously liable for the violation of § 1202. *See* [*id.*].

Only a limited number of courts have analyzed whether the vicarious-liability principles applicable in the direct copyright infringement context equally apply to alleged violations of § 1202. Two decades ago, the Sixth Circuit concluded that they do. *See Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*, 345 F.3d 922, 925 (6th Cir. 2003) (concluding that it would be "inappropriate to permit summary judgment . . . based on the defendants' lack of actual knowledge of the removal of the copyright management information when they may be vicariously liable for its removal."). Under *Gordon*, a defendant may be vicariously liable for § 1202 violations where (1) the defendant "has the right and ability to supervise the infringing conduct" and (2) the defendant "has an obvious and direct financial interest in the infringement." *Id.* A small number of courts, including a court in the District of Colorado, have relied on *Gordon* in finding the same. *See, e.g.*, *Atlanta Photography, LLC v. Ian Marshall Realty, Inc.*, No. 1:13-cv-2330-AT, 2014 WL 11955391, at *4 (N.D. Ga. Mar. 7, 2014); *Rosenthal v. MPC Computers, LLC*, 493 F. Supp. 2d 182, 190 (D. Mass. 2007); *Stockart.com, LLC v. Engle*, No. 10-cv-00588-MSK-MEH, 2011 WL 10894610, at *9 (D. Colo. Feb. 18, 2011), *report and recommendation adopted*, [ECF No. 63].

Absent any supporting authority from Defendant, the Court declines to hold, at the pleading stage, that principles of vicarious liability are inapplicable to claims arising under § 1202. "Secondary liability is 'well established' in the copyright context." *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-cv-864, 2019 WL 4166864, at *13 (N.D. Ill. Sept. 3, 2019) (citing *Metro-*

*Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)).  "Despite the fact that the copyright statute does not include language expressly addressing secondary liability, 'vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another.'"  *Id.* (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984)).   On the other hand, courts have acknowledged that a violation of § 1202 is "an altogether different violation" than copyright infringement.  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 719 (9th Cir. 2004).  In any event, the Court simply notes that accepting Defendant's argument would shield an entity from liability based on their users' illegal conduct so long as the entity took a head-in-the-sand approach with respect to keeping informed of how its users engaged with its platform.  At this juncture, the Court declines to rule whether vicarious liability is available in the context of § 1202, reserving the issue for more developed briefing from the Parties, and assumes, without deciding, that Plaintiffs can bring vicarious liability claims under § 1202.

### 2.    Knowledge and Intent

Next, PIA argues that to sufficiently state a claim under Rule 12(b)(6), Plaintiffs "must plausibly allege that [PIA] possessed actual knowledge of the unauthorized change to the [CMI]" and must also allege that PIA distributed or imported the CMI with knowledge that it would induce, enable, facilitate, or conceal infringement.  [Doc. 70 at 12-13 (quotation and alteration marks omitted)].  PIA asserts that "beyond regurgitating the elements of a § 1202 claim against [PIA's] end users, Plaintiffs provide no specific factual allegations that could plausibly support th[e] elements" of a § 1202 claim against PIA.  [*Id.* at 13].  In support of its argument, PIA relies upon three cases:  *Stevens v. Corelogic, Inc.*, 899 F.3d 666 (9th Cir. 2018); *Brittney Gobble*

*Photography, LLC v. Sinclair Broad. Grp., Inc.*, No. CV SAG-18-03384, 2021 WL 5359671 (D. Md. Nov. 17, 2021); *and Sid Avery & Assocs., Inc. v. Pixels.com, LLC*, No. 18-cv-10232-CJC-JEMX, 2020 WL 6114918 (C.D. Cal. Aug. 18, 2020).  In their Response, Plaintiffs assert that PIA's argument is a veiled attempt "to import a double scienter [requirement] for *direct* DMCA violations to secondary liability and construct a *quadruple* scienter requirement for secondary liability."  [Doc. 79 at 21].  Plaintiffs suggest, but do not directly argue, that vicarious liability in the § 1202 context is available so long as the defendant (1) has the right and ability to supervise the infringing conduct and (2) the defendant has an obvious and direct financial interest in the infringing conduct.  [*Id.* at 20 (citing *Gordon*, 345 F.3d at 925-26)].

First, the Court is respectfully unpersuaded by PIA's reliance on non-binding cases, each of which was decided at the summary-judgment stage.  In each of the cases relied upon by PIA, the court concluded that the plaintiff had failed to submit sufficient *evidence* demonstrating the defendant's knowledge or intent, and did so in the context of *direct* liability claims under § 1202. *See Stevens*, 899 F.3d at 673 (concluding that "[t]he [plaintiffs] ha[d] not offered any evidence to satisfy that mental state requirement" where the plaintiffs relied on a "general possibility [of infringement] whenever CMI is removed"); *Brittney Gobble Photography*, 2021 WL 5359671, at *27 (after discrediting the plaintiff's evidence of knowledge, concluding that even if the plaintiff could show that the defendants distributed CMI knowing that the CMI had been removed or altered, the plaintiffs had "no evidence that would support a jury's finding that [the defendants] knew or had reasonable grounds to know that "such distribution [would] induce, enable, facilitate, or conceal an infringement.") (quoting 17 U.S.C. § 1202(b)); *Pixels.com*, 2020 WL 6114918, at *8 (rejecting argument that knowledge and intent to facilitate infringement could be inferred from

the defendant's possession of copyrighted material because the "inference [was] unreasonable and unsupported by any evidence in the record").

Plaintiffs need not prove their case at the pleading stage. *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 349 (4th Cir. 2005) ("[A] complaint need not make a case against a defendant or *forecast evidence* sufficient to prove an element of the claim. . . . It need only *allege* facts sufficient to *state* elements of the claim.") (quotations and citation omitted).  Indeed, Plaintiffs' burden at this stage is to allege a plausible claim for relief.  *Flowers v. Life Ins. Co. of N. Am.*, 781 F. Supp. 2d 1127, 1133 (D. Colo. 2011).  Thus, contrary to PIA's suggestion, Plaintiffs need not "prove a mental state" at this stage of the proceedings.

As with cases discussing vicarious liability in this context generally, there is little authority, if any, discussing the pleading requirements of a vicarious liability claim under § 1202.  To state a claim for direct liability under § 1202(a)(2), a plaintiff must allege (1) the distribution of false CMI; (2) the defendant knew the CMI was false; and (3) the defendant acted with the intent to induce, enable, facilitate, or conceal infringement.  *Penske Media Corp. v. Shutterstock, Inc.*, 548 F. Supp. 3d 370, 381 (S.D.N.Y. 2021).  Similarly, to state a direct liability claim under § 1202(b), a plaintiff must allege:

> (1) the existence of CMI in connection with a copyrighted work; and (2) that a defendant distributed works or copies of works; (3) while knowing that CMI has been removed or altered without authority of the copyright owner or the law; and (4) while knowing[] or having reasonable grounds to know that such distribution will induce, enable, facilitate, or conceal an infringement.

*Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 171 (2d Cir. 2020) (quotations and alteration marks omitted).

In *Gordon*, when concluding that vicarious liability is available arising out of violations of § 1202, the Sixth Circuit held that "*[r]egardless of the defendants' actual knowledge* of the

removal or alteration of the copyright information, a party may be held vicariously liable for the actions of others under certain circumstance[s] within the copyright context." *Gordon*, 345 F.3d at 925 (emphasis added). The Sixth Circuit thus determined that to succeed on a § 1202(b)(3) claim, the plaintiff "must prove that the defendants—*or those for whom they are vicariously liable*—possess actual knowledge of the unauthorized change to the copyright management information." *Id.* at 926 (emphasis added). Thus, it appears that under *Gordon*, vicarious liability exists when "(1) a defendant has the right and ability to supervise the infringing conduct and (2) the defendant has an obvious and direct financial interest in the infringement," *and* if the persons for whom the defendant is vicariously liable committed a direct violation of § 1202. *Id.* at 925-26.[14] Indeed, one district court has found allegations of vicarious liability under § 1202(b) sufficient where the allegations set forth (1) an underlying DMCA violation; (2) the defendant's right and ability to supervise the infringing conduct; and (3) the defendant's financial interest in the infringement. *See Millennium Funding, Inc. v. Doe*, No. 1:21-cv-282-RDA-TCB, 2021 WL 5217018, at *8 (E.D. Va. Oct. 15, 2021), *report and recommendation adopted in pertinent part sub nom. Millennium Funding, Inc. v. Wicked Tech. Ltd.*, 2022 WL 1156579 (E.D. Va. Jan. 20, 2022). This tracks the requirements for pleading vicarious copyright infringement generally. *See Shell v. Am. Fam. Rts. Ass'n*, 899 F. Supp. 2d 1035, 1058 (D. Colo. 2012).

The Court is cautioned, however, by the unsettled nature of the applicable law. The Court finds that this issue—the specific requirements of a vicarious liability claim under § 1202—is more

---

[14] PIA asserts that to state a claim under § 1202, "Plaintiffs must plausibly allege 'that the Defendants . . . possessed actual knowledge of the authorized change to the copyright management information . . . .'" [Doc. 70 at 12 (quoting *Gordon*, 345 F.3d at 926-27) (ellipses in original)]. Compared to the full text of the *Gordon* court's statement, set forth above, it is evident that what PIA omits with ellipses is a significant omission, materially altering the meaning of the *Gordon* court's statement.

appropriately definitively determined at a later stage in the proceedings.  *See Doe v. Univ. of Mississippi*, No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229, at *11 (S.D. Miss. July 24, 2018) ("Given the developing nature of the law, and the fact that other portions of this claim survive Defendants' Rule 12(b)(6) attack, the Court elects to carry this issue beyond the pleading stage."). The Court thus declines to order dismissal of Claim Five on this basis, but simply notes that assuming that vicarious liability is available for violations of § 1202, under *Gordon*, Plaintiff's allegations are sufficient to state a claim at this stage in the case.[15]

### 3. Alteration of CMI

Finally, PIA argues that Plaintiffs fail to allege that CMI was altered or deleted.  [Doc. 70 at 14].  According to PIA, Plaintiffs allege only that "initial seeders who made infringing moving files available via BitTorrent added certain short character strings at the end of the filename," but because "[t]he allegedly altered filenames still contain the original CMI, *i.e.*, the entire title for each movie," the CMI was not "altered" or "deleted" within the meaning of the statute.  [*Id.* at 13-14].  PIA cites no authority to support its argument that the addition of letters to a filename cannot amount to an alteration of CMI.  *See generally* [*id.*].

---

[15] Specifically, Plaintiffs allege that PIA's end users know that the CMI which includes additional letters is false and that the false or altered CMI would induce, enable, facilitate, or conceal infringement of Plaintiffs' Works, and that PIA's users induced or facilitated infringement by providing the altered CMI to others.  [Doc. 59 at ¶¶ 260-68].  Furthermore, Plaintiffs allege that PIA had knowledge of its users' actions; specifically, they assert that Plaintiffs' agent sent a notice of the conduct to the host provider of the users' IP addresses, and that upon information and belief, "the history provider forwarded these Notices to [PIA]," [*id.* at ¶¶ 271, 273-74], providing examples of specific instances of such notices.  *E.g.*, [*id.* at ¶¶ 276-78, 281].  Despite these notices, and despite its ability to control users' conduct by terminating or suspending user accounts, PIA did not take corrective action, instead "provid[ing] service to [its] end users despite knowledge that [its] end users were using the service to engage and facilitate massive piracy of copyright protected Works."  [*Id.* at ¶¶ 296, 299, 302].  Finally, Plaintiffs allege that PIA directly profits from its end users' streaming and distribution of Plaintiffs' Works.  [*Id.* at ¶ 320].

Plaintiffs allege in the Second Amended Complaint that "[a] legitimate file copy of the Work[s] includes [CMI] indicating the title."  [Doc. 59 at ¶ 254].  They assert that the "initial seeder of the infringing file copies of Plaintiff[s'] Work[s] added wording to the file titles to 'brand' the quality of piracy files he or she released [to] attract further traffic to his or her website." [*Id.* at ¶ 255].  For example, the initial seeders added "YTS" or "TGx" to the file names of Plaintiffs' Works.  [*Id.* at ¶¶ 256-57].  These words are not included in the file name "of legitimate copies or streams of the Plaintiffs' Works."  [*Id.* at ¶ 258].

"Few courts have meaningfully interpreted § 1202(c), but most courts that have considered the issue have found that the meaning of CMI is broad."  *Michael Grecco Prods., Inc. v. Alamy, Inc.*, 372 F. Supp. 3d 131, 137 (E.D.N.Y. 2019).  A small number of courts have concluded that a file name identifying a copyrighted work constitutes CMI.  *See Izmo, Inc. v. Roadster, Inc.*, No. 18-cv-06092-NC, 2019 WL 13210561, at *3 (N.D. Cal. Mar. 26, 2019); *Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261, 277 (5th Cir. 2020) ("Nothing in § 1202 indicates that a digital file name cannot be CMI.  Rather, a PDF's file name may be CMI if it is 'conveyed in connection with copies' of the underlying work and contains a 'title and other information identifying the work.'") (quoting 17 U.S.C. § 1202(c)(1)); *Millennium Funding*, 2021 WL 5217018, at *4, *7 (in default-judgment context, concluding that allegations that "YTS" was added to the file names of protected works were sufficient to allege altered CMI).  And while the DMCA does not define "alter," *see* 17 U.S.C. § 1202, "alter" is defined generally as "to cause to become different in some particular characteristic (as measure, dimension, course, arrangement, or inclination) without changing into something else."  *Alter*, Webster's Third New International Dictionary 63 (1993 ed.).  The Court concludes that by alleging that PIA's end users knowingly distributed Plaintiffs' Works with altered CMI, Plaintiffs have sufficiently alleged that the users

"caused [the file name] to become different in some particular characteristic . . . without changing [the file name] into something else" and has thus alleged alteration of the CMI.

Finally, PIA argues that Plaintiffs "do not allege any facts plausibly supporting how such trivial additions to the end of file names could, in themselves, induce, enable, facilitate, or conceal infringement." [Doc. 70 at 14]. The Court respectfully disagrees. Plaintiffs allege that the "YTS" or "TGx" designations "brand the quality of piracy files" and "attract further traffic to the [end users'] website[s]." [Doc. 59 at ¶¶ 255-57]. "Namely, [PIA's] end users knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent files originated to obtain unlicensed copies of the Work." [*Id.* at ¶ 266]. In other words, according to Plaintiffs, the addition of these letters encourages potential viewers of the infringed Works to view the infringed Works on the end users' websites, thus "induc[ing]," "enabl[ing]," or "facilitat[ing]" infringement. PIA does not explain why it believes such an inference is implausible. *See* [Doc. 70]. Accordingly, the Court is respectfully not persuaded by this argument. For these reasons, the Motion to Dismiss is respectfully **DENIED** to the extent it seeks dismissal of Claim Five.

### D.   Breach of Contract

Finally, PIA seeks dismissal of Plaintiff's breach of contract claim, Claim Six. [Doc. 70 at 16]. First, PIA asserts that a Hawaii choice-of-law and forum-selection provisions in the agreement preclude enforcement of the agreement in this Court. [*Id.* at 17]. In the alternative, PIA argues that (1) the Parties never reached a final agreement; and (2) the unsigned agreement is barred by Hawaii's statute of frauds. [*Id.*]. The Court addresses these arguments in turn.[16]

---

[16] Both Parties rely on documents outside of the pleadings in their briefing. Typically, the Court considers only the allegations contained within the four corners of the operative complaint in ruling on a motion to dismiss. *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013).

### 1.    Appropriate Forum

PIA argues that "the draft settlement agreement specifies that Hawaii law is to govern," which "alone should preclude Plaintiffs from seeking enforcement in this court." [Doc. 70 at 17]. But just two sentences later, PIA posits that the draft settlement agreement "is not binding." [*Id.*]. The Tenth Circuit has recognized "the logical flaw inherent in applying a contractual choice of law provision before determining whether the underlying contract is valid." *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 661 n.9 (10th Cir. 2006); *accord Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."). Given the Parties' dispute over the validity of the subject agreement, the Court declines to rely on the agreement's forum-selection clause and instead turns to the Parties' arguments concerning the existence of a binding agreement.

### 2.    The Existence of a Contract

Next, Defendant argues that Plaintiffs have not sufficiently alleged that a final, enforceable agreement exists so as to state a breach of contract claim, relying on Hawaii case law. [Doc. 70 at 17].  Plaintiffs respond that Colorado law applies to the issue of contract formation, arguing that under Colorado law, its allegations are sufficient to plead that the Parties entered into a binding settlement agreement.  [Doc. 79 at 8].

---

However, the Court may also consider documents outside of the pleadings if those documents are referenced in the complaint and central to the plaintiff's claims and if the parties do not dispute the documents' authenticity.  *Id.*  Here, the purported settlement agreement is referenced in the Second Amended Complaint, [Doc. 59 at ¶ 321], is central to Plaintiffs' breach of contract claim, and the Parties do not dispute the authenticity of the red-lined version attached to Defendant's Motion.  *See* [Doc. 70-2 at 4-13].  Moreover, emails exchanged between counsel are referenced in the operative pleading and form the basis of Plaintiffs' theory of contract formation, *see* [Doc. 59 at ¶¶ 329-32], and the Parties do not dispute the emails' authenticity.  *See* [Doc. 70; Doc. 79].  Accordingly, the Court may consider these documents in ruling on the Motion to Dismiss.

45

*Choice of Law*.   The Parties do not raise any express choice-of-law argument under the applicable principles.  *See generally* [Doc. 70; Doc. 79].[17]  As explained above, PIA relies upon the choice-of-law provision in the purported agreement in arguing that Hawaii law applies here. [Doc. 70 at 17].  Meanwhile, Plaintiffs argue that "[t]he law of the state where a contract is made on controlling on questions of the contract's validity," citing *Carlson v. Boryla*, 490 P.2d 700, 702 (Colo. App. 1971).  [Doc. 79 at 8].  But the *Carlson* rule is no longer good law following the Colorado Supreme Court's decision in *Wood Bros. Homes v. Walker Adjustment Bureau*, 601 P.2d 1369, 1372 (Colo. 1979), wherein the Colorado Supreme Court acknowledged that applying the law of the place of execution "ha[d] frequently proven unduly inflexible, leading to harsh and unjust results." *Wood Bros.*, 601 P.2d at 1372.  Accordingly, in *Wood Bros.*, the Colorado Supreme Court officially adopted the choice-of-law approach set forth in the Restatement (Second) of Conflict of Laws (the "Restatement") for contract actions, rendering the place-of-execution rule inapplicable.  *Id.*

A federal court sitting in diversity "must apply the substantive law of the state in which it sits, including the forum state's choice-of-law rules."  *Boyd Rosene & Assocs., Inc. v. Kan. Mun. Gas Agency*, 123 F.3d 1351, 1352-53 (10th Cir. 1997) (emphasis added).  "Thus, in a contract suit, . . . rather than automatically applying the law of the state providing the substantive contract law, a district court must first apply the forum state's choice-of-law rules."  *Id.* at 1353.  As set forth above, "Colorado has adopted the approach set forth in the Restatement (Second) of Conflict of Laws."  *Mountain States Adjustment v. Cooke*, 412 P.3d 819, 823 (Colo. App. 2016).   In the

---

[17] In its Reply, PIA argues that "under Colorado's choice of law principles and precedent, the Court must apply Hawaii law to Plaintiffs contract claim."  [Doc. 81 at 11].  Because this argument is raised for the first time in Defendants' Reply and could have been raised in the Motion, the Court considers it waived and does not substantively consider it.  *Eaton v. Pacheco*, 931 F.3d 1009, 1025 n.15 (10th Cir. 2019).

absence of an effective choice-of-law provision, Colorado courts apply the law of the state with the "most significant relationship" to the contract. *See* Restatement § 188; *Werden v. Allstate Ins. Co.*, 667 F. Supp. 2d 1238, 1242 (D. Colo. 2009).[18]   However, "a court need not choose which body of law to apply unless there is an outcome determinative conflict between the potentially applicable bodies of law." *Sec. Serv. Fed. Credit Union v. First Am. Mortg. Funding, LLC*, 861 F. Supp. 2d 1256, 1264 (D. Colo. 2012).

Neither Party identifies an outcome-determinative conflict between Hawaii and Colorado law with respect to the breach of contract claim. *See* [Doc. 70; Doc. 79].   To state a claim for breach of contract under Colorado law, a plaintiff must allege (1) the existence of a contract; (2) either performance by the plaintiff or some justification for the plaintiff's nonperformance; (3) the defendant failed to perform on the contract; and (4) the plaintiff was thereby damaged. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).   In Hawaii, a claimant must allege the same four elements, but must also allege that "the damage [to the plaintiff] was of the nature and extent reasonably foreseeable by defendants at the time the contract was entered into." *Calipjo v. Purdy*, 439 P.3d 218, 225 (Haw. 2019).   But here, PIA challenges only Plaintiffs' allegations as to

---

[18] "To determine which state has the most significant relationship, [the Court is] required to take into account the principles set forth in both Section 6 and Section 188" of the Restatement. *Sec. Serv. Fed. Credit Union v. First Am. Mortg. Funding, LLC*, 861 F. Supp. 2d 1256, 1267 (D. Colo. 2012).   Section 6 provides that courts should consider the following principles when determining which state's substantive law is applicable in a given case:   (1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability, and uniformity of result; and (7) ease in the determination and application of the law to be applied.   Restatement § 6(2).   And under § 188, courts consider the following contacts in weighing the § 6 factors:   (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the party.   Restatement § 188.

the first element—the existence of a contract—a necessary element under both Colorado and Hawaii law. *See* [Doc. 70 at 17-20]. Furthermore, the formation of a contract requires the same basic elements in each state: an offer, acceptance, and consideration. *Indus. Prod. Int'l, Inc. v. Emo Trans, Inc.*, 962 P.2d 983, 988 (Colo. App. 1997); *Douglass v. Pflueger Hawaii, Inc.*, 135 P.3d 129, 140 (Haw. 2006). And finally, both states require mutual assent, or a meeting of the minds, on all essential terms of the agreement in order to form a binding agreement. *See id.* at 134; *Agritrack, Inc. v. DeJohn Housemoving, Inc.*, 25 P.3d 1187, 1192 (Colo. 2001). Because there does not appear to be any outcome-determinative difference between Colorado and Hawaii law in this context, the Court need not determine the choice-of-law issue to assess whether Plaintiffs have sufficiently alleged the existence of a valid contract.

     ***The Sufficiency of Plaintiffs' Allegations***. PIA contends that Plaintiffs' breach of contract claim should be dismissed because the allegations in the Second Amended Complaint "do not demonstrate any unequivocal assent between the Parties, as would be required to find the existence of a binding contract." [Doc. 70 at 19]. Defendant first argues that "[i]n the context of settlement negotiations, an email between counsel indicating that the parties have generally reached an agreement on settlement terms is not a binding agreement," [*id.* at 18], asserting that the emails relied upon by Plaintiffs "clearly show[] that PIA's General Counsel did not expect there to be a final settlement agreement until after he circulated a clean final execution copy." [*Id.* at 18-19]. The Court is respectfully unpersuaded by this argument, which asks the Court to improperly draw inferences and construe allegations in favor of the moving party at the pleading stage.[19] *See Duran*

---

[19] The case relied upon by Defendant is distinguishable from this matter. *See Shorter v. G4S Secure Sols. (USA) Inc.*, No. CIV. 13-00470 JMS, 2014 WL 4216498 (D. Haw. Aug. 5, 2014), *report and recommendation adopted*, 2014 WL 4216998 (D. Haw. Aug. 25, 2014). In *Shorter*, the court issued a recommendation on a motion to enforce the settlement agreement—not a motion to dismiss—and thus considered evidence in its ruling. *Id.* at *1, *4. Here, the Court's role is only

*v. Carris*, 238 F.3d 1268, 1270 (10th Cir. 2001) (courts must accept well-pleaded allegations as true and construe them in favor of the non-moving party).   Indeed, in the email referenced by Defendant, Kape's counsel referenced "this final version" of the purported agreement.  [Doc. 70-2 at 2].   "To the extent the wording of the emails is ambiguous, this is a question of fact to be resolved by a jury, not by the court in the context of . . . a Rule 12(b)(6) motion." *Xyience Beverage Co., LLC v. Statewide Beverage Co., Inc.*, No. CV 15-02513 MMM (AJWx), 2015 WL 13313487, at *8 (C.D. Cal. Oct. 30, 2015).

The same is true with respect to Defendant's argument that "Plaintiffs' own pleadings show that the Parties continued to negotiate the terms of a possible settlement well past the September 1, 2021 date on which Plaintiffs claim such a final agreement was reached."  [Doc. 70 at 19]. Specifically, Defendant relies upon Plaintiffs' allegations concerning purported negotiations occurring after September 1, 2021.  *See* [*id.* (citing Doc. 59 at ¶¶ 336-42, 346)].   But Defendant overlooks that Plaintiffs specifically allege that these negotiations were in the context of a new, separate agreement:  "Despite Plaintiffs and PIA agreeing to the fully enforceable [a]greement, on [September] 10, 2021 the general counsel for PIA sent a new proposed agreement."  [Doc. 59 at ¶ 336]; *see also* [*id.* at ¶¶ 337, 344-49 (consistently referring to the second agreement as a "new proposed agreement")].   The Court must take these well-pleaded allegations as true at this stage. *Casanova*, 595 F.3d at 1124.

---

to assess the sufficiency of Plaintiffs' allegations.   Moreover, in *Shorter*, the parties had "repeated[ly] use[d] . . . the phrase 'conditional settlement' that was 'pending execution' of a written settlement agreement," which the court found "indicate[d] an intent that the parties would only be bound if any when the written agreement was executed."  *Id.* at *4.  Defendant directs the Court to no similar allegations in the Second Amended Complaint.  Thus, *Shorter* does not alter this Court's analysis here.

In their Second Amended Complaint, Plaintiffs allege that on September 1, 2021, PIA's general counsel, who negotiated the agreement and had the authority to bind PIA, sent an email to Plaintiffs' counsel stating, "We are sending the approved version of the final settlement agreement after [Kape's general counsel] sent her feedback and I made a couple of small revisions." [Doc. 59 at ¶¶ 322-24, 329]. Plaintiffs' counsel replied with a revised version, [*id.* at ¶ 330], and then PIA's general counsel "stated that he was revising [the agreement] to make the signing party [the CFO of PIA and Kape] rather than himself and sending over for his signature." [*Id.* at ¶ 331]. Plaintiffs' counsel replied, "This is fine." [*Id.* at ¶ 332]. Plaintiffs posit that through this exchange, the Parties entered into a binding settlement agreement. [*Id.* at ¶¶ 321, 334].

"A contract implied in fact arises from the parties' conduct that evidences a mutual intention to enter into a contract, and such a contract has the same legal effect as an express contract." *Winter v. Indus. Claim Appeals Off.*, 321 P.3d 609, 614 (Colo. App. 2013); *see also Kemp v. State of Hawai'i Child Support Enf't Agency*, 141 P.3d 1014, 1038 (Haw. 2006) ("The essential element of an implied contract that . . . is an apparent mutual intent to form a contract" that is "implied from the actions of the parties." (emphasis omitted)). Here, the Court concludes that Plaintiffs' allegations are sufficient to allege the Parties' respective counsel's mutual intent to enter into the settlement agreement and are thus sufficient to allege that an implied-in-fact contract was formed in this exchange. Insofar as Defendant suggests that it did not intend to enter into a contract during the September 1, 2021 email exchange, this argument is more appropriately raised at a later stage in the proceedings. *Xyience Beverage Co.*, 2015 WL 13313487, at *8. Indeed, whether an offer has been accepted or a contract has been formed are typically questions of fact reserved for the factfinder. *Scoular Co. v. Denney*, 151 P.3d 615, 620 (Colo. App. 2006); *Mednick v. Davey*, 959 P.2d 439, 448 (Haw. Ct. App. 1998). Having concluded that Plaintiffs' *allegations*

are sufficient to plausibly allege contract formation, the Court finds that dismissal of Claim Six is not warranted on this basis.[20]

### 3.   Statute of Frauds

Finally, PIA argues that even if the Parties did enter into a binding agreement, the agreement is unenforceable "because it violates the applicable statute of frauds." [Doc. 70 at 20]. In so doing, PIA relies upon Hawaii's statute of frauds, which provides that "[n]o action shall be brought and maintained . . . upon any agreement that is not to be performed within one year from the making thereof . . . unless the . . . agreement . . . is in writing, and is signed by the party to be charged therewith." Haw. Rev. Stat. § 656-1(5). PIA maintains that because the settlement agreement could not be fully performed within one year[21] and was not signed by the Parties, it is barred by this statute. [Doc. 70 at 21]. Plaintiffs first respond that "Colorado's statute of frauds applies here just as Colorado law applies to determining whether a valid agreement exists," and "[u]nder Colorado's statute of frauds, the agreement 'need not have been in signed written form.'" [Doc. 79 at 10 (quoting *Carlson*, 490 P.2d at 702)].

***Choice of Law***. Contrary to Plaintiffs' argument, the Court can discern no outcome-determinative conflict of law here that requires a choice-of-law analysis. Like Hawaii, Colorado law provides that "[e]very agreement that by the terms is not to be performed within one year after

---

[20] The Court is also respectfully unpersuaded by PIA's argument that there was no binding agreement because on September 9, 2021, Plaintiffs' counsel sent an email to PIA's counsel stating that he "would like to finalize the agreement with PIA so this case can be closed." [Doc. 70 at 19-20]. Plaintiffs suggest in their Response that counsel was "clearly referring to getting the executed copies and payment so that the notice of dismissal could be filed." [Doc. 79 at 10]. Again, the Court must draw all reasonable inferences in Plaintiffs' favor, and does not find this purported email fatal to Plaintiffs' argument that a binding agreement was formed on September 1, 2021.

[21] The agreement provides that Plaintiffs "agree not to file any claims for inducement of copyright infringement, [or] indirect copyright infringement . . . against PIA for a single ten (10) year term starting from the Effective Date" of the agreement. [Doc. 66 at § 10].

the making thereof" is "void, unless such agreement or some note or memorandum thereof is in writing and subscribed by the party charged therewith."  Colo. Rev. Stat. § 38-10-112(1)(a).[22] Accordingly, the Court need not make a choice-of-law determination here.

*The Statute of Frauds*.  The Federal Rules of Civil Procedure recognize the application of the statute of frauds as an affirmative defense.  *See* Fed. R. Civ. P. 8(c)(1).  "Rule 12(b)(6) motions . . . are intended 'to test the sufficiency of the allegations within the four corners of the complaint.'" *Corum Real Est. Grp., Inc. v. Blackrock Realty Advisors, Inc.*, No. 09-cv-01680-DME-MEH, 2010 WL 1957226, at *3 (D. Colo. May 14, 2010) (quoting *Issa v. Comp USA*, 354 F.3d 1174, 1177 (10th Cir. 2003)).  However, "[d]ismissal of a claim under Rule 12(b)(6) on the basis of an affirmative defense" is proper *only* "where that defense is <u>clear</u> from the face of the Complaint." *VanLandingham v. Grand Junction Reg'l Airport Auth.*, 46 F. Supp. 3d 1119, 1124 (D. Colo. 2014), aff'd, 603 F. App'x 657 (10th Cir. 2015) (emphasis added); *McDavid Bros. Aviation v. Bd. of Cnty. Comm'rs of Pitkin Cnty.*, No. 84-cv-01435, 1984 WL 1447, at *2 (D. Colo. Sept. 13, 1984).

The Court cannot conclude that it is *clear* from the face of the Second Amended Complaint that there is no "writing" sufficient to satisfy the statute of frauds here.  Plaintiffs argue in their Response that PIA counsel's email signature constitutes a "memorandum or note thereof" that is "in writing" and signed by the party to be charged.  *See* [Doc. 79 at 13].  One court in this District

---

[22] *Carlson* does not support Plaintiffs' argument.  In *Carlson*, the court noted a conflict between Colorado and California law, as California law required that an oral authorization to enter into a contract "would have to be evidenced by a written document signed by" the other parties to be charged.  *Carlson*, 490 P.2d at 702; *see also* Cal. Civ. Code § 2309 ("An oral authorization is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing.").  But under Colorado law, this authorization "need not have been in signed written form."  *Carlson*, 490 P.2d at 702.  *Carlson* did not discuss nor eliminate the requirement of a signed writing for contracts with a performance duration of greater than one year.  *See generally id.*

has denied a motion to dismiss under Rule 12(b)(6) upon concluding that "the multiple emails to which the amended complaint refers may serve to satisfy the writing requirement under the credit agreement statute of frauds." *PayoutOne v. Coral Mortg. Bankers*, 602 F. Supp. 2d 1219, 1226 (D. Colo. 2009); *cf. Buckles Mgmt., LLC v. InvestorDigs, LLC*, 728 F. Supp. 2d 1145, 1150 (D. Colo. 2010) ("I agree that under Colorado law an email exchange may satisfy a statute of frauds writing requirement."). While the Court could locate no similar authority under Hawaii law, other state courts have similarly concluded that a signed email may constitute a "writing" for purposes of a statute of frauds. *See, e.g.*, *Agosta v. Fast Sys. Corp.*, 136 A.D. 3d 694, 695 (N.Y. App. Div. 2016) ("An e-mail sent by a party, under which the sending party's name is typed, can constitute a signed writing for the purposes of the statute of frauds") (alterations omitted); *MEMC Elec. Materials, Inc. v. BP Solar Int'l, Inc.*, 9 A.3d 508, 521 (Md. Ct. Spec. App. 2010) ("[P]rinted e-mails constitute a sufficient writing under the Statute [of Frauds] . . . [and] if so intended, a typed name is a sufficient signature as an agent of the party against whom enforcement is sought."); *McClare v. Rocha*, 86 A.3d 22, 27 (Me. 2014) ("An email or other electronic record can constitute a signed writing based on the historically broad interpretation of the term 'writing' in the statute of frauds."). In other words, a signed email "may be a sufficient writing to satisfy the statute of frauds," which precludes dismissal of Plaintiffs' claim on this basis. *McDavid Bros.*, 1984 WL 1447, at *2.

For this reason, the Court cannot conclude that Defendant's statute-of-frauds affirmative defense is <u>clearly</u> successful based on the face of the Second Amended Complaint and declines to dismiss the breach of contract claim on this basis.[23] The Motion to Dismiss is respectfully **DENIED** insofar as it seeks to dismiss the breach of contract claim under Rule 12(b)(6).

---

[23] Accordingly, the Court does not address Defendant's part-performance argument, *see* [Doc. 70

## CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)    Defendant Private Internet Access, Inc.'s Motion to Strike [Doc. 71] is **GRANTED in part** and **DENIED in part** as set forth in this Order;

(2)    Paragraphs 77, 78, 79, 80, 81, 82, 83, 84, 86, 87, 88, 89, 91, and 92 in the Second Amended Complaint are **STRICKEN** under Rule 12(f);

(3)    Paragraph 48 in the Second Amended Complaint is **STRICKEN in part** under Rule 12(f);

(4)    On or before **October 17, 2022**, Plaintiffs **SHALL FILE** an amended pleading which omits the stricken Paragraphs;

(5)    Defendant Private Internet Access, Inc.'s Motion to Dismiss [Doc. 70] is **GRANTED in part** and **DENIED in part** as set forth in this Order;

(6)    Plaintiffs' Claim One is **DISMISSED without prejudice** under Rule 12(b)(6); and

(7)    Within **seven days** of the entry of this Order, counsel for Plaintiffs and Defendant shall **JOINTLY** contact the chambers of Magistrate Judge S. Kato Crews to set a Scheduling Conference in this matter.

DATED:  October 13, 2022          BY THE COURT:

                                                 Nina Y. Wang
                                                 United States District Judge

---

at 22], or Plaintiffs' severance argument. *See* [Doc. 79 at 12].